# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

LINWOOD DOUGLAS THORNE,

Defendant.

Criminal Action No. 18-389 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The defendant, Linwood Douglas Thorne, is charged in six counts with multiple firearm and narcotics offenses, including possession with intent to distribute one kilogram or more of heroin and detectable amounts of fentanyl and marijuana, and conspiracy to distribute those illegal drugs, in violation of 18 U.S.C. §§ 924(c)(1) and 922(g)(1), and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(C), 841(b)(1)(D), and 846. *See* Superseding Indictment (Oct. 23, 2019), ECF No. 28. In advance of trial, which is scheduled to begin on April 13, 2020, *see* Minute Entry (Oct. 31, 2019), the government has noticed its intent to use the defendant's prior federal felony conviction, in 1999, for conspiracy and possession with intent to distribute cocaine base, for purposes of proving knowledge, intent, and opportunity pursuant to Federal Rule of Evidence 404(b)(2), and for purposes of impeachment pursuant to Federal Rule of Evidence 609, should the defendant choose to testify, *see* Gov't's Mot. Regarding Rule 404(b) and 609 ("Gov't's Mot. I") at 1, ECF No. 34. Invoking *United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016), which held that a decade-old possession with intent to distribute Phencyclidine ("PCP") conviction was inadmissible to show knowledge and intent at Sheffield's trial for the same crime involving the same illegal narcotic, *id.* at 307–08, the defendant has moved to

1

exclude the prior conviction evidence, Def.'s Mot. *In Limine* Regarding 404(b) and 609 Admissibility ("Def.'s MIL") at 2, ECF No. 37. He argues that, under *Sheffield*'s teaching, because his prior "conviction and conduct occurred more than 20 years before the start of the conspiracy in this case," the probative value of this prior conviction cannot substantially outweigh the risk of unfair prejudice under Rule 403. *See id.* at 3; *see also* FED. R. EVID. 403.

Divining whether the split panel decision in *Sheffield* has shifted the D.C. Circuit's rules for the admissibility of older prior convictions under Rules 403 and 404(b) is a challenge. The defendant posits that *Sheffield* imposed a bright line excluding all convictions older than a decade, regardless of the conviction's probative value and notwithstanding the lack of textual support in Rules 403 and 404(b) for such a *per se* staleness limitation. *See infra*, Section III.B.2. Such a limitation for admissibility of prior convictions under Rule 404(b) would reflect a more stringent admissibility standard even than that set out under the more protective regime in Rule 609, which governs admission of prior criminal convictions for impeachment purposes. This challenge is only compounded by the difficulty of discerning *Sheffield*'s import as to the proof necessary to support the admissibility of any prior conviction for an appropriate purpose under Rule 404(b). *See infra*, Section III.C.2.

For the reasons discussed below, evidence of the defendant's prior conviction is admissible under Rules 404(b) and 403, but the fulsome trial transcripts underlying the prior conviction proffered by the government must be excluded under Rule 403 and the D.C. Circuit's caution about *Sheffield* in *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018). Further, the fact of the prior conviction is admissible for purposes of impeachment, should the defendant testify.

Also pending is the defendant's request to exclude evidence of money laundering, *see* Def.'s Reply to Gov't's Supplemental 404(b) Briefing Related to Money Laundering ("Def.'s Reply II") at 1, ECF No. 66, which the government has noticed its intent to introduce at trial pursuant to Rule 404(b), *see* Gov't's Supplemental Mot. Regarding Money Laundering Evidence Pursuant to Rule 404(b) ("Gov't's Mot. II"), ECF No. 62. For the reasons explained, the money laundering evidence is inadmissible in the government's direct case.

I.      **BACKGROUND**

Background on the pending charges against the defendant is set out below to inform the analysis of the admissibility of the defendant's prior narcotics trafficking conviction and the government's proffered money laundering evidence.

The government describes as follows the events that led to law enforcement's identification of the defendant as the supplier of heroin to an individual, known as Suspect-1, who made four separate sales of guns and illegal narcotics to an undercover agent ("UC") in August and November 2018. *See* Gov't's Mot. I at 1, 3.[1] Suspect-1 made his first two sales, of guns, ammunition, and marijuana, to the UC in August. *Id*. at 4. At the time, Suspect-1 also told the UC that he had a heroin supplier willing to sell kilogram-quantities of heroin. *Id.* Later, on September 24, 2018, Suspect-1 told the UC that he "believed his supplier to be a millionaire who owned a mechanic shop, an auto-body shop, and a small car dealership." *Id*. at 5. During conversations in October 2018, Suspect-1 discussed the terms of a heroin transaction with the UC, referring to his heroin supplier as "OG," "Doug" or "Uncle D." *Id*. at 6 & n.3 (noting that Douglas is the defendant's middle name). On October 18, 2018, Suspect-1 informed the UC that

---

[1]      Suspect-1 is currently charged with two counts of unlawful distribution of heroin and two counts of firearm possession in a pending case. *See* Indictment, *United States v. Elbakkoush*, 18-cr-387 (BAH) (D.D.C. Dec. 20, 2018), ECF No. 4.

he had been unable "to speak to 'OG' because 'OG' went on vacation with his significant other to Cancun, Mexico for a week." *Id*. at 6. Law enforcement subsequently confirmed, consistent with Suspect-1's statement, that the defendant had traveled to Mexico on or about October 16, 2018. *Id.* at 8.

In November 2018, according to the government, the UC completed two controlled purchases of heroin supplied by the defendant. On November 1, 2018, the UC bought 131 grams of heroin from Suspect-1 for $10,800 at a Wendy's parking lot in Northeast Washington, D.C. *Id.* at 7. Law enforcement tracking of incoming and outgoing calls on Suspect-1's phone prior to and during this transaction revealed that Suspect-1's supplier was associated with a phone number listed to Dou Perfect, an auto body repair shop located in Clinton, Maryland. *Id.*

In the hour leading up to the second controlled purchase, on November 29, 2018, law enforcement conducting surveillance observed the defendant leave Dou Perfect in a Jeep Grand Cherokee and then watched the defendant and Suspect-1 interact in the parking lots of a Hip Hop Fish and Chicken and of another restaurant, Mid-Atlantic Crab and Seafood, in Clinton, Maryland. *Id.* at 10. Afterward, the defendant was seen returning to Dou Perfect. *Id.* Suspect-1 drove immediately from Clinton to a pre-arranged meeting with the UC in Southeast Washington, D.C., at which meeting the UC paid Suspect-1 $10,300 for handguns and 129 grams of heroin. *Id.*

After these two controlled purchases, on December 5, 2018, the UC spoke to Suspect-1 about purchasing one kilogram of heroin from "OG." *Id*. at 11. While discussing this deal, Suspect-1 reported that "OG" did not want to meet with the UC until "OG" had "establish[ed] a relationship with the UC with respect to large quantities of heroin." *Id*. Also in December, law

enforcement observed the defendant leaving 4215 Foote Street, a duplex residence in Northeast Washington, D.C., in the same Jeep Grand Cherokee he had driven November 29. *Id.*

Dou Perfect and the Foote Street location were searched pursuant to search warrants on December 19, 2018. *Id.* at 12. At Dou Perfect, law enforcement seized mail, ammunition, two laptops, and two cars — a GMC Sierra K1500 Denali and a Lexus RX 350. *Id.* No customer invoices or work orders for auto body work, nor any wage records reflecting that Dou Perfect had employees were found in the search. *Id.* at 23. At the Foote Street location, from the main bedroom, law enforcement seized: (1) a Black Stanley tool chest containing almost 44 kilograms of heroin, some laced with fentanyl, *id.* at 12–14; (2) 50 pounds of marijuana in large, opaque bags, *id.* at 14; (3) clear and colored baggies, *id.* at 13–14; and (3) six firearms, *id.* at 13, 15. From the living room, law enforcement seized two more tool boxes, one containing distribution paraphernalia. *Id.* at 14. Outside, a Maserati sedan was seized. *Id.*

According to Witness-1, the defendant's girlfriend, who owns the Foote Street duplex and who lived there with her 11 year-old daughter and 18 year-old son, the defendant had resided at 4215 Foote Street for the year or two prior to his arrest. *Id.* at 15. In a video-taped interview with law enforcement, *id*. at 15 n.5, Witness-1 denied having access to the bags and tool boxes seized at her apartment and said those items belonged to the defendant, *id.* at 15. She provided a firearm registration card confirming her right to possess one of the firearms, a pink Walther P22 firearm found underneath a pillow on the main bedroom's bed but denied any knowledge of the other five other firearms, which were found inside bags. *Id.*

The defendant was initially indicted on two drug and gun charges on December 20, 2018. *See* Indictment (Dec. 20, 2018), ECF No. 1. While the indictment was under seal, on January 3,

2019, the defendant was apprehended at an apartment in Baltimore. Gov't Mot. I at 16.[2] The superseding indictment, issued on October 23, 2019, charges the defendant with the following six counts: (1) unlawful possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i); (2) using, carrying, and possessing a firearm during a drug trafficking offense under 18 U.S.C. § 924(c)(1); (3) unlawful possession of a firearm and ammunition by a person convicted of a felony, in violation of 18 U.S.C. § 922(g)(1); (4) unlawful possession with intent to distribute marijuana, *see* 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); (5) unlawful possession with intent to distribute fentanyl, *see id.* §§ 841(a)(1) and 841(b)(1)(C); and (6) conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, marijuana, and fentanyl, in violation of 21 U.S.C. § 846. *See* Superseding Indictment at 1–4.

Following a hearing regarding various pretrial motions, held on December 12, 2019, and the parties' supplemental filings on the pending motions *in limine*, completed on December 23, 2019, the issues of admissibility of the defendant's prior conviction, under Rules 404(b) and 609, and of the alleged money laundering, under Rule 404(b), are now ripe for resolution.[3]

---

[2]     Following execution of the search warrants, two different attorneys contacted law enforcement to arrange for the defendant's safe surrender, and although the defendant did not surrender, one of those attorneys provided the defendant's telephone number, which ultimately led law enforcement to the location in Baltimore, Maryland where he was arrested. Gov't Mot. at 16. The defendant's motion to exclude any evidence about these counsel contacts on the defendant's behalf, *see* Def.'s Motion *in Limine*, ECF No. 45, was denied orally at the motions hearing, *see* Minute Entry (Dec. 12, 2019).

[3]     At the hearing, seven motions — three motions to suppress, a motion *in limine*, a motion to preserve rough notes, a motion to decide co-conspirator statements, and a motion to exclude expert narcotics testimony — were resolved orally. *See* Minute Entry (Dec. 12, 2019). Judgment was reserved on: (1) the defendant's motion *in limine* regarding 404(b) and 609, ECF No. 37; *see also* Gov't Mot. I; (2) the defendant's motion to exclude the testimony of the government's money laundering expert, *see* Def.'s Opp'n to Gov't's *In Limine* Notice to Admit Testimony of Narcotics Expert and Money Laundering Expert ("Def.'s Expert MIL") at 2, ECF No. 38; (3) the defendant's motion to exclude DNA evidence, ECF No. 47; and (4) the defendant's motion to exclude the expert testimony of a cell cite expert, ECF No. 46. The first two motions are resolved in this Memorandum Opinion; the third motion to exclude DNA evidence has since been denied as moot in light of a stipulation by the parties, *see* Minute Order (Jan. 7, 2020), and the last outstanding motion regarding the government's cell site expert is not yet ripe for review due to the parties' filing of supplemental briefing, *see* Min. Order (Dec. 12, 2019).

## II.     LEGAL STANDARD

The Supreme Court has recognized that "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also id.* at 40 n.2 (defining motion *in limine* "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered"); *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (noting inherent "power of a judge to hear a motion *in limine*").  Indeed, Rule 103(d) of the Federal Rules of Evidence mandates that the court must, to the extent practicable, conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.  FED. R. EVID. 103(d).

Pretrial motions *in limine* are an important mechanism to effectuate this goal of insulating the jury from inadmissible evidence and also further the general purpose of the rules to administer the proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination."  FED. R. EVID. 102; *see Brodit v. Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003) (noting that motions *in limine* "allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury"); 21 Charles Alan Wright & Kenneth W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5042 (2d ed. 2005) (noting that "the motion in limine . . . still remains a favorite method of the writers for satisfying Rule 103(c)").  Moreover, "[a] pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations."  *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

## III.     DISCUSSION

Following review of the legal principles guiding application of Rules 403, 404(b) and 609, the evidence proffered by the government for admission at trial under these rules is

considered, starting with the money laundering evidence and then turning to the defendant's prior narcotics conviction.

### A. Overview of Relevant Evidentiary Rules

#### 1. Rule 404(b)

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," FED. R. EVID. 404(b)(1), but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," *id.* 404(b)(2). This rule codifies the common law tradition of "disallow[ing] resort by the prosecution to" propensity evidence — that is, "evidence of a defendant's evil character to establish a probability of his guilt." *Michelson v. United States*, 335 U.S. 469, 475 (1948). Such "propensity evidence is relevant," but "the risk that a jury will convict for crimes other than those charged — or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment — creates a prejudicial effect that outweighs ordinary relevance." *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)). "[S]o long as the evidence is not offered *solely* to prove character," however, "*any* purpose for which bad-acts evidence is introduced is a proper" purpose under Rule 404(b). *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990); *see also, e.g.*, *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994) (stating that evidence is admissible under the rule as long as it is "probative of some material issue other than character" or propensity). Put differently, "[o]nly one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to

have committed the act in question." *Miller*, 895 F.2d at 1436 (quoting 2 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 404[8] at 404–52 (1989)).[4]

### 2. *Rule 403*

Relevant evidence that is admissible under Rule 404(b) may nevertheless be excludable under Rule 403 because "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403; *Old Chief*, 519 U.S. at 182 ("[E]vidence of a prior conviction is subject to analysis under Rule 403 for relative probative value and for prejudicial risk of misuse as propensity evidence."). Critically, the test focuses on "unfair prejudice," or prejudice that is "compelling or unique," *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995) (quoting *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992)), or has "an undue tendency to suggest decision on an improper basis," *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting FED. R. EVID. 403, Advisory Committee Notes, 1972 Proposed Rules).

---

[4]　Some in the academy have described "a war raging over the admissibility of the prior bad acts of criminal defendants in federal trials," Daniel J. Capra & Liesa L. Richter, *Character Assassination: Amending Federal Rule of Evidence 404(B) to Protect Criminal Defendants*, 118 COLUM. L. REV. 769, 769 (2018), with some courts being "increasingly permissive in allowing the admission of other-acts evidence," *id.* at 778, based on "a faulty premise that Rule 404(b) is a 'rule of inclusion,'" *id.* at 786, while other courts "have curtailed the admissibility of other-acts evidence in criminal cases," *id.* at 802. The Judicial Conference Advisory Committee on Evidence Rules recently considered but ultimately rejected substantive changes to Rule 404(b) keyed to case-related limitations adopted by some circuits. *See* Judicial Conference of the U.S., Report of the Advisory Comm. on Evidence Rules ("Adv. Comm. on Evid. Report") at 4–5 (June 12, 2018), https://www.uscourts.gov/sites/default/files/ev_report_1.pdf. The Advisory Committee concluded, for instance, that "an attempt to require the court," by means of an amendment to the Rule itself, "to establish the probative value of a bad act by a chain of inferences that did not involve propensity would add substantial complexity, while ignoring that in some cases, a bad act is legitimately offered for a proper purpose but is nonetheless bound up with a propensity inference." Adv. Comm. on Evid. Report at 5. The Committee also rejected a proposal to adjust the balancing test to align with FED. R. EVID. 609(a)(1)(B) and require that "the probative value of bad acts evidence outweigh its prejudicial effect." *Id.* at 5. "[S]uch a balancing test would result in too much exclusion of important, probative evidence." *Id.* at 5. Instead, to provide "some protection for defendants in criminal cases," *id.*, the Advisory Committee recommended an amendment requiring the prosecutor to describe, in noticing 404(b) evidence, "the non-propensity purpose for which the prosecutor intends to offer the evidence and the reasoning that supports that purpose." *Id.* That amendment is currently under review by the Supreme Court. *See* Judicial Conference of the U.S., Summary of Proposed Amendments to the Federal Rules (Oct. 23, 2019), https://www.uscourts.gov/sites/default/files/2019-10-23_scotus_package_final_for_posting_0.pdf.

Further, by the express terms of Rule 403, 404(b) evidence is admissible, unless "its probative value is *substantially outweighed* by a danger of . . . unfair prejudice," FED. R. EVID. 403 (emphasis added), and thereby the identified danger must be amply weighty to warrant exclusion of otherwise probative relevant evidence. Hence, the D.C. Circuit has opined that Rule 404(b) "is a rule of inclusion." *United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007) ("Indeed, 'Rule 404(b) is a rule of inclusion rather than exclusion' 'prohibiting the admission of other crimes evidence "in but one circumstance" — for the purpose of proving that a person's actions conformed to his character.'" (citation omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929–30 (D.C. Cir. 2000); and then quoting *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc))); *see also United States v. Lawson*, 410 F.3d 735, 740 (D.C. Cir. 2005) (stating the same).

"[T]he analytical method to be used in Rule 403 balancing" requires the district court "to take account of the full evidentiary context of the case as the court understands it when the ruling must be made." *Old Chief*, 519 U.S. at 182. Thus, the probative value and unfair prejudice of an item of evidence "may be calculated by comparing evidentiary alternatives," *Old Chief*, 519 U.S. at 184, and "[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point," *id.* (quoting 22 Wright & Graham, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5250 (1978)); *see also id.* at 183 (observing that "a judge applying Rule 403 could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point."); FED. R. EVID. 404, Advisory Committee Notes, 1972 Proposed Rules) (noting that in making determination "whether the danger of undue prejudice outweighs the probative value of the evidence" relevant factors are "the availability of other means of proof and other facts

appropriate for making decision of this kind under Rule 403"); *see also* FED. R. EVID. 403,

Advisory Committee Notes, 1972 Proposed Rules (noting that "[i]n reaching a decision whether

to exclude on grounds of unfair prejudice . . . [t]he availability of other means of proof may also

be an appropriate factor."). Given district courts' familiarity with this full evidentiary context,

district courts generally have "broad discretion to weigh the extent of potential prejudice against

the probative force of relevant evidence." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633

(D.C. Cir. 2010) (quoting *Fredrick v. District of Columbia*, 254 F.3d 156, 159 (D.C. Cir. 2001)).

### 3. *Rule 609*

Rule 609 governs the admission of a prior felony conviction for purposes of

impeachment and sets out four different standards for admission, ranging from automatic

admissibility to the inclusionary, Rule 403 standard to more exclusionary standards protective of

the criminal defendant and any witness with a prior conviction over a decade old. The applicable

standard depends on four variables: whether the case is criminal or civil, whether the witness is a

criminal defendant, and the nature and age of the prior conviction.

Specifically, any prior conviction occurring within 10 years, "must be admitted"

(1) automatically, if it requires proof of a dishonest act or false statement, FED. R. EVID.

609(a)(2); (2) subject to the Rule 403 standard (*i.e.*, the probative value of the evidence is

substantially outweighed by the danger of unfair prejudice), in civil cases or in criminal cases

where the witness is not the defendant, *id.* 609(a)(1)(A); and (3) subject to a more exclusionary

standard (*i.e.*, "the probative value of the evidence outweighs it prejudicial effect to that

defendant"), where the witness is the criminal defendant, *id.* 609(a)(1)(B). Finally, regardless of

the nature of the case or prior conviction, or the status of the witness, "if more than 10 years have

passed since the witness's conviction or release from confinement," "[e]vidence of the

conviction is admissible only if . . . its probative value, supported by specific facts and

circumstances, substantially outweighs its prejudicial effect" and "written notice of the intent to use" the prior conviction is given. *Id.* 609(b). This fourth Rule 609 standard amounts to "a reverse Rule 403 test," Capra & Richter, *supra*, at 821 n.277, imposing the most stringent admissibility requirement on decade-or-older prior convictions for purposes of impeaching any witness, including a testifying criminal defendant. The exclusionary nature of this standard is intended to ensure "that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances" for purposes of impeaching a witness. FED. R. EVID. 609, Advisory Committee Note, 1974 Enactment, Note to Subdivision(b).

Notwithstanding the more exclusionary standard applicable to admission of prior conviction evidence against a criminal defendant–witness under Rules 609 (a)(1)(B) and (b), courts generally have concluded that, where a jury has already heard about a defendant's prior conviction for some other purpose under Rule 404(b), the danger of prejudice by repetition of the evidence for purposes of impeachment is "negligible." *United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (first quoting *United States v. Chauncey*, 420 F.3d 864, 874 (8th Cir. 2005); and then citing *United States v. Lattner*, 385 F.3d 947, 961 (6th Cir. 2004); and then citing *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978)). As the D.C. Circuit has explained, Rule 609 "governs only the admissibility of evidence introduced for impeachment of a witness," such that evidence of a prior conviction "not introduced to attack a witness's credibility falls outside the rule's scope" and must be evaluated for admissibility under Rules 404(b) and 403. *United States v. Rogers*, 918 F.2d 207, 211 (D.C. Cir. 1990) (declining the defendant's "invitation to conflate" Rules 404(b) and 609); s*ee also United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1075 (5th Cir. 1982) (calling the matter of impeaching credibility

"quite different" from the issues for which prior convictions may be admissible under Rule 404(b)).

## B. Money Laundering Evidence

### 1. *Background*

Three vehicles belonging to the defendant — a GMC Sierra K1500 Denali, a 2014 Lexus RX 350, and a 2009 Maserati sedan — were found at Dou Perfect and the Foote Street location on December 19, 2018, when the search warrants were executed. Gov't Mot. II at 1. The government seeks to introduce, through six witnesses, evidence showing how the defendant acquired each car. *Id.* at 2; *see also* Gov't's Notice of Supplemental Filing Related to Money Laundering ("Gov't Supp. II") at 1–2, ECF No. 64. On this foundation, the government hopes to argue, through a seventh witness, a money laundering expert, that the way the defendant obtained the cars is consistent "with the methods used by narcotics traffickers to conceal the source of their illegal proceeds, as well as their illegal assets, in an effort to thwart efforts by law enforcement to identify them and any vehicles and residences associated with them." Gov't's Mot. II at 1.

The expected testimony of the six witnesses who participated in the purchase of the three cars is summarized as follows. *See* Gov't Mot. I at 23–26; Gov't Mot. II at 2–5 (providing additional details). The titles to all three cars were found in the Denali, and none of the titles identified the defendant as the purchaser. *See* Gov't Mot. I at 23–26; Gov't Mot. II at 2–5. The Denali also contained the defendant's social security card, his passport, and bank statements, as well as the bill of sale for the Denali, from 74 Auto LLC, dated March 16, 2017, showing a sale price of $19,700. Gov't Mot. II at 2. The listed purchaser of the Denali, Person-3, told law enforcement that she had bought the car for a middle-aged man named "Doug," who had been introduced to her by a friend as someone who needed to use another person's bank account

for a purchase. *Id.* at 3. Paypal records showed an initial $500 deposit on the car to 74 Auto LLC from the defendant himself. *Id.*

The Lexus had previously been seized at a 2017 narcotics raid related to Dou Perfect and was retrieved from law enforcement by the defendant on February 5, 2018. *Id.* at 4. The defendant, working with Person-5, had obtained a power of attorney from the vehicle's previous owner, Person-4, *id.*, who had purchased the car in November 2016 for $8,000, *id.* at 3.

Maryland motor vehicle records revealed that the Maserati, which was seized at the Foote Street location, had been purchased in October 2016 for $7,900. *Id.* at 4. The Maserati was also seized in the previous narcotics raid at Dou Perfect and, in July 2017, law enforcement returned the car to its then-titled owner, Person-6. *Id.* at 4–5. According to Person-6, the defendant had initially asked Person-6 to title the vehicle in Person-6's name as a favor, and Person-6 had signed the title over to the defendant on the vehicle's return after the raid. *Id.* at 5.

### 2.      *Analysis*

The government argues that the money laundering evidence is relevant to showing that the defendant had the requisite knowledge and intent to engage in drug trafficking. Gov't Mot. II at 7. According to the government, the evidence suggests that the defendant believed he needed to obscure the source of his money, his ownership of assets, and his connections to two locations he used for narcotics trafficking, Dou Perfect and Foote Street. *Id.* The defendant disputes the government's factual inferences and thus the evidence's relevance. *See* Def.'s Reply II at 2.

The defendant's position is persuasive. To start, the central inference the government seeks to draw about concealing illicit narcotics proceeds is undercut by evidence that defendant did not, in fact, conceal his connections to the cars. The defendant placed a down payment on

the Denali himself, *see* Gov't's Mot. II at 3, went to pick up the Lexus from law enforcement, *id.* at 4, and eventually titled the Maserati in his name, *id.* at 5.

Further, the link between the charged drug trafficking and the purchases of the Maserati, Denali, and Lexus cars is tenuous at best for several reasons. First, as a factual matter, none of the cars at issue in the proffered money laundering evidence is the Jeep Grand Cherokee that the defendant was actually observed using on November 29, 2018, during the UC's purchase of heroin, and on December 7, 2018, leaving the Foote Street location, where the drugs were found stashed later the same month. Gov't's Mot. I at 10-11.[5]

Second, the government seeks to infer that the money used to purchase the vehicles in 2016 and 2017 was related to drug trafficking based on the lack of "invoices or work orders at Dou Perfect," *id.* at 23, and searches of state and District pay records in late 2018 and 2019 that, according to the government, revealed that the defendant had no "legitimate income," Gov't's Mot. I at 22. As the defendant points out, however, the search of Dou Perfect and the pay records occurred long after the car purchases. Def.'s Reply II at 3. Absent direct evidence tying the purchase of the cars to proceeds of drug trafficking, those car purchases have little import on the issue of the defendant's intent to conceal narcotics proceeds. The subterfuge of using straw purchasers for cars strongly suggests the defendant's involvement in some kind of illegal shenanigans, but the government's evidence alone does not indicate precisely what potential illegal funding source was intended to be masked.

Third, and relatedly, the government's chronology for tying the car purchases to the charged narcotics conspiracy simply does not work because those car purchases occurred one to two years before the charged conduct. This chronology makes the proffered money laundering

---

[5]     Likewise, the defendant was observed, on December 11, 2018, leaving the Foote Street location in a Chevrolet Tahoe truck, which is also not part of the proffered money laundering evidence. *See* Gov't's Mot. I at 11.

evidence too thin a reed to support the intended inference that the defendant was involved in illegal narcotics trafficking prior to and during the charged period, as demonstrated by the very cases cited by the government. In these cases, the uncharged money laundering was contemporaneous with, and therefore "intrinsic" to, the charged conspiracy so that the other acts evidence was not subject to Rule 404(b), which applies only to "extrinsic" acts. Gov't's Mot. II at 8–9 (first citing *United States v. Childress*, 58 F.3d 693, 712 n.5 (D.C. Cir. 1995); then citing *United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 45 (D.D.C. 2015); and then citing *United States v. Lerma-Plata*, 919 F. Supp. 2d 152, 157–60 (D.D.C. 2013)). The money laundering evidence here is not intrinsic — the car purchases occurred one to two years before the charged conduct.[6] In the cited cases, the uncharged money laundering also had unmistakable links to the charged drug trafficking. For example, in *Lorenzana-Cordon*, the government was permitted to present, at a trial for conspiracy to import cocaine, ledgers reflecting drug proceeds' paths and witnesses involved in helping the defendants launder drug proceeds through "legitimate ventures, such as cattle, farming, and other legitimate business sectors." 141 F. Supp. 3d at 44–45. The contrast between the money laundering evidence in *Loreneza-Cordon* and the car evidence offered by the government here highlights the latter's tenuous relevance.

---

[6] Evidence of "uncharged acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime" may be considered "intrinsic." *Bowie*, 232 F.3d at 929. Here, as the government acknowledges, "given the time frame of the acquisition of the defendant's vehicles," Gov't's Mot. II at 9 — as early as 2016 and 2017 — in relation to the conspiracy, which began in August 2018, *see* Superseding Indictment at 3, the government can "not rely solely on this intrinsic distinction," Gov't's Mot. II at 9; *see also Lorenzana-Cordon*, 141 F. Supp. 3d at 45 ("[T]o the extent that the Government intends to introduce evidence of money laundering outside the time frame of the alleged conspiracy, such evidence shall not be considered evidence intrinsic to the charged conspiracy, but shall be conditionally admitted under Rule 404(b)."). The government maintains that the defendant's continued possession of the cars "in two pertinent locations" makes some unspecified aspect of the evidence intrinsic. Gov't's Mot. II at 9. Continued possession of the cars certainly cannot render the purchasing of the cars a year or more before intrinsic. In any event, as already stated, the government has not shown a link between the funds used to purchase the cars and the charged drug trafficking, so the government has not established that any money laundering "facilitate[d] the commission of the charged crime." *Bowie*, 232 F.3d at 929.

Finally, the government's proposed method for introducing the money laundering is problematic. The government intends to present seven witnesses: the agent who seized the defendant's vehicles, as well as Persons 3, 4, 5, 6, the owner of 74 Auto LLC, and Rachel Bingham, the proposed money laundering expert. Gov't's Supp. II at 1–2. "[T]he cumulative impact of this drip-drip-drip is much more likely to wear away the jurors' resistance to using the evidence for an improper" propensity purpose. Wright & Graham, 22B FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5259 (2d ed. 2017). For all of these reasons, the government's proffered money laundering evidence is inadmissible under Rule 404(b) in the government's direct case.[7]

## C. Prior Conviction Evidence

### 1. *Background*

The defendant was convicted in 1999 of conspiracy to distribute and possess with intent to distribute crack cocaine, *see* 21 U.S.C. § 846 (West 1994), and possession with intent to distribute crack cocaine, *see id.* § 841(a)(1), after he supplied a kilogram of crack cocaine for a controlled sale to a confidential police informant ("CI") in 1994. Gov't's Mot. I at 27; *see also* Gov't's Notice of Supplemental Filing Related to 404(b) Materials ("Gov't's Supp. I"), ECF No. 61, Ex. A, Judgment and Commitment Order ("1999 Judgment"), ECF No. 61-1. The government seeks to introduce at the defendant's upcoming trial the following facts underlying this prior conviction.

On November 21, 1994, a CI arranged to meet two men, Dennis Allen and Lascelles Owens, at a Bob's Big Boy restaurant in Montgomery County about buying a kilogram of crack

---

[7] Should the defendant open the proverbial door by presenting a defense, for example, about his operation of legitimate car-related businesses, the proffered money laundering evidence may be admissible as impeachment or in rebuttal. Further, given that the government will not be allowed to introduce the money laundering evidence in its case in chief, the defendant's separate motion, *see* Def.'s Expert MIL, to exclude the testimony of the money laundering expert is denied as moot.

cocaine. *See* Gov't's Mot. I at 26. The defendant was not present at this initial meeting. *Id.*

When the CI said he needed to see the drugs before tendering the money, the group agreed to

reconvene later in the day with the crack cocaine. *Id.*

Once this plan was in place, Allen paged the defendant, who returned the page, and they

agreed that Allen and Owens would pick up the drugs from the defendant in Washington, D.C.

*Id.* at 26–27. Allen and Owens, accompanied by the defendant, returned to the parking lot from

this errand thirty minutes later with a bag containing the crack cocaine. *Id.* at 27. Allen and

Owens took the drugs to the informant while the defendant remained in the car. *Id.* After

checking the bag and confirming that the contents were crack cocaine, the CI gave a

pre-arranged arrest signal to police nearby. *Id.* at 27.

The police approached, and the defendant fled, exiting from the passenger side of the

backseat of the car. *Id.* He was apprehended after running across the parking lot and colliding

with a responding police car. *Id.* A .357 magnum handgun was recovered from the floor of the

passenger side of the backseat where the defendant had been sitting. *Id.* At the defendant's trial,

Allen testified that he had seen the defendant with the same gun prior to the day of the drug

transaction. Gov't's Supp. I, Dennis Allen's Testimony ("Allen Testimony"), Ex. B-b, Tr.

129:10–16, ECF No. 61-2.

The defendant was convicted on April 23, 1999, Gov't's Mot. I at 27, and sentenced on

April 26, 1999 to 235 months' imprisonment, followed by five years of supervised release, *id.* at

28. That sentence was reduced to 188 months of imprisonment on March 18, 2008, under 18

U.S.C. § 3582(c)(2). *Id.* The defendant was released from incarceration on August 20, 2008.

*Id.*

The government seeks to introduce evidence about this prior conviction through various documents, including: (1) one page of the judgment and commitment order reflecting that the defendant was convicted, and on what charges, in April 1999, *see* 1999 Judgment; (2) the chemist report and the parties' trial stipulation about the chemist report showing that the conviction involved 1,003 grams of cocaine base, *see* Gov't's Supp. I, Chemist Report, Ex. C, ECF No. 61-3; Gov't's Supp. I, Stipulation, Ex. D, ECF No. 61-4; (3) approximately 75 pages from the transcript of the defendant's 1999 trial, consisting of excerpts from the testimony of four witnesses, Allen and Owens, along with two police officers, *see* Gov't's Supp. at 1–2 (listing the testimony).

### 2.    *Analysis of Admissibility Under Rules 404(b) and 403*

The government seeks to use the fact of the defendant's 1999 conviction and evidence about the underlying circumstances to prove his knowledge, intent, and opportunity.  *See* Gov't's Mot. I at 31–35.  These are well-established non-propensity purposes for the admission of a defendant's prior drug trafficking conviction, and the D.C. Circuit has deemed such evidence particularly probative when, as here, the government must show constructive possession of illegal narcotics.  Indeed, in this case, the government must rely on circumstantial evidence, such as records of cell phone contacts from Suspect-1 to a phone registered to Dou Perfect at times when Suspect-1 was communicating with his narcotics supplier, surveillance of the defendant together with Suspect-1 on the date of the November 29, 2018 heroin transaction, and surveillance of the defendant at the Foote Street location on two other occasions.  Notably, the defendant was not observed actually handling the heroin purchased in the two November 2018 transactions and was not present at the Foote Street location when the firearms and multi-kilogram quantities of heroin and marijuana were found.  The owner and resident of the Foote Street duplex, Witness-1, has attributed ownership of this contraband to the defendant but,

given her obvious motivations to shift the blame away from herself and her 18 year-old son, a jury may discount the credibility of those statements. These circumstances indicate the beginnings of an apparent defense, alluded to during the pretrial motions practice, that the defendant did not exercise constructive possession of the contraband.[8]

The D.C. Circuit has long viewed evidence that a defendant "previously possessed and distributed" drugs as having "'a tendency to make' it 'more probable,' FED. R. EVID. 401, both that he knew the nature of the substance . . . he was charged with possessing . . . and that he intended to distribute it," *Douglas*, 482 F.3d at 597 (citing *United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002)). Consequently, introduction of evidence of a defendant's prior "'hands-on experience in the drug trade' . . . would generally be permissible to show . . . knowledge and intent to possess and distribute," *Sheffield*, 832 F.3d at 307 (quoting *Crowder*, 141 F.3d at 1208 n. 5), as well as to show opportunity or access, *see Crowder*, 141 F.3d at 1208 n. 5 ("A defendant's hands-on experience in the drug trade . . . can show that he knew how to get drugs, what they looked like, where to sell them, and so forth."); *Mitchell*, 49 F.3d at 775 (noting that D.C. Circuit "ha[s] frequently upheld the admission of evidence regarding other drug transactions as relevant to [knowledge and] intent in a charged drug transaction." ). A defendant's prior involvement in drug trafficking, particularly in constructive possession narcotics cases like this one, has been found "not only relevant" but also "highly probative" of

---

[8]     For instance, the defendant's motion to suppress the evidence seized at the Foote Street location contended that the government had not established a nexus between the defendant and that location adequate to support the search warrant. Specifically, the defendant challenged the warrant's reliance on a database search used to identify residences associated with the defendant's name because that search returned multiple addresses so associated, including the Foote Street location. *See* Def.'s Omnibus Reply to Gov't's Responses to Def.'s Pretrial Mots. at 7, ECF No. 57. The defendant argued that the Foote Street location "was way down on the pecking order for where he lived," Hr'g Tr. at 17:18–19 (Dec. 12, 2019), an effort to distance himself from this location that prompted the government to raise the issue of the defendant's Article III's standing to seek suppression of the seized evidence, *id.* at 32:10–19; *see also id.* at 32:21–25 (observation by the Court that the defense counsel "has walked that line very professionally . . . to protect her standing at the same time challenging the warrant"). At trial, the defendant may well push this argument further.

these non-propensity purposes. *United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008); *see also, e.g.*, *Douglas*, 482 F.3d at 600–01; *United States v. Pettiford* (*Pettiford I*), 517 F.3d 584, 590 (D.C. Cir. 2008); *United States v. McGill*, 815 F.3d 846, 884 & n.6 (D.C. Cir. 2016); *Washington*, 969 F.2d at 1080–81; *United States v. Burch*, 156 F.3d 1315, 1324 (D.C. Cir. 1998); *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982); *Rogers*, 918 F.2d at 211 (finding that evidence of defendant's prior arrest for distributing crack was properly admitted under Rule 404(b) to show defendant's "knowledge, intent, and the absence of mistake," and relying on the following cases and explanations: "*United States v. Watson*, 894 F.2d 1345, 1348–49 (D.C. Cir. 1990) (possession of cocaine subsequent to possession charged in indictment relevant to show defendant's knowledge of 'cocaine distribution business'); *United States v. Molinares Charris*, 822 F.2d 1213, 1220 (1st Cir. 1987) ('Evidence of [the defendants'] prior involvement in smuggling controlled substances, even though the involvement occurred several years earlier, tended to disprove their claim of "mere presence," and was, therefore, probative of their state of mind."); *United States v. Moore*, 732 F.2d 983, 987–92 (D.C. Cir. 1984) (prior pattern of drug dealing similar to crimes charged relevant to show intent and admitted over rule 404(b) challenge)").[9] Moreover, the D.C. Circuit has emphasized on more than one occasion that the risk of prejudice inherent in other crimes evidence "cannot give rise to a *per se* rule of exclusion," *Crowder*, 141 F.3d at 1210, and has affirmed the admission of prior drug trafficking convictions absent some "compelling or unique evidence of prejudice," *Mitchell*, 49 F.3d at 777; *see also Douglas*, 482 F.3d at 601; *Pettiford I*, 517 F.3d at 590.

---

[9] Other circuits have done the same. *See, e.g.*, *United States v. Adams,* 401 F.3d 886, 894 (8th Cir. 2005) (admitting evidence of a 19-year-old prior conviction for drug trafficking); *Moccia*, 681 F.2d at 63–64 (admitting prior conviction for drug trafficking); *United States v. Ramirez*, 63 F.3d 937, 942–43 (10th Cir. 1995) (same).

Recently, however, in *Sheffield*, a divided panel of the D.C. Circuit concluded that a defendant's 2002 conviction for possession with intent to distribute PCP had been erroneously admitted at his 2011 trial for possession with intent to distribute 100 grams or more of PCP. 832 F.3d at 307–08. That case involved a vehicle traffic stop, during which the police found an eight-ounce bottle labeled "lemon juice" containing PCP locked in the center console between the driver's and front passenger seats. *Id.* at 300. Both the driver, who owned the car, *see* Trial Tr. (Nov. 30, 2011) at 32*, United States v. Sheffield*, No. 11-cr-213 (BAH), ECF No. 98, and Sheffield, who was the front passenger, were charged with possession with intent to distribute PCP, *see* Indictment (July 7, 2011), *Sheffield*, No. 11-cr-213 (BAH), ECF No. 9.[10] Prior to trial, the Court granted the government's motion to introduce, under Rule 404(b), limited evidence about one of Sheffield's six adult convictions: namely, his conviction for possession with intent to distribute PCP in February 2002, which arose from an October 2000 stop and search of a car, found to contain PCP and a gun, in which Sheffield was also a passenger. *See* Minute Entry (Sept. 26, 2011), *Sheffield*, No. 11-cr-213 (BAH); Gov't's Mot. to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b) ("*Sheffield* Mot."), at 2–3, *Sheffield*, No. 11-cr-213 (BAH), ECF No. 19; *see also* Presentence Investigation Report ("*Sheffield* PSR") ¶¶ 26–31, *Sheffield*, 11-cr-213, ECF No. 78. That Sheffield was also convicted of possessing the gun found in the car was not admitted. *See* Minute Entry (Sept. 26, 2011), *Sheffield*, No. 11-cr-213 (BAH); *Sheffield* PSR ¶ 27. Deeming this application of Rule 404(b) harmless error, the D.C. Circuit ultimately affirmed Sheffield's 2011 conviction. *See Sheffield*, 832 F.3d at 308–09, 315.

---

[10]     Sheffield's co-defendant was acquitted by the jury, after testifying in her own defense that she was with Sheffield to celebrate his birthday and, during the course of that evening, Sheffield had borrowed her car while she waited at a restaurant for "a long time," and she did not know how or when the PCP was put into the center console of her car. Trial Tr. (Nov. 30, 2011) at 19, 33, 34, *Sheffield*, No. 11-cr-213 (BAH), ECF No. 98.

The panel majority's analysis of the admissibility of the prior conviction emphasized first the age of the prior conviction, which had "occurred *a decade* before the offense conduct at issue in this case." *Id*. at 308 (emphasis in original).[11] The panel majority next criticized the way that conviction was introduced at the 2011 trial, "by telling the jury only about the fact of a decade-old conviction." *Id*. at 307. Given this limited information about the prior conviction, the panel majority observed that "the evidence bore little evidentiary relevance to the question of Sheffield's knowledge in 2011 about such matters as how to acquire or to market PCP." *Id*. at 307–08.[12] The panel majority then concluded that "the staleness of this conviction reduces its probative value such that it is 'substantially outweighed' by the danger of unfair prejudice already inherent in the admission of prior-bad-act evidence." *Id*. at 308 (first citing *United States v. Bigesby*, 685 F.3d 1060, 1065 (D.C. Cir. 2012); and then citing *Pettiford I*, 517 F.3d at 590).[13] Judge Sentelle wrote separately, stating: "I would . . . deem [admission of the prior crime

---

[11]    *Sheffield*'s panel majority's calculation of the age of a prior conviction for purposes of application of Rule 404(b) may be read as more restrictive than even Rule 609(b)'s evaluation. Sheffield was initially released from confinement for his February 2002 conviction on September 16, 2002, but due to revocation of his probation for substantive violations, including his re-arrest on assault charges and his testing positive for PCP and marijuana on over forty occasions, he was sentenced to an additional term of imprisonment and ultimately released on August 18, 2004. *See Sheffield* PSR ¶ 27. Rule 609(b) asks "if more than 10 years have passed since the witness's conviction or release from confinement for it," FED. R. EVID. 609(b), and Sheffield's "release from confinement" on his 2002 conviction occurred *less* than a decade — seven years — before his commission of the new PCP offense in June 2011. *See United States v. Lapteff*, 160 F. App'x 298, 303 (4th Cir. 2005) (holding that confinement pursuant to a revocation of supervised release is confinement imposed for the original conviction within the meaning of Rule 609(b)); *United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (holding that 17 year-old bank robbery conviction was admissible for impeachment where, as a result of a parole violation, defendant's confinement came within Rule 609(b)'s ten-year period); *United States v. McClintock*, 748 F.2d 1278, 1289 (9th Cir. 1984) (holding that confinement imposed for substantive probation violations is "confinement" for the original offense within the meaning of 609(b)); *United States v. Brewer*, 451 F. Supp. 50, 52-53 (E.D. Tenn. 1978) (holding that re-confinement after violating parole is confinement imposed for the original conviction).

[12]    The notion that a prior conviction judgment, standing alone, has "little evidentiary relevance" has gained traction in some jurisdictions. *See infra* note 15. Yet, the judgment for a prior distribution conviction involving the same distributional intent as the crime charged has "self-evident" probative similarities, *United States v. Hall*, 858 F.3d 254, 292 (4th Cir. 2017) (Wilkinson, J., dissenting), and use of a conviction judgment to establish this fact has the added benefit of avoiding re-trying the Rule 404(b) conduct, a task that would impose on the jury the concomitant burden of assessing the strength of the evidence not only for the charged conduct at issue but also underlying the prior conviction.

[13]    In a footnote, the panel majority rejected the government's citation to *McCarson*, 527 F.3d 170, "as an example of a decision upholding the admission of a decade-old conviction for firearm possession under Rule 404(b)," because "[t]hat opinion did not address the staleness of the conviction," *Sheffield*, 832 F.3d at 308 n.3.

evidence] perfectly consistent with the exception to Rule 404(b) recognized in such cases as *Crowder* and with Rule 403." *Id.* at 317 (Sentelle, J., concurring in part and concurring in the judgment).[14]

The *Sheffield* panel majority did not spell out its "staleness" reasoning. Plainly, evidence of "crimes, wrongs" committed by a defendant in close temporal proximity to the charged conduct may very well be intrinsic evidence rather than an "other act" subject to the additional notice and purpose analysis of Rule 404(b). *See supra* note 6. The well-established rubric in this Circuit for distinguishing intrinsic from extrinsic evidence rests largely on temporal proximity, but *Sheffield* seems to make this consideration a marker both for when Rule 404(b) applies and when "other acts" are barred by Rules 404(b) and 403. *Sheffield*'s brisk treatment of "staleness," however, leaves other fundamental questions unanswered: When does a prior conviction become too stale for admission for Rule 404(b) purposes, and why? Does staleness preclude admission under Rules 403 and 404(b) for all or only some non-propensity purposes? Is

---

[14]    Judge Sentelle's concurrence also invoked the standard of review, stating:

> I . . . do not understand how we can properly reverse a balancing whose resolution is allocated to the district court on nothing more than our differing opinion as to the effect of 'staleness,' but also do not share the majority's view that there is staleness. Therefore, of the four judges who have viewed the question of the admission of this evidence, two circuit court judges would, apparently in their discretion, not have admitted it. The district court judge, charged with the actual duty of deciding whether or not to admit it, decided to admit it. And, finally, one of the circuit court judges supposed to review the issue only for abuse of discretion would also have admitted it.

*Sheffield*, 832 F.3d at 317 (Sentelle, J., concurring in part and concurring in judgment); *see also Hall*, 858 F.3d at 288–89 (Wilkinson, J., dissenting) (disagreeing with panel majority vacating defendant's conviction and reversing district court's evidentiary ruling under Rule 404(b), stating "[o]n evidentiary questions, especially those of non-constitutional dimension, appellate judges are best advised to keep hands off. Our instincts are less practiced than those of the trial bench and our sense for the rhythms of a trial less sure. Here, the district judge made a perfectly acceptable, indeed a correct, discretionary call at trial to admit evidence of Hall's prior conviction. Now, twenty-five months later, after sifting evidence at length and at our leisure, we presume to call that right choice wrong and to transform the Rule 404(b) light from yellow to flashing red for even the most probative past drug offenses. (citation omitted)); *id.* at 294 ("The dukes and earls of the appellate kingdom should learn to respect a trial court's job.").

staleness an obstacle for admission of other bad acts under these rules because a defendant is presumed, after passage of some time-certain period, to forget knowledge of the illegal drug trade or because the illegal drug trade is presumed to change, making prior knowledge of how to arrange an illicit drug deal obsolete?  The D.C. Circuit has previously explained that "[t]he assumption that people do not forget" is the basic "connection" in all 404(b) cases involving prior acts.  *United States v. Latney*, 108 F.3d 1446, 1450 (D.C. Cir. 1997).  In light of this common sense assumption, other circuits have reasoned that similarities between the prior conviction and the charged conduct mitigate concerns about temporal remoteness and have therefore focused analysis under Rule 404(b) on such similarities.  *See, e.g.*, *United States v. Hadley*, 918 F.2d 848, 851 (9th Cir. 1990) ("The similarity of the prior act to the offense charged outweighs concerns regarding its remoteness."); *United States v. Spillone*, 879 F.2d 514, 519 (9th Cir. 1989); *United States v. Edelmann*, 458 F.3d 791, 810 (8th Cir. 2006); *United States v. San Martin*, 505 F.2d 918, 922 (5th Cir. 1974).  *Sheffield* brushes past the fundamental questions raised by its finding of error, without referencing or grappling with contrary views from other circuits.

Sheffield also instructed that "telling the jury only about the fact of" the conviction cut in favor of exclusion.  832 F.3d at 307–08.[15]  A later panel of the D.C. Circuit found this instruction

[15]     A divided panel of the Fourth Circuit relied on similar reasoning in *Hall*, which held that admission of the mere fact of prior drug convictions, without "information regarding the facts and circumstances giving rise to those convictions," was an abuse of discretion under Rule 404(b), 858 F.3d at 260, requiring vacatur of the defendant's convictions and remand for a new trial, *id.* at 288. There, "the government introduced the fact of Defendant's prior possession with intent to distribute convictions without providing *any* evidence linking the prior convictions to the charged offense" of possession with intent to distribute.  *Id.* at 274.  Judge Wynn, for the majority, wrote that "the fact of a defendant's past involvement in drug activity *does not in and of itself* provide a sufficient nexus to the charged conduct where the prior activity is not related in time manner, place, or pattern of conduct."  *Id.* (internal quotation marks omitted).  Judge Wynn's decision drew an energetic dissent from Judge Wilkinson, who saw no abuse of discretion in the district court's decision to admit the prior convictions without their underlying facts. Calling the case a "routine" one for "the admission of 404(b) evidence," the dissent explained that no facts about the prior convictions beyond the judgment were needed to establish the convictions' relevance and probative value: "The distributional convictions in particular were three in number, involved the very drug at issue here, and involved the distributional intent of which Hall stood accused, all of which combined to place the evidence within the realm

counterintuitive, stating "[i]t is not clear to us that . . . greater detail does not come with greater prejudice as well."  *Winstead*, 890 F.3d at 1086.  At one hand, then, *Sheffield* says that "telling the jury only about the fact of a decade-old conviction" weakens that conviction's evidentiary value; on the other hand, *Winstead* warns that introduction of "greater detail" about an older prior conviction likely brings "greater prejudice."  That puts the district court in a situation akin to Goldilocks' fabled visit to the three bears.  To avoid error, the district court must admit not too little, not too much, but just the right amount of evidence about a not-too-remote prior conviction.

Confronted by *Sheffield*, the parties have expressed some puzzlement.  The government says, "obviously, we're abiding by *Sheffield* and read it for what it is," but "[i]t is hard to navigate without some additional guidance."  Hr'g Tr. at 76:22–23.  "I don't understand it," counsel for the defendant confessed, "but I do understand . . . [that] the D.C. Circuit punted when they later had an opportunity to talk about it in *Winstead*."  *Id.* at 79:9–11.  Nevertheless, the

---

of district court discretion.  The resemblance and similarity to Hall's present conviction are self-evident."  *Id.* at 292 (Wilkinson, J., dissenting).

     Some jurisdictions restrict even further the use of prior convictions as "other bad acts" evidence.  North Carolina state courts, for instance, have adopted an explicit rule that "introducing the bare fact of a prior conviction under Rule 404(b) fails to satisfy the Rule 403 balancing test."  *State v. Wilkerson*, 559 S.E.2d 5, 17 (N.C. Ct. App. 2002) (Wynn, J., dissenting), *rev'd for reasons stated in the dissent*, 571 S.E.2d 583 (N.C. 2002) (interpreting state rules of evidence).  The state's prohibition on introducing prior convictions was articulated by then-North Carolina Court of Appeals and now–Fourth Circuit Judge Wynn, who also authored the majority opinion in *Hall*.  In *Wilkerson*, Judge Wynn wrote, and the North Carolina Supreme Court agreed: "[E]ven if a conviction, in and of itself, held a scintilla of probative value for Rule 404(b) purposes, the inherent prejudicial effect of such a conviction would substantially outweigh its probativity, mandating its exclusion under Rule 403."  *Id.* at 25.  Consequently, the North Carolina Court of Appeals has held that admission of the fact of a prior conviction, even alongside the underlying facts of the conviction, is prejudicial error.  *State v. McCoy*, 620 S.E.2d 863, 868 (N.C. Ct. App. 2005) (holding that police officer's live testimony describing "underlying facts of an assault committed by the defendant" a decade earlier was properly admitted under local Rule 404(b) but "trial court committed prejudicial error" by admitting "certified copy of defendant's criminal conviction for assault inflicting serious injury resulting from the events described by" the officer).  This view that the prejudice attached to the fact of a prior conviction is so powerful as to outweigh the probative value of even the most probative prior conduct flies in the face of the collected wisdom of many courts, including the D.C. Circuit, which have held that the risk of prejudice inherent in other crimes evidence "cannot give rise to a *per se* rule of exclusion."  *Crowder*, 141 F.3d at 1210.

parties have managed thoughtfully to frame the issues for review. The analysis proceeds as follows.

As the defendant reads *Sheffield*, "[t]the logic underlying the staleness finding . . . is that knowledge of the drug trade will fade over time, such that the more remote the prior conviction, the less probative it will be of a defendant's present knowledge of drug trafficking." Def.'s MIL. at 2. To the defendant, "[u]nder *Sheffield*, the age of this conviction and conduct diminishes its probative value insofar as Thorne's possession of [drugs] two decades ago would tell the jury little about his knowledge of today's drug trade." *Id.* at 3–4. As a result, the defendant argues, the probative value of the conviction is easily, and substantially, outweighed by its prejudicial effect. *Id.* at 4.[16] The first question to address, then, is whether *Sheffield* bars the admission of evidence about the defendant's prior conviction simply because the conviction is twenty years old. The answer to that question, as will be explained, is no. This leads then to the second question: how should *Sheffield* be read? Guided by the D.C. Circuit's cases before and after *Sheffield*, as well as by other circuits, principles for evaluating the admissibility of older prior convictions are then roughly sketched. The final task is applying those principles to determine whether any part of the government's noticed prior conviction evidence is admissible under

---

[16]     The defendant thus reads *Sheffield* as having deemed the prior conviction inadmissible under Rule 403. *See* Def.'s MIL. at 2. Alternatively, *Sheffield* could be read to conclude that "stale" past crimes are no longer relevant and are therefore inadmissible under Rules 401, 402 and 404(b). *Cf. Winstead*, 890 F.3d at 1086 (summarizing the defendant's "contention that under our precedent, his past crimes are stale and, therefore, no longer relevant"). This alternative reading finds some support in other circuits that analyze the "remoteness" of a prior conviction as a function of "relevance." *See, e.g., United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir. 1994) (stating that, to be admissible under Rule 404(b), the prior act must be "close enough in time to be relevant to the matter in issue" (internal quotation marks omitted)); *United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997) ("Exclusion of proof of other acts that are too remote in time caters . . . to the dual concerns for relevance and reliability."). Although *Sheffield* mentions "relevance," 832 F.3d at 307, its conclusion is framed in Rule 403 terms — the probative value versus the prejudicial effect of the prior conviction, *id.* at 308. The Court therefore agrees with the defendant's reading of *Sheffield* on this issue.

Rules 404(b), 403, *Sheffield*, *Winstead*, and the D.C. Circuit's many prior cases affirming the admission of prior drug trafficking evidence for sanctioned non-propensity purposes.

### a) Does **Sheffield** *Bar Admission of the Prior Conviction Simply Because of its Age?*

The defendant's straightforward reading of *Sheffield*'s "logic" finds support in the two decisions of this district applying *Sheffield*. *See* Hr'g Tr. at 78:15–79:11 (defendant's argument that this is so). *United States v. Fields*, No. 18-cr-267 (APM), 2019 WL 690347 (D.D.C. Feb. 19, 2019), interpreted *Sheffield* to hold that "the probative value of prior trafficking activity diminishes over time and, if old enough, can give rise to unfair prejudice." *Id.* at \*2. *Fields* went on to apply *Sheffield* to exclude from a defendant's trial on charges of conspiracy and possession with intent to distribute PCP, heroin, marijuana and other drugs, his convictions for possession of heroin in 1998 and for trafficking in crack cocaine in 1992. *Id.*; *see also* Superseding Indictment (Sept. 25, 2018), *Fields*, No. 18-cr-267 (APM), ECF No. 22. By the court's count, even the 1998 conviction occurred "more than 19 years before the start of the conspiracy in this case," so that: "Under *Sheffield*, the age of this conviction and conduct diminishes its probative value insofar as [the defendant's] possession of heroin two decades ago would tell the jury little about his knowledge of today's drug trade, and risk resulting in unfair prejudice because of its staleness." *Fields*, 2019 WL 690347, at \*2; *see also id.* at \*3 (discussing the 1992 conviction). By contrast, *Fields* admitted evidence of another defendant's "trafficking activities in 2009," explaining that those "occurred less than eight years before the charged conspiracy, so evidence relating to them . . . would not run afoul of *Sheffield*." *Id.* at \*3.

Similarly, *United States v. Zanders*, No. 16-cr-197 (RC), 2019 WL 6329400 (D.D.C. Nov. 26, 2019), applied *Sheffield* to exclude prior convictions for possession with intent to distribute cocaine base and carrying a pistol without a license, both in 2002, and for possession

with intent to distribute a "large amount of marijuana," in 2007, *id.* at *1, as "too old to have significant probative value" in the defendant's trial on cocaine trafficking and firearms charges, *id.* at *3. Even "[t]he more recent of Mr. Zanders's prior convictions is roughly as old as the conviction in *Sheffield*," so that the 2007 conviction was "fairly stale" and ultimately inadmissible. *Id.*[17] "[A]ge alone [wa]s enough . . . to discount the probative value" of the 2002 conviction. *Id.*

The D.C. Circuit's two decisions discussing *Sheffield* hint at the same logic, albeit in passing. Most recently, *United States v. Oral George Thompson*, 921 F.3d 263 (D.C. Cir. 2019), citing *Sheffield*, noted: "We have held that when evidence of prior bad acts is introduced to show defendant's knowledge of the type of transactions, it cannot be stale." *Id.* at 269. Characterizing "evidence from the 1990's" as "seem[ing] stale," *Oral George Thompson* nevertheless concluded that, "given all the other evidence in the case, if admission of that" 1990s evidence "to show knowledge was erroneous, it was harmless." *Id.* Similarly, in *Winstead*, the D.C. Circuit found "no need to decide" whether "the prior convictions were too stale for admission" because any error would have been harmless. 890 F.3d at 1086. *Winstead* described *Sheffield* as having "held that a ten-year-old PCP conviction was too old to be used to establish knowledge for a similar crime." *Id*.

Reducing *Sheffield*'s logic to an equation where admissibility of a prior act is a function of time alone would sacrifice the nuanced balancing required by Rules 404(b) and 403, simply for ease of application. *Sheffield* considered factors other than temporal remoteness, including, as Rule 403 contemplates, "the scarcity or abundance of other evidence on the same point." *Old*

---

[17]      The probative value of this 2007 conviction was further diminished, *Zanders* decided, by a shift in substances:  the 2007 conviction was for cocaine base and the pending charge involved cocaine powder. *Zanders*, 2019 WL 6329400, at *3.

*Chief*, 519 U.S. at 184 (quoting 22C Wright & Graham, Federal Practice & Procedure: Evidence § 5250).  The panel majority in *Sheffield* reviewed the government's evidence in detail, highlighting that "[t]he jury heard" four significant pieces of evidence: (1) testimony that Sheffield was "a passenger in a car that contained PCP;" (2) testimony that Sheffield stated to police, "[e]verything is mine" in the car, *Sheffield*, 832 F.3d at 309 (alteration in original); (3) testimony from Sheffield's co-defendant "that Sheffield had earlier taken her car for 30–45 minutes and that there was no PCP in her car before then;" and (4) "legitimate Rule 404(b) evidence that Sheffield dealt PCP in 2009," *id.*, referring to Sheffield's surreptitiously audio-recorded statement that he sold "water" to an undercover confidential informant, *see Sheffield* Mot. at 3.  Notwithstanding that the PCP was locked in the console of a car owned and driven by Sheffield's co-defendant, that Sheffield's statement claiming ownership of the car's contents was counterbalanced by his further statements that "they [don't] have a strong case, they've got nothing on us," *Sheffield*, 832 F.3d at 306, that the co-defendant's testimony was not anticipated at the time of admission of the Rule 404(b) evidence, and that Sheffield's 2009 reference to "water" could have been discounted as vague by the jury, the *Sheffield* panel majority concluded that the government's case was "overwhelming," *id.* at 309 (quoting *McGill*, 815 F.3d at 886), and "amply evidenced [the defendant's] knowledge and intent," the very issues on which the prior crimes evidence was offered, *id.*  The panel majority highlighted this evidence in analyzing whether admission of the prior conviction was harmless error, but context is always critical to calculating the probative value of a piece of evidence offered under Rule 404(b); albeit, that calculation must be made without the benefit of such hindsight as informs a harmless error analysis.  *See Old Chief*, 519 U.S. at 183 n.6 ("It is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by

hindsight.")  As will be discussed in detail in the next section, *Sheffield*'s holding depends not on the age of the prior conviction alone but also on the context in which that conviction was presented.

Reading *Sheffield* as not excluding "other bad acts" based on temporal remoteness alone would be consistent with rulings from other circuits, which have rejected the suggestion that a temporal bright-line of exclusion should, or could, be drawn for 404(b) evidence.  *See United States v. Thornton*, 515 F. App'x 101, 103 (3d Cir. 2013) ("Rule 404 does not put any express limit on the time that can elapse between the conduct underlying a prior conviction and the conduct underlying a charged offense, and we have not imposed a limit."); *United States v. Nava*, 83 F. App'x 172, 173 (9th Cir. 2003) ("There is no bright-line rule requiring the court to exclude evidence of other acts after a certain period has elapsed." (citing *Spillone*, 879 F.2d at 519)); *United States v. Baker*, 82 F.3d 273, 276 (8th Cir. 1996) ("[T]here is no fixed period within which the prior acts must have occurred."); *United States v. Zakaria*, 972 F.2d 344 (Table) (4th Cir. 1992) (per curiam) ("[T]here is no rule that states how many years will render a prior conviction stale for purposes of Rule 404(b) admissibility."); *Larson*, 112 F.3d at 605 ("Neither Rule 403 nor any analogous Rule provides any bright-line rule as to how old is too old."); *United States v. Fields*, 871 F.2d 188, 198 (1st Cir. 1989) ("[T]here is no absolute rule governing the number of years that can separate offenses."); *United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir. 1985) ("There is no absolute maximum number of years that may separate a prior act and the offense charged."); *United States v. Arnold*, 773 F.2d 823, 833 (7th Cir. 1985) ("[T]he length of time elapsed since the commission of the prior act is not *per se* determinative of its admissibility under Rule 404(b)."); *San Martin*, 505 F.2d at 922 ("The test for remoteness need not, and indeed cannot, be a simple rule of thumb based solely on the number of years that

have elapsed between the prior crime and the present offense charged.").  *Sheffield*'s abbreviated

analysis, which did not engage with other circuits, cannot be read to split from this clear

consensus.  Read properly, then, *Sheffield* does not bar admission of the defendant's prior

conviction simply because of its age.

### b)  *How Should* Sheffield *Be Read?*

How, then, is *Sheffield* properly understood and applied?  To the extent *Sheffield* stands

for the proposition that prior convictions can become less probative over time for *some* purposes,

this decision breaks no new ground.  Indeed, Congress wrote a staleness presumption into Rule

609, *see* FED. R. EVID. 609(a), (b), stating that convictions older than ten years are less probative

"with respect to . . . credibility," H.R. Rep. No. 93-650 at 7085 (1973) (explaining the House

version of the rule, which would have totally excluded convictions older than ten years; the

Senate version of the rule was ultimately adopted).  The assumption underlying Rule 609 is that

"the passage of a significant period of time raises the possibility that the witness may have been

rehabilitated, which would reduce the extent to which past criminal conduct is probative of a

present propensity to lie."  Wright & Graham, 22B FEDERAL PRACTICE & PROCEDURE EVIDENCE

§ 6136 (2d ed. 2017); *see also*, *e.g.*, *Mills v. Estelle*, 552 F.2d 119, 120 (5th Cir. 1977) ("[T]he

ten-year period is evidence that the inference supporting use of prior crime impeachment

evidence (a lawbreaker is likely to lie) can no longer be drawn about a certain person.").

Notably, the D.C. Circuit has previously cautioned against "conflat[ing]" the purposes of

Rules 609 and 404(b).  *Rogers*, 918 F.2d at 211.  In the process, the Circuit suggested that

concerns about rehabilitation have limited applicability where prior drug distribution is offered to

show "knowledge, intent, and the absence of mistake."  *Id.* at 210.  In *Rogers*, the defendant

argued that introduction of testimony under Rule 404(b) describing his distribution of crack at

age seventeen circumvented the "policies" embodied by Rule 609(d), which generally makes

juvenile adjudications inadmissible for impeachment purposes. *Id.* The D.C. Circuit rejected this argument, because, as noted, *supra* Part II.A.3, "[e]vidence not introduced to attack a witness's credibility falls outside [Rule 609's] scope," *Rogers*, 918 F.2d at 211. Thus, evidence of distribution, even as a minor, was relevant "to rebut his defenses of mistake and lack of intent and lack of knowledge," *id.*, as this evidence "indicated that Rogers was familiar with crack distribution," *id.* at 210.

Notwithstanding *Rogers*, remoteness concerns may surface in the Rule 404(b) context, "[s]ince character can change over years, acts done during a crime-committing youth may not accurately reflect what a middle-aged person may do." Wright & Graham, 22B FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5259 (2d ed. 2017). Although no court has explicitly adopted this reasoning, the reality that people's motivations and behaviors mature and evolve may cause "the significance of . . . prior acts . . . [to] become too attenuated" over time. *Larson*, 112 F.3d at 605. This reasoning supports an inference that older prior convictions have diminished probative value only for some issues, however. Rehabilitation might have bearing on a person's intent, for example, but has little bearing on other issues for which prior convictions are commonly admitted under Rule 404(b), such as motive, knowledge and, relatedly, absence of mistake. *Cf. Cacciola v. McFall*, 561 F. App'x 535, 538 (7th Cir. 2014) (rejecting a defendant's argument that a ten-year-old prior conviction should have been excluded, explaining "Rule 609 restricts evidence of prior convictions when used to impeach credibility. Here, evidence of the ten-year sentence was elicited for another purpose: to explain that Cacciola ran away to avoid returning to jail."). As the Fifth Circuit put it in *Rubio-Gonzalez*, "[t]he passage of time and changing circumstances are more likely to significantly change one's intent than they are to obliterate knowledge once gained." 674 F.2d at 1075. *Rubio-Gonzalez* thus concluded that "to

the extent . . . prior acts are relevant to the matter of knowledge, rather than being relevant only to intent, remoteness may be less of a factor in determining probative value of the evidence." *Id.*

In sum, temporally-remote Rule 404(b) evidence may have reduced probative value for some purposes due to rehabilitation or maturation over time.[18] At the same time, the probative value of such evidence may be *enhanced* based on the "similarity" between the prior crime and the charged conduct and the "theory of admissibility" — that is, whether the prior conduct goes to a disputed issue at trial. These factors can "outweigh[] concerns regarding remoteness." *Hadley*, 918 F.2d at 851; *Spillone*, 879 F.2d at 519 (stating that "[d]epending upon the theory of admissibility and the similarity of the acts, for example, some remote acts may be extremely probative and relevant"); *Edelmann*, 458 F.3d at 810 ("While the three prior convictions are approximately 15 years old, we find that they are not too remote in time because of their similarities with the crime charged."); *Zakaria*, 972 F.2d 344 ("Moreover, the similarity of the prior crimes made the recency of the prior convictions less important."); *Nava*, 83 F. App'x at 173 ("We have upheld decisions to admit significantly older acts where, as here, the acts are sufficiently similar to remain probative."); *San Martin*, 505 F.2d at 922–23 (focusing not primarily "on the number of years that have elapsed," but on "whether the prior crime is similar in nature and in its material elements to have clearly probative value . . . at the time of the offense charged."); *Arnold*, 773 F.2d at 833 ("The similarity of the prior conversation concerning witness bribery to the present offense and its probative value, not the time of occurrence, determines whether it is admissible under Rule 404(b).").

---

[18] The *Sheffield* panel majority said nothing about rehabilitation prompting its staleness concern, and reliance on this consideration would, in any event, have been misplaced. Sheffield had four convictions between the 2002 PCP conviction admitted under Rule 404(b) and the 2011 charges, and the government presented evidence that, during that time period, in 2009, the defendant had admitted to an undercover police informant that he sold "water." *See Sheffield* Mot. at 3, ECF No. 19; *see also Sheffield* PSR ¶ 27.

Applying these principles, other circuits have routinely affirmed the admission of prior convictions greater than a decade old. *See Adams,* 401 F.3d at 894 (19 year-old conviction); *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006) (18 year-old conviction); *United States v. Strong*, 415 F.3d 902, 905 (8th Cir. 2005) (16 year-old conviction); *United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) (incidents as old as 15 years); *Hadley*, 918 F.2d at 851 (acts from 10–15 years prior); *United States v. Hernandez-Guevara*, 162 F.3d 863, 873 (5th Cir. 1998) (18 year-old conviction) (citing *United States v. Chavez*, 119 F.3d 342, 346–47 (5th Cir. 1997) (18 year-old conviction); *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997) (acts from "thirteen or more years" prior).[19]

Before *Sheffield*, the D.C. Circuit had emphasized these same two factors of similarity and theory of admissibility for non-propensity purpose. Pre-*Sheffield* cases emphasized the "likeness of the allegations" in finding prior drug trafficking evidence highly probative and therefore admissible. *See, e.g.*, *Burch*, 156 F.3d at 1324; *Douglas*, 482 F.3d at 601. Pre-*Sheffield*, the D.C. Circuit repeatedly deemed prior trafficking evidence highly probative, particularly in constructive possession cases, where the key disputed issue is whether the

---

[19]     Both *Adams* and *Walker* relied on the similarity of the prior offenses as well as the fact that the defendant was incarcerated for some of the period separating the prior offense from the charged conduct. *Adams,* 401 F.3d at 894; *Walker*, 470 F.3d at 1275. *Winstead* questioned other circuits' "assumption" that "the staleness of old crimes is lessened if part of the time between the defendant's old crime and a new case was spent in prison." 890 F.3d at 1086 (first citing *United States v. Cherry*, 433 F.3d 698, 702 & n.4 (10th Cir. 2005); then citing *United States v. Brooks*, 736 F.3d 921, 940 (10th Cir. 2013); then citing *United States v. Sterling*, 738 F.3d 228, 238–39 (11th Cir. 2013); and then citing *United States v. Halk*, 634 F.3d 482, 487–88 (8th Cir. 2011)). Observing that "our sister circuits do not explain their reasoning," *Winstead* speculated "that they are assuming that conversations in prison would refresh a prisoner's knowledge of the modus operandi of drug crimes." 890 F.3d at 1086. In *Cherry*, however, the Tenth Circuit explained that time in prison gives the defendant "no opportunity to commit other distribution offenses," explaining a long gap between charges. 433 F.3d at 702 n.4. Here, although the defendant was in prison on the prior conviction until 2008, the government does not argue that the defendant's time in prison affects the probative value of the conviction, likely heeding *Winstead*'s critical assessment of this factor. Given the D.C. Circuit's apparent skepticism about other circuits' analysis of the role of prison time, this Court will not rely on that factor. *See Zanders*, 2019 WL 6329400, at *3 n.2; *Fields*, 2019 WL 690347, at *3.

defendant's possession was knowing and intentional.  *See, e.g., McCarson*, 527 F.3d at 173–74; *Douglas*, 482 F.3d at 600–01; *Cassell*, 292 F.3d at 796; *Burch*, 156 F.3d at 1324.

*Sheffield* mentions neither similarity nor the government's theory of admissibility, leaving unremarked when these factors do or do not make an older conviction more probative.[20] For *Sheffield*'s panel majority, neither the similarity of the defendant's prior conviction to the charged conduct nor the need for the government to establish constructive possession of the PCP assuaged concerns about remoteness.  That conclusion, however, might be explained by two compounding factors: (1) the panel majority's view that the jury's understanding of the prior conviction was limited because the jury was told only the bare fact of the prior conviction, *Sheffield*, 832 F.3d at 307, and (2) the panel majority's assessment that other evidence "amply evidenced [the defendant's] knowledge and intent," *id*. at 309.  The latter factor is an important feature of *Sheffield*, distinguishing the case from prior ones where the government's other evidence of knowledge and intent "was not without holes."  *Douglas*, 482 F.3d at 591; *see also McCarson*, 527 F.3d at 173–74.  On this reading of *Sheffield*, the panel majority did not intend to rewrite the D.C. Circuit's prior precedents; *Sheffield* merely did not explain why those precedents were distinguishable.

Now, these principles must be applied to the present case.  In the two sections that follow, the prior conviction evidence offered by the government is first taken as a whole and is evaluated for relevance and probative value.  The prior conviction is deemed generally

---

[20]     Earlier cases likewise provide little guidance about the intersection of age and these factors.  *McCarson* involved four convictions, including a ten-year-old gun possession conviction, Reply Brief of Appellant, *McCarson*, 527 F.3d 170, 2007 WL 5029473 at *11, but the decision itself does not mention the dates of the convictions or their temporal remoteness.  Both *Cassell* and *Douglas* involved convictions or arrests about three years old, *see Cassell*, 292 F.3d at 790; *Douglas*, 482 F.3d at 595, and *Burch* did not even mention the age of the prior conviction.  This may be because age was not as relevant as similarity and theory of admission to the Rule 404(b) analysis, until *Sheffield* made it so.

admissible, so the final question is what part of the government's proffered evidence about the prior conviction can be introduced without unfair prejudicial effect or juror confusion.

### c) *The Prior Conviction is Relevant and Highly Probative.*

The defendant objects that none of the government's proffered prior conviction evidence should be admitted, arguing that his 1999 conviction has limited relevance and probative value because of its age. *See generally* Def.'s MIL; Def.'s Reply to Gov't's Supplemental 404(b) Briefing ("Def.'s Reply I"), ECF No. 63. The Court disagrees and finds that this prior conviction, due to the defendant's role in that offense and the quantity of drugs involved, is relevant for several non-propensity purposes. *See* FED. R. EVID. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . the fact is of consequence in determining the action."); *id.* 404(b) (listing purposes).

Even if *Sheffield* suggests that relevance fades over time, *see supra* Part III.C.2.b, relevance does not evaporate for purposes of showing the defendant's knowledge, motive and intent, *cf. McCarson*, 527 F.3d at 173–74 (considering prior acts and never mentioning their age); *Douglas*, 482 F.3d at 600–01 (same); *Cassell*, 292 F.3d at 796 (same); *Burch*, 156 F.3d at 1324 (same). That the defendant had previously possessed illegal narcotics with the intent to distribute increases the likelihood that he knew about the illegal narcotics stashed in the bedroom at the Foote Street location and that he intended to distribute them, as the D.C. Circuit has held many times before. *See Douglas*, 482 F.3d at 597; *Crowder*, 141 F.3d at 1208 n. 5; *Mitchell*, 49 F.3d at 777; *McGill*, 815 F.3d at 884 & n.6; *McCarson*, 527 F.3d at 174; *Pettiford I*, 517 F.3d at 588–90; *Latney*, 108 F.3d at 1448; *Harrison*, 679 F.2d at 948. That the prior conviction involved a significant quantity of narcotics, a kilogram, makes more probable that the defendant had the expertise necessary to possess and distribute the significant quantity of narcotics at issue in this case. *See United States v. Sitzmann*, 856 F. Supp. 2d 55, 63-65 (D.D.C. 2012) (deeming

evidence of prior high-volume drug trafficking relevant and probative of the defendant's ability to traffic in large quantities of drugs); *United States v. Tringali*, 71 F.3d 1375, 1379 (7th Cir. 1995) ("Part of Hernandez's defense was that he could not put a large drug deal together. The prior four-kilo transaction showed he had the knowledge and intent to do so."); *United States v. Calderon*, 127 F.3d 1314, 1331 (11th Cir. 1997) ("Evidence of prior large scale drug trafficking is directly relevant to the question of intent regarding the charged crimes of cocaine importation and distribution.").

The difference in the type of illegal narcotics at issue does not render the prior conviction irrelevant for these purposes. *See Mitchell*, 49 F.3d at 776–77 (admitting evidence of methamphetamine trafficking in a cocaine trafficking case); *McGill*, 815 F.3d at 884 (admitting evidence of prior crack cocaine dealing in a conspiracy case involving crack cocaine, cocaine, heroin, and marijuana); *see also, e.g.*, *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1224 (11th Cir. 1993) ("The only difference between the two offenses, the type of drug involved, is not material.").

Examination of the probative value of the evidence demonstrates that this is a case where other factors, including "similarity" and "theory of admissibility," enhance the probative value of the evidence and "outweigh[]" any "concerns regarding remoteness." *Hadley*, 918 F.2d at 851; *see also Spillone*, 879 F.2d at 519. This examination starts with assessment of the full evidentiary context. The government's available evidence of knowledge and intent is "not without holes." *Douglas*, 482 F.3d at 591. On that score, as already noted, the government's case against the defendant here is circumstantial: the defendant was not surveilled handling any illegal narcotics packages and was not present when the illegal narcotics stash was found at the Foote Street location; he did not own the Foote Street duplex, and Witness-1's statements that he

resided there may viewed by the jury as inherently biased, or even not credible; calls by Suspect-1 to his heroin supplier went to a number registered to a business, and, in fact, a different number was used to locate the defendant in Baltimore for arrest. As the defendant succinctly put it, "[t]he government's burden before the jury is to prove that Mr. Thorne had the specific and knowing intent that that the marijuana and heroin found in someone else's home was for the purposes of distribution . . . ." Def.'s Expert MIL at 2.

Given that similarity and these "holes," the probative value of the defendant's prior conviction is high. The defendant is currently charged with possession with intent to distribute and conspiracy to commit this substantive offense and was previously convicted of those same crimes. *See, e.g.*, *Burch*, 156 F.3d at 1324 (relying on the "likeness" of the crimes); *Douglas*, 482 F.3d at 601 (same); *Diaz-Lizaraza*, 981 F.2d at 1224 (holding that prior drug trafficking was highly probative where "[t]he intent elements of these two offenses were identical: possession with intent to distribute"). Moreover, the roles he played in his prior conduct and in the alleged conspiracy of selling narcotics as a wholesaler to a middleman for re-sale are identical. Evidence of the defendant's role in 1994 is highly probative to help prove the defendant's knowledge of how to access, store, arrange for distribution of and actually distribute large quantities of illegal narcotics, *see Douglas*, 482 F.3d at 600–01, and "to undercut his [anticipated] argument at trial that the contraband belonged to his girlfriend because [law enforcement] . . . found the contraband in his girlfriend's" duplex, *McCarson*, 527 F.3d at 173–174 (admitting defendant's prior convictions as "not only relevant" but "also highly probative of both his intent to distribute the crack cocaine and his constructive possession of the gun and the drugs.").

Limiting instructions will further "guard the space between the permissible and impermissible" uses for the prior conviction evidence. *Mitchell*, 49 F.3d at 777; *see also*

*Crowder*, 141 F.3d at 1210 (considering "the effect of a limiting instruction" in conducting balancing under Rule 403).

      **d)**    **To Guard Against Unfair Prejudice, Only Part of The Government's Proffered Evidence About the Prior Conviction May be Admitted.**

The conclusion that the defendant's 1999 prior drug conviction is relevant and highly probative under Rules 404(b) and 403 leaves open the question of what evidence the government may admit about that prior conviction consistent with Rule 403's concerns about unfair prejudice and confusion of the jury. As noted, *supra* Part III.C.1, the government's proffered evidence about this prior conviction consists of the 1999 Judgment, the parties' trial stipulation about the chemist report plus the report itself, and excerpts of testimony of four witnesses (*i.e.,* two cooperating defendants, Allen and Owens, and two police officers) from the defendant's prior trial in February 1999. Admission of this fulsome record would address *Sheffield*'s concern that the evidentiary value of an older prior conviction will not be apparent to a jury told only the fact of the prior conviction and would certainly more completely illustrate to the jury the defendant's knowledge "about such matters as how to acquire or to market" an illegal narcotic. 832 F.3d at 307-308.[21] Yet *Winstead*'s caution that an abundance of evidence about the prior conviction may "come with greater prejudice," 890 F.3d at 1086, counsels for close scrutiny of potential prejudice in each item of the proposed evidence, starting with the quantity of drugs.

Almost 44 kilograms of heroin and 50 pounds of marijuana were found at the Foote Street location, so a key task for the jury will be evaluating the defendant's expertise to engage in such large-scale narcotics trafficking. Evidence that the defendant previously possessed large

---

[21]    A limiting instruction describing the purposes for which the prior conviction could be considered was also given in *Sheffield*, but that instruction was apparently insufficient to overcome *Sheffield*'s panel majority's concern that the "evidentiary relevance" of the prior conviction would not be clear to a jury told "only about the fact of" the prior conviction. *See* 832 F.3d at 308 (reprinting the entire limiting instruction and finding that the error was harmless in part because of that instruction).

quantities of drugs is probative of this kind of expertise, which the government describes as an "understanding of the marketplace," Hr'g Tr. at 72:14–15, and capacity to move "*significant product*," Gov't's Mot. I at 39.  In the government's view, to the extent *Sheffield* implies that knowledge fades over time, this suggestion is less powerful, or even inapplicable, where the prior conviction involved large quantities of drugs, given the nature of the expertise and access required to be a high-level drug distributer.  *See* Hr'g Tr. at 75:18–19 ("It is a quantity [that] overcomes the prohibition, at least from the Government's perspective, in *Sheffield*."); Gov't's Mot. I at 38.  Such a concrete and specific theory connecting the prior conviction and the charged conduct should obviate concern that the jury in this case will lack sufficient information to grasp the prior conviction's "evidentiary relevance."  *Sheffield*, 832 F.3d at 307.  Thus, the fact of the 1999 conviction, along with the 1999 trial stipulation reflecting the one-kilogram quantity of cocaine base involved, are highly probative of the defendant's knowledge and access to large quantities of illegal narcotics.

The information contained in the 1999 Judgment and stipulation are not unfairly prejudicial.[22]  One kilogram of cocaine base is a significant but not an inflammatory amount, especially in the context of the much greater quantity of drugs at issue here.  *See* Wright & Graham, 22B FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5259 (citing "comparative enormity" as the number one factor courts consider in evaluating the potential prejudice of other crimes evidence and citing cases); *United States v. Asher*, 910 F.3d 854, 862 (6th Cir. 2018) ("[W]hen the charged crime has 'inflammatory potential' similar to or greater than the prior act, the risk of the jury being inflamed by presentation of the prior-act evidence may be

---

[22]    The chemist's report will not be admitted for two reasons: first, the chemist report shows the amount of cocaine base, information that is redundant of the information in the parties' stipulation and thereby "needlessly . . . cumulative," FED. R. EVID. 403; and, second, the chemist report reflects that two marijuana cigarette butts were tested, which evidence shows a personal use amount of marijuana that is not relevant.

diminished."). Thus, the 1999 Judgment and the parties' stipulation as to the quantity of drugs involved are admissible based on their relevance to proving intent, knowledge, and opportunity, and because the risk of unfair prejudice from admitting this evidence does not substantially outweigh its probative value.

Missing from these two documents is information about the defendant's role in the prior conviction, which is similar to the role he allegedly performed in the instant case. The government argues that the defendant's role as supplier in the 1994 deal is probative of his expertise in executing kilogram-quantity drug deals and of his wholesaler position in the charged 2018 conspiracy. *See* Gov't's Mot. I at 38. Admission of all 75 pages of prior trial testimony would certainly make clear to the jury that little "gap" exists between the prior conviction and the charged conduct. *Sheffield*, 832 F.3d at 308 (quoting *United States v. Bigesby*, 685 F.3d 1060, 1065 (D.C. Cir. 2012) (affirming district court's decision denying defense request to admit evidence of six-year-old prior conviction of person not called as defense witness who lived with the defendant where illegal narcotics were found)). This would address *Sheffield*'s concern about introducing too little evidence about a prior conviction. As discussed, however, *Winstead* warned that admission of too much evidence about a prior conviction could be unfairly prejudicial. 890 F.3d at 1086. Although the guidance from the D.C. Circuit on how little 404(b) evidence is too little and how much is too much is somewhat opaque, in this case, admission of all transcript excerpts proffered by the government to show the defendant's role would be too much.

From the testimony of Dennis Allen, the defendant's middleman who orchestrated the narcotics deal in 1994, the government seeks to admit 29 pages of excerpts describing the initial meeting with the CI, Allen's trip with Owens to get the drugs from the defendant, and the

group's return to the Bob's Big Boy. *See* Allen Testimony. Allen also testified that he had previously seen the defendant with the gun that was found in the backseat of the car. *See* Allen Testimony at 129:10–16. From the testimony of Lascelles Owens, the government seeks to admit six pages presenting the same story, minus Allen's observation about the defendant's possession of a gun. *See* Gov't's Supp. I, Lascelles Owens' Testimony ("Owens Testimony"), Ex. B-d, ECF No. 61-2. From the testimony of Sargent Kirk Holub, the government seeks to admit 14 continuous pages in which Holub recounts the events in the Bob's Big Boy parking lot, but from Holub's vantage point across the street, where police were waiting for the confidential informant to give the arrest signal. *See* Gov't's Supp. I, Kirk Holub's Testimony ("Holub Testimony"), Ex. B-c., ECF No. 61-2. Holub adds that the defendant fled as police approached, colliding with a police cruiser before being apprehended. *Id.* at 191:11–193:19. Finally, from Detective Christopher Sakala's testimony, the government seeks to admit 25 pages recounting the same main events. *See* Gov't's Supp. I, Det. Christopher Sakala's Testimony ("Sakala Testimony"), Ex. B-e, ECF No. 61-2.

Broadly, the defendant objects, echoing *Winstead*, that these proffered transcripts should be excluded in full "because the parallels in his previous case and the instant case are unmistakable" and thus unfairly prejudicial. Def.'s Reply I at 1. Yet, those "parallels" are precisely what make the defendant's prior conviction highly probative of his opportunity, knowledge, and intent in this case. Further, the basic facts and patterns of conduct shared by the prior conviction and the charged conduct must be shown to the jury, given *Sheffield*'s insistence that a conviction alone has "little evidentiary relevance." 832 F.3d at 307.

That said, admission, even through transcripts lacking the spark of live testimony, of all these grippingly similar details to the charged offense conduct, heightens the risk that the jury —

despite being instructed to consider the evidence for only legitimate purposes — will indulge the impermissible inference: because the defendant supplied narcotics for an illegal deal in a Washington-area restaurant parking lot before, he did so this time. Plus, introducing excerpts from four different witnesses poses some risk of confusing the jury.[23] To minimize these risks, instead of permitting admission of all 75-pages of trial transcripts from four witnesses, the trial transcript excerpts will be pared down to the core probative content: the defendant's role as the wholesale supplier of the illegal narcotics to a middleman for resale to another person. The government will be permitted to admit the following four pages from the trial transcript of Allen: page 1 (showing cover sheet of trial transcript with case name, court, date and related information); page 9, lines 20–23 (showing that Dennis Ray Allen was called to testify); page 127, line 15 through page 128, line 8. In this final excerpt, Allen testifies about his role connecting "Mr. Owens to the informant" in return for $1,500 from the defendant, who was the person with "the drugs for sale" and who "showed up with the drugs" and "got the drugs for the deal." *See* Allen Testimony, 127:15–128:8.

---

[23] The defendant also objects to the government's proposed evidence of the underlying facts of the defendant's 1999 prior conviction because "[t]he government provides no caselaw that supports the position that transcripts from a previous case are admissible as 404(b) evidence" and "[u]ndersigned counsel knows of no court in this district that has allowed same." Def.'s Reply I at 3 n.1. This objection is puzzling because transcripts of a defendant's prior guilty plea colloquy are frequently used as Rule 404(b) evidence. *See, e.g.*, *United States v. Burnett*, 827 F.3d 1108, 1118 (D.C. Cir. 2016) (noting admission of defendants' prior guilty pleas as Rule 404(b) evidence); *Pettiford* (*Pettiford II*), 627 F.3d 1223, 1229 n.9 (D.C. Cir. 2010) (noting that "instead of calling witnesses to the events of" the defendant's prior conviction, "the court admitted the evidence of Pettiford's guilty plea to the earlier offense" by "read[ing] to the jury a redacted transcript of his guilty plea" and observing that the evidence "might have had more impact if, instead of being read to the jury in a brief, matter-of-fact way, it had been introduced through the testimony of the officers who witnessed Pettiford engage in an apparent drug sale"). Indeed, as a tactical matter, to reduce the drama of prior bad act evidence, defendants may agree to use of a transcript to avoid the presentation of additional details through a live witness. *See, e.g.*, *Pettiford I*, 517 F.3d at 592 (noting that defendant made "tactical choice" for use of his plea transcript as Rule 404(b) evidence because "Pettiford's counsel preferred a dry transcript to the live testimony of police officers"); *United States v. Curtis*, 481 F.3d 836, 838 (D.C. Cir. 2007) (rejecting defendant's objection to admission of two police officers' live testimony about facts underlying prior conviction, when defendant did not contest introduction of his prior plea colloquy, under Rule 404(b), since "the government is, in general, permitted to determine how to present its case" and "is not limited to one piece of evidence for each material fact"). Moreover, memories may fade over time, and thus use of a prior transcript may provide more accurate details than recalling witnesses to testify live.

Admission of the remainder of Allen's testimony would pose too great a danger of confusion and undue prejudice. For one, imperfections in Allen's testimony risk drawing the jury in this case too deeply into the story of and trial on an event for which the defendant has already been tried and convicted. *See* Def.'s Reply I at 2. Allen struggles to remember, and to recount cogently, specifics of the drug deal, such as whether the defendant approached the undercover informant or stayed in the car. *See* Allen's Testimony at 57:1–3.[24] Allen's testimony was so muddled on this point and others that the trial judge intervened, twice, "for clarification for the record." *Id.* at 57:12; *see also id.* at 42:21–44:14. The "jury in the instant case," the defendant objects, will be "left to speculate" about gaps in Allen's account and will be "unable to gauge the credibility" of Allen's testimony about precisely what occurred when in the parking lot. Def.'s Reply I at 2.[25] In tempting the jury to get bogged down in issues like Allen's credibility that were the job of the prior jury, the fuller transcripts invite juror confusion.

Confusion plagues the particular portion of Allen's testimony describing the defendant's possession of a gun during the prior transaction. The prosecutor, after several attempts, eventually elicited from Allen the fact that Allen had previously seen the defendant with the gun found on the floor of a car at the Bob's Big Boy. *See* Allen's Testimony at 129:10–16. Allen does not say when or where the defendant had the gun. The government argues that this testimony is probative of the defendant's knowledge and intent on the current firearm charges,

---

[24] The defendant's eventual decision to stay in the car "[b]ecause he don't know Mr. Owens," Allen Testimony 129:4, parallels the defendant's alleged reluctance to meet with the UC until he and the UC had a relationship, *see* Gov't's Mot. I at 11. The government has not made any specific arguments about the probative value of this detail, and it will not be admitted.

[25] Complicating the issue of Allen's credibility is the fact that Allen cooperated with law enforcement but acknowledges this cooperation in a portion of the transcript that the government does not seek to admit. *See* Gov't's Mot. I, Trial Transcript at 18:14–25, Ex. C, ECF No. 34-3. Inherent in admitting slices of a witness's direct testimony at a prior trial is that some information for evaluating credibility is lost, but this is balanced here by severely limiting the scope of the prior testimony to be admitted.

*see* Gov't's Mot. I at 39, but any such probative value is substantially outweighed by the risks of unfair prejudice and juror confusion posed by introduction of Allen's vague testimony.

As to the transcript excerpts from the three other witnesses, the proposed excerpts from Owens' testimony describe his interactions with Allen and the defendant on the day of the drug deal. Allen, not Owens, communicated with the defendant, however, so Owens' testimony is less directly probative of the defendant's role and is otherwise redundant of Allen's testimony. Considerable portions of Holub's and Sakala's testimony are of such limited relevance that their probative value is easily outweighed. The first five pages of Holub's testimony describe, in excruciating detail, his position in a parking lot "next to a Safeway" in relation to the Bob's Big Boy parking lot. *See* Holub Testimony at 181:23–187:2. Sakala's testimony contains similarly extraneous information about police operations, *see* Sakala Testimony at 292:14–294:6, and even Sakala's background, *see id.* at 291:22–292:16. Further, repetition of the play-by-play of the transaction — the meetings in the Bob's Big Boy and the arrest signal and police pursuit — are not necessary to understand the defendant's role in the drug deal. Piling on the details of the 1994 drug deal would risk confusing the jury. Further, both Holub and Sakala describe the defendant's run from the police. *See* Holub Testimony at 191:11–193:19; Sakala Testimony at 318:10–319:16. The defendant's flight parallels his possible flight to Baltimore after the recovery of the drugs from Foote Street, but the parallel facts are so thin that introduction of the evidence would invite the impermissible inference that, if the defendant fled because he was guilty in 1994, then he's guilty this time because he fled.

For all these reasons, the four pages identified from Allen's testimony at the 1999 trial have high probative value that is not substantially outweighed by the risk of unfair prejudice

inherent in the introduction of a prior conviction, but the remaining proffered trial transcripts will be excluded.

### 3. *Admission Under Rule 609*

"[M]ore than 10 years have passed since the [defendant]'s . . . release from confinement" on August 20, 2008, so "[e]vidence of the conviction is admissible only if . . . its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." FED. R. EVID. 609(b).[26] "Rule 609(b) carves out a specific class of prior convictions, that would otherwise be admissible under Rule 609(a), but are declared to be inadmissible unless additional considerations are met." *United States v. Lewis*, 626 F.2d 940, 950 (D.C. Cir. 1980). The "danger" in admitting old convictions for purposes of impeachment is that "while their remoteness limits their probative value, their prejudicial effect remains." *United States v. Pritchard*, 973 F.2d 905, 908 (11th Cir. 1992).

The degree to which a prior conviction is probative for Rule 609 purposes depends on what the conviction is for, how old it is, and on whether the defendant's credibility will be central to the trial. *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980) ("Among the factors pertinent to an inquiry into whether the probative value of the prior conviction outweighs its prejudicial effects are the nature of the crime, the time of the conviction, the similarity of the past crime to the charged crime, the importance of the defendant's testimony, and the degree to

---

[26] The government argues that the defendant's prior conviction falls within the ten-year threshold because he was released from custody on August 20, 2008 and "the earliest involvement of the defendant in this case, per the indictment, is August 13, 2018." Gov't's Mot. I at 42. Although the D.C. Circuit has not explicitly identified Rule 609(b)'s start and end dates, the majority rule identifies the end date as, at least, the start of the trial. *See United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008) ("[T]he end date of the time limit for impeaching convictions is the start of the trial at which the witness is testifying."); *United States v. Hans*, 738 F.2d 88, 93 (3d Cir. 1984) ("Normally such evidence [under Rule 609] is admissible only if either the conviction or the witness' release from prison occurred within 10 years of the trial."); *see also United States v. Pettiford*, 238 F.R.D. 33, 37 (D.D.C. 2006) ("[F]or the purposes of determining whether a conviction is more than ten years old, the question is whether ten years has expired at the time the witness testifies at trial."). The defendant's trial is set to begin in April 2020, which is more than ten years after his release from custody.

which the defendant's credibility is central to the case.").  The probative value of this prior

conviction is "supported by the specific facts and circumstances."  FED. R. EVID. 609(b).  The

defendant's prior conviction is for a serious crime and thus reflects more strongly on his

credibility than a mere "crime of impulse."  *Lipscomb*, 702 F.2d at 1062.  Although the

defendant was about 22 years old at the time of the prior conviction, his role in the transaction,

and the significant quantity of drugs involved, suggests that the prior conduct was not simply a

youthful indiscretion.  *See Pettiford*, 238 F.R.D. at 43 (concluding that such a crime is less

probative).  Moreover, should the defendant choose to testify, his testimony "could play a

significant role in the jury's verdict," *Moore*, 75 F. Supp. 3d at 455, and the prior conviction has

substantial probative value in evaluating the defendant's anticipated defenses, discussed above,

*see Lewis*, 626 F.2d at 950 ("With appellant defending himself by denying knowledge of drug

transactions, it is clear that his prior conviction on a plea of guilty to distributing heroin has

substantial probative value on the issue of his credibility.").

Although the D.C. Circuit has cautioned that greater prejudice may result from admitting

under Rule 609 prior convictions similar to the instant charge, *see United States v. Gordon*, 383

F.2d 936, 940 (D.C. Cir. 1967), "[t]he potential prejudice that comes from admitting these same-

crime prior convictions is minimal when the jury has already been exposed to those prior

convictions for some other purpose," as the jury will be here.  *Moore*, 75 F. Supp. 3d at 456 (first

citing *Chauncey*, 420 F.3d at 874; and then citing *Lattner*, 385 F.3d at 961).[27]  This minimal

prejudicial effect from introducing the prior conviction for impeachment purposes is thus

substantially outweighed by the probative value of the prior conviction for the jury's assessment

of the defendant's credibility, and the conviction is admissible under Rule 609(b).

---

[27]     The defendant's motion *in limine* opposes introduction of the prior conviction for purposes of impeachment but presents no arguments specific to the Rule 609 balancing.  *See* Def.'s MIL.

## IV.  CONCLUSION

For the reasons stated, the government's evidence of prior money laundering is inadmissible under Rules 404(b) and 403.  The following submitted materials related to the defendant's prior conviction, however, are admissible for purposes of proving knowledge, intent, and opportunity: the 1999 judgment and commitment order, the parties' trial stipulation, and four pages of the trial testimony of Dennis Ray Allen, which are exhibits A and D and portions of exhibit B to the Government's Notice of Supplemental Filing Related to 404(b) Materials, ECF No. 61.  The chemist report and the remaining proffered transcripts from the 1999 trial, however, are excluded under Rule 403.  Finally, the defendant's prior conviction is admissible under Rule 609 for purposes of impeachment.

An appropriate Order accompanies this Memorandum Opinion.

Date:  January 10, 2020

_____
BERYL A. HOWELL
Chief Judge