**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 18-389 (BAH) |
| LINWOOD DOUGLAS THORNE, | Chief Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

### Table of Contents

I.   BACKGROUND ................................................................................................................. 2

   A. Investigation and Apprehension of Defendant ............................................................ 3

      1. August 2018 Undercover Transactions ................................................................... 3

      2. November 2018 Undercover Transactions .............................................................. 5

      3. Searches of Dou Perfect and the Foote Street Address ........................................... 8

      4. Fugitive Investigation and Defendant's Arrest ..................................................... 10

      5. Search of Linden Avenue Address Incident to Defendant's Arrest ...................... 13

   B. Procedural History ...................................................................................................... 15

II.  DISCUSSION ................................................................................................................. 17

   A. Defendant's Renewed Motions to Suppress Evidence Recovered During Foote Street
      and Barbara Lane Searches ......................................................................................... 18

      1. Reconsideration of Foote Street and Barbara Lane Warrants ............................... 20

      2. Applicable Legal Standards ................................................................................... 23

         a. Probable Cause ................................................................................................. 23

         b. Particularity and Overbreadth ......................................................................... 24

      3. Analysis of Foote Street Warrant .......................................................................... 25

         a. Particularity ..................................................................................................... 25

         b. Overbreadth ...................................................................................................... 28

         c. Errors in Filing of Warrant Return ................................................................. 32

         d. Alleged Factual Errors in Migliara Affidavit and Probable Cause ................ 34

            i.  Probable Cause for the Foote Street Warrant ............................................ 35

        ii.   Factual Inaccuracies Immaterial to Probable Cause ........................................ 38

    e.  *Franks* Hearing Not Warranted ........................................ 40

  4.  Analysis of Barbara Lane Warrant ........................................ 44

    a.  Particularity ........................................ 44

    b.  Overbreadth ........................................ 48

    c.  Errors in Filing of Warrant Return ........................................ 50

    d.  Alleged Factual Errors in Smith Affidavit and Probable Cause ........................ 53

        i.   Probable Cause for the Barbara Lane Warrant ................................ 53

        ii.   Factual Inaccuracies Immaterial to Probable Cause ........................................ 54

    e.  *Franks* Hearing Not Warranted ........................................ 56

B.  Defendant's Motion to Suppress Fruits of Law Enforcement Use of Cell-Site Simulator ........................................ 58

  1.  Description of Investigative Techniques Related to Cell Phone Location ................ 58

    a.  Cell-Site Simulators ........................................ 59

    b.  GPS "Pinging" ........................................ 62

  2.  Venue Under Rule 41 ........................................ 64

    a.  Applicable Legal Standard ........................................ 64

        i.   Principles Guiding Interpretation of Rule 41 ................................ 65

        ii.   Plain-Text Reading of Rule 41(b)(2) Produces Absurd Results ................... 69

        iii.  Constitutional Policies and Precedent Favor a Flexible Reading of Rule 41 ........................................ 74

        iv.  Rule 41(b)(2) Is Best Read to Impose a "Reason to Believe Standard" ......... 78

    b.  Law Enforcement Had "Reason to Believe" Defendant and His 202 Cell Phone Were in the District of Columbia ........................................ 83

    c.  Good-Faith Exception ........................................ 87

        i.   Applicable Legal Standard ........................................ 87

        ii.   Law Enforcement Reasonably Relied on the Cell-Site Simulator Warrant in Good Faith ........................................ 88

  3.  *Franks* Hearing Not Warranted ........................................ 93

C.  Defendant's Motion to Suppress Cell Phones Seized at Arrest Location ........................ 95

  1.  Applicable Legal Standard ........................................ 98

  2.  Seizure of Cell Phones Was Constitutional ........................................ 99

III.  CONCLUSION ........................................ 103

The defendant, Linwood Douglas Thorne, is charged in six counts with multiple firearms and narcotics offenses, including possession with intent to distribute one kilogram or more of heroin and detectable amounts of fentanyl and marijuana, and conspiracy to distribute those illegal drugs, in violation of 18 U.S.C. §§ 924(c)(1) and 922(g)(1) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(C), 841(b)(1)(D), and 846. *See* Superseding Indictment (Oct. 23, 2019) at 1–4, ECF No. 28. In advance of the trial scheduled to begin on October 4, 2021, *see* Min. Order (Oct. 1, 2020), defendant has moved to suppress the fruits of, first, two search warrants, which were issued for his Washington, D.C. residence and Dou Perfect, defendant's Clinton, Maryland auto-repair business, during law enforcement's investigation of his alleged criminal activities and, second, a cell-site simulator warrant, which was obtained to assist a fugitive apprehension investigation leading to his arrest. In these three pending suppression motions, he alleges a myriad of Fourth Amendment violations that, in his view, render the challenged warrants invalid and the evidence obtained pursuant to them inadmissible. *See* Def.'s Renewed Mot. Suppress Evid. Recovered During Search of Foote St. Address ("Def.'s Foote St. Mot."), ECF No. 120; Def.'s Renewed Mot. Suppress Evid. Recovered During Search of Barbara Lane Location ("Def.'s Barbara Lane Mot."), ECF No. 121; Def.'s Mot. Suppress Fruits Law Enforcement Use of Cell-Site Simulator ("Def.'s Cell-Site Mot."), ECF No. 122. Defendant also challenges the seizure incident to his arrest of three cell phones that were not on his person, and

seeks to suppress any evidence recovered from the phones as well as the phones themselves. Def.'s Mot. Suppress Cell Phones at Arrest Location ("Def.'s Cell Phones Mot."), ECF No. 123.

A hearing on the pending motions to suppress was held on June 22, 2021. *See* Min. Entry (June 22, 2021); Rough Tr. of Mots. Hr'g (June 22, 2021) ("Hr'g Tr. (Rough)").[1] For the reasons explained below, defendant's motions to suppress the evidence recovered from his Washington, D.C. home and Dou Perfect; the fruits of law enforcement's use of a cell-site simulator to locate and ultimately apprehend him; and the cell phones seized incident to his arrest are denied.[2]

# I. BACKGROUND

Background on the pending charges against defendant, law enforcement's investigation of his alleged narcotics-trafficking activities, and his eventual apprehension are set out below to inform the analysis of defendant's motions to suppress, followed by review of the procedural history of this case to date.

---

[1] Citations to the June 22, 2021 motions hearing transcript are to a rough draft of the transcript, since no final transcript is available. When finalized, the transcript will be posted on this case's docket. Discrepancies in page numbers between the rough and final transcripts may exist.

[2] Defendant's two motions *in limine* to limit the testimony of the government's proffered expert in cell-site analysis, Def.'s Mot. *in Lim*. Exclude Expert Test. & Cellular Analysis Report & Charts of Special Agent Mathew Wilde ("Def.'s First Wilde Mot."), ECF No. 39; Def.'s Mot. *in Lim*. Exclude Expert Test., Cellular Analysis Report & Charts of Special Agent Mathew Wilde ("Def.'s Second Wilde Mot."), ECF No. 74, also remain pending. As described *infra* Part I.B, these motions were initially submitted over a year ago by defendant's previous counsel, in connection with a December 2019 hearing on pretrial motions filed in anticipation of defendant's trial, which was then scheduled to begin in April 2020. In the intervening months, defendant's trial was delayed until October 2021 due to the COVID-19 pandemic, and defendant changed counsel several times. His current counsel, who was reappointed in February 2021, initially represented that, although she "d[id] not anticipate a blanket exclusion of Agent Wilde's testimony," as originally sought in the motions *in limine*, she planned to pursue "the setting of certain boundaries to [Agent Wilde's] testimony" and to "limit[] the introduction of diagrams" submitted as part of Agent Wilde's expert report. Def.'s Notice of Position Regarding Whether Motions to Exclude Cell Site Expert and Analysis Are Moot ("Def.'s Cell-Site Notice") at 3, ECF No. 129. Like her predecessor, defendant's counsel requested a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on the reliability of Agent Wilde's methodology. *See* Def.'s Cell-Site Notice at 2–3. At the June 22, 2021 motions hearing, defendant's counsel clarified that she is no longer asking for a *Daubert* hearing and plans instead to confer with the government about certain of Agent Wilde's diagrams in advance of trial and pursue any objections to his testimony via cross-examination or competing expert testimony at trial. Hr'g Tr. (Rough) at 116:14–117:5. Accordingly, defendant's motions *in limine* concerning Agent Wilde's testimony, ECF Nos. 39 and 74, are denied.

## A.    Investigation and Apprehension of Defendant

As set out in a prior decision resolving the parties' motions regarding evidence proffered by the government under Federal Rules of Evidence 404(b) and 609, *see United States v. Thorne* ("*Thorne I*"), Crim. A. No. 18-389 (BAH), 2020 WL 122985, at *2–3 (D.D.C. Jan. 10, 2020), and the affidavits submitted in support of law enforcement's applications to search defendant's Washington, D.C. residence and Clinton, Maryland auto-repair business, *see* Gov't's Omnibus Opp'n Def.'s Second Mots. Suppress Evid. Obtained Pursuant to Search Warrants ("Gov't's Opp'n"), Ex. B, Foote St. Search Warrant ("Foote St. Warrant"), Aff. of Special Agent Richard A. Migliara Supp. Appl. Search Warrant ("Migliara Aff."), ECF No. 124-2; *id.*, Ex. H, Barbara Lane Search Warrant ("Barbara Lane Warrant"), Aff. of Special Agent Kevin T. Smith Supp. Search Warrant ("Smith Aff."), ECF No. 124-8, the events that led to law enforcement's identification of defendant as the supplier of heroin to an individual known as Suspect-1, who made four separate sales of guns and illegal narcotics to an undercover agent ("UC") in August and November 2018, are as follows.[3]

### 1.    *August 2018 Undercover Transactions*

In July 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), and the D.C. Metropolitan Police Department ("MPD") "began investigating [Suspect-1] for possible criminal offenses involving the illegal sale of firearms and narcotics." Migliara Aff. ¶ 8; Smith Aff. ¶ 6. Over the course of that investigation, between August and November 2018, the UC engaged in four controlled purchases of guns and drugs with Suspect-1, as the Migliara and Smith Affidavits describe in detail and is summarized

---

[3]    Suspect-1 has since been identified as Omar Elbakkoush, who is currently charged with two counts of unlawful distribution of heroin and two counts of firearm possession in a pending case.  *See* Indictment, *United States v. Elbakkoush*, No. 18-cr-387 (BAH) (D.D.C. Dec. 20, 2018), ECF No. 4.

here. "Suspect-1 made his first two sales, of guns, ammunition, and marijuana, to the UC in August." *Thorne I*, 2020 WL 122985, at *2. At the first buy, on August 6, 2018, the UC paid Suspect-1 $3,000 for "half a kilogram of . . . marijuana[], one unloaded Mack 11 9 mm handgun, one extended magazine, and one regular magazine." Migliara Aff. ¶ 9; *see also* Smith Aff. ¶ 8. At the second buy, on August 20, 2018, the UC paid Suspect-1 $7,600 for two pounds of marijuana, various ammunition, a silencer, a Sig Sauer pistol with an extended magazine, a Draco AK-47 pistol with a magazine, and one AR-15 rifle with multiple magazines. Migliara Aff. ¶ 10. All of this contraband was brought to the transaction in "a big black duffle bag." *Id.*; *see also* Smith Aff. ¶ 10.

Soon after this second transaction, the undercover agent's conversations with Suspect-1 "shifted from the purchase of marijuana and firearms to the purchases of heroin and firearms." Migliara Aff. ¶ 11; *see also* Smith Aff. ¶ 11. Over the course of these exchanges, "Suspect-1 . . . told the UC that he had a heroin supplier willing to sell kilogram-quantities of heroin." *Thorne I*, 2020 WL 122985, at *2; *see also* Migliara Aff. ¶ 11; Smith Aff. ¶ 11. "[O]n September 24, 2018, Suspect-1 told the UC that he believed his supplier to be a millionaire who owned a mechanic shop, an auto-body shop, and a small car dealership." *Thorne I*, 2020 WL 122985, at *2 (internal quotation marks and citation omitted); *see also* Migliara Aff. ¶ 22; Smith Aff. ¶ 15. "During conversations in October 2018, Suspect-1 discussed the terms of a heroin transaction with the UC, referring to his heroin supplier as 'OG,' 'Doug' or 'Uncle D.'" *Thorne I*, 2020 WL 122985, at *2 (citation omitted); *see also* Migliara Aff. ¶ 12; Smith Aff. ¶ 12. "On October 18, 2018, Suspect-1 informed the UC that he had been unable to speak to OG because OG went on vacation with his significant other to Cancun, Mexico for a week." *Thorne I*, 2020 WL 122985, at *2 (internal quotation marks and citation omitted); *see* Migliara Aff. ¶ 24; Smith Aff. ¶ 27.

"Law enforcement subsequently confirmed, consistent with Suspect-1's statement, that the defendant had traveled to Mexico," returning to the Washington, D.C. area on or about October 16, 2018. *Thorne I*, 2020 WL 122985, at *2; *see* Migliara Aff. ¶ 24; Smith Aff. ¶ 27.

### 2. *November 2018 Undercover Transactions*

"In November 2018, according to the government, the UC completed two controlled purchases of heroin supplied by the defendant." *Thorne I*, 2020 WL 122985, at *2. At the third transaction, on November 1, 2018, Suspect-1 entered the UC's vehicle and "explained that he was waiting for the heroin to arrive within five minutes from his supplier." Migliara Aff. ¶ 12; *see also* Smith Aff. ¶ 12. After some time passed, Suspect-1 "call[ed] his heroin supplier . . . to find out when the heroin would arrive." Migliara Aff. ¶ 12; *see also* Smith Aff. ¶ 12. Suspect-1 indicated that his supplier's subordinate would drop off the heroin, but after the heroin did not arrive, the UC left. Migliara Aff. ¶ 12; Smith Aff. ¶ 12. Suspect-1 then called the UC back, explaining that the heroin had been delivered. Migliara Aff. ¶ 13; Smith Aff. ¶ 13. The UC drove back to the transaction location and purchased 131 grams of heroin for $10,800 from Suspect-1. Migliara Aff. ¶ 13; Smith Aff. ¶ 13.

On that same date, law enforcement learned, via a pen register installed on Suspect-1's cell phone, that Suspect-1 "was in contact with [a telephone number with area code (301)] on several occasions in the same time frame . . . as when [Suspect-1] told the UC that he was trying to ascertain the whereabouts of his incoming heroin"—*i.e.*, from approximately 12:30 p.m. to approximately 3:30 p.m. Migliara Aff. ¶ 21; *see also* Smith Aff. ¶ 14(a). This phone number with area code 301 "was the listed business contact number for Dou Perfect," Migliara Aff. ¶ 21; *see also* Smith Aff. ¶ 14(a), an auto-repair business located at 7605 Barbara Lane, Suite B, in Clinton, Maryland. *See Thorne I*, 2020 WL 122985, at *2. Law enforcement also obtained "information from a reliable, non-testifying Confidential Source," who advised that defendant

was "known to supply large amounts of heroin," and that defendant did so "in part using [Dou Perfect]," where he "ha[d] stored large amounts of heroin . . . as recently as late November 2018." Smith Aff. ¶ 14(b). "[A] business records search listed [defendant] as a business contact/key executive of Dou' Perfect Auto Repair and Detailing LLC." *Id.* ¶ 14(a).

Law enforcement arranged a fourth controlled purchase for November 29, 2018. "[Suspect-1] indicated that he first had to pick up the heroin from his supplier," and that "he would first have to get picked up by his driver, who would then drive him to meet his supplier." Migliara Aff. ¶ 14; *see also* Smith Aff. ¶ 16. Later, at approximately 1:25 p.m., law enforcement conducting surveillance observed Suspect-1 exit an apartment complex in Fairfax, Virginia, place a black bag in the trunk of a Mercedes four-door sedan, and get into the vehicle's rear passenger seat. Migliara Aff. ¶ 16; Smith Aff. ¶ 17. The Mercedes then drove to, and Suspect-1 entered, a Hip Hop Fish and Chicken located at 7600 Old Branch Avenue in Clinton, Maryland, arriving at around 2:05 p.m. Migliara Aff. ¶ 17; Smith Aff. ¶ 18.

A few minutes later, at approximately 2:08 p.m., law enforcement observed defendant leave Dou Perfect in a dark gray Jeep Grand Cherokee and drive directly to and enter the Hip Hop Fish and Chicken, where defendant met with Suspect-1. Migliara Aff. ¶¶ 17–18; Smith Aff. ¶ 18. Shortly after, at about 2:20 p.m., defendant and Suspect-1 left the restaurant, got into the Jeep, with defendant driving and Suspect-1 in the front passenger seat, and drove out of the parking lot, followed by the Mercedes. Migliara Aff. ¶ 17; Smith Aff. ¶ 18. The Jeep and the Mercedes proceeded to the rear of Mid-Atlantic Crab and Seafood, located across the street from the Hip Hop Fish and Chicken. Suspect-1 "exited the Jeep and opened the rear passenger door of the Mercedes before briefly going back to the Jeep to meet with [defendant], who remained seated in the Jeep." Migliara Aff. ¶ 18; Smith Aff. ¶ 18. At approximately 2:23 p.m., defendant

left in the Jeep and was seen returning to Dou Perfect, while Suspect-1 again "entered the rear passenger seat of the Mercedes, which also drove out of the area." Migliara Aff. ¶ 19; Smith Aff. ¶ 19. Suspect-1 proceeded directly to meet, at approximately 2:55 p.m., with the UC in a parking lot located at 1535 Alabama Avenue Southeast, Washington, D.C. Migliara Aff. ¶¶ 14, 20; Smith Aff. ¶¶ 20, 22.

Suspect-1 "exited a black Mercedes sedan and retrieved a small black duffle bag from the trunk of the Mercedes." Migliara Aff. ¶ 14. Suspect-1 then gave the undercover agent "a clear plastic baggie filled with large chunks of suspected heroin," which "was later field-tested and came back positive for the presence of opiates" and "weighed approximately 129 grams," as well as "two revolvers and one Glock pistol," in exchange for $10,300. *Id.*; *see also* Smith Aff. ¶ 22. In total, between August 6, 2018 and November 29, 2018, Suspect-1 "sold eight firearms, approximately 1.5 kilograms of marijuana, approximately 260 grams of heroin, several firearms magazines, and other firearms accessories" to the UC. Migliara Aff. ¶ 15.

Following the November 2018 controlled purchases, the UC spoke to Suspect-1, on December 5, 2018, about purchasing one kilogram of heroin from "OG." *Thorne I*, 2020 WL 122985, at *3. "While discussing this deal, Suspect-1 reported that OG did not want to meet with the UC until OG had established a relationship with the UC with respect to large quantities of heroin." *Id.* (internal quotation marks, citation, and alteration omitted). "Also in December, law enforcement observed the defendant leaving 4215 Foote Street, a duplex residence in Northeast Washington, D.C., in the same Jeep Grand Cherokee he had driven [on] November 29," on two occasions. *Id.* at *3. Specifically, on December 7, 2018, at approximately 9:20 p.m., law enforcement saw the Jeep parked directly behind the Foote Street residence. Migliara Aff. ¶ 25. The next morning, at approximately 10:05 a.m., defendant was seen exiting the

building, getting into the Jeep, and driving away. *Id.* Likewise, on December 11, 2018 at approximately 10:00 a.m., defendant was observed leaving the Foote Street residence through the front door and driving away in a Chevrolet SUV. *Id.* ¶ 26. He then parked in a random parking lot for thirty seconds before departing from the lot, without exiting the vehicle. *Id.* Public records database searches indicated that defendant and his then-girlfriend, Kelli Davis, resided at the Foote Street location. *Id.* ¶ 24.

### 3. *Searches of Dou Perfect and the Foote Street Address*

Relying on these and other facts, law enforcement obtained warrants to search the Barbara Lane address where Dou Perfect was located and the Foote Street address. The search warrant for the Foote Street address was issued on December 17, 2018 by a Magistrate Judge of this Court, *see* Gov't's Opp'n, Ex. B, Foote St. Warrant at 1, ECF No. 124-2, while the search warrant for Dou Perfect was issued on December 18, 2018 by a Magistrate Judge in the District of Maryland, *see id.*, Ex. H, Barbara Lane Warrant at 1, ECF No. 124-8. Both warrants were supported by substantially similar affidavits, outlining the facts described above, submitted by FBI Special Agent Richard Migliara for the Foote Street Location, *see* Migliara Aff., and ATF Special Agent Kevin T. Smith for Barbara Lane address, *see* Smith Aff.

On December 19, 2018, law enforcement executed the search warrants at both locations and found approximately four million dollars' worth of heroin laced with fentanyl, fifty-five pounds of marijuana, several firearms, and various distribution paraphernalia. *Thorne I*, 2020 WL 122985, at *3; Gov't's Opp'n, Ex. K, Order, No. 18-sw-353 (D.D.C. Dec. 26, 2018) ("Cell-Site Warrant"), Aff. of Kevin Smith Supp. Appl. Search Warrant ("Cell-Site Warrant Aff.") ¶ 11, ECF No. 124-11. Defendant was not present at either location. At the Foote Street location, law enforcement seized "44 kilograms of heroin, some laced with fentanyl," "50 pounds of marijuana in large, opaque bags," "clear and colored baggies," "six firearms," and various narcotics

distribution paraphernalia. *Thorne I*, 2020 WL 122985, at *3 (internal citations omitted); *see also* Gov't's Opp'n, Ex. D, Form FD-302 for Foote St. Warrant (Dec. 31, 2018) ("Foote St. FD-302") at 2–3, ECF No. 124-4. Kelli Davis, defendant's girlfriend and the owner of the Foote Street residence, was present at the scene. She informed law enforcement that "defendant had resided at 4215 Foote Street for the year or two prior to his arrest" with her and her two children and stated that the contraband recovered from the home belonged to defendant. *Thorne I*, 2020 WL 122985, at *3; *see also* Cell-Site Warrant Aff. ¶ 11. Davis also provided defendant's cell phone number, with a 301 area code that law enforcement had previously identified as being associated with defendant during the investigation of Suspect-1. Cell-Site Warrant Aff. ¶ 11; Hr'g Tr. (Rough) at 65:22–66:11.

At Dou Perfect, law enforcement seized, among other items, mail matter; documents, including a rental agreement between defendant and the landlord for the property; forty-six rounds of nine millimeter ammunition; two laptops; and two vehicles, a GMC Sierra K1500 Denali and a Lexus RX 350. Gov't's Opp'n, Ex. J, Form FD-597, Receipt for Property (Dec. 19, 2018) ("Barbara Lane Receipt") at 1, ECF 124-10; Hr'g Tr. (Rough) at 11:24–12:16; *Thorne I*, 2020 WL 122985, at *3. Special Agent Migliara, who was present at the Dou Perfect search, prepared the requisite paperwork while at the scene and documented the receipt for property on the same day the warrant was executed. Barbara Lane Receipt at 1; Hr'g Tr. (Rough) at 79:3-6. He testified that he gave the receipt and a copy of the warrant to "the designate of the [building's] owner" at the scene. Hr'g Tr. (Rough) at 80:11-20; *see* Barbara Lane Receipt at 1; Gov't's Opp'n, Ex. I, Form FD-302 for Barbara Lane Warrant (Jan. 3, 2019) ("Barbara Lane FD-302") at 2, ECF No. 124-9; Gov't's Opp'n at 27, ECF No. 124. These documents were produced to defendant in discovery. Gov't's Opp'n at 27. The search was also documented in a formal

FD-302. *See* Barbara Lane FD-302. Special Agent Smith completed the Barbara Lane warrant return and gave it to Davis when she was interviewed at the FBI's Washington Field Office. Hr'g Tr. (Rough) at 39:9-12, 40:15–41:10. The warrant return was also filed in the District of Maryland with the property receipt form for the Foote Street search, not the Dou Perfect search, attached. *Id.* at 26:18–27:11.

### 4. *Fugitive Investigation and Defendant's Arrest*

One day later, on December 20, 2018, defendant was indicted, *see* Indictment (Dec. 20, 2018), ECF No. 1, and a warrant was issued for his arrest, *see* Arrest Warrant (Dec. 20, 2018), ECF No. 5. Law enforcement officers from the U.S. Marshals Service, ATF, and the FBI accordingly initiated "a fugitive apprehension investigation" to locate and arrest defendant. Gov't Opp'n, Ex. L, Form FD-302 for Cell-Site Simulator Warrant (Jan. 10, 2019) ("Cell-Site FD-302") ¶ 2, ECF No. 124-12. That same day, December 20, 2018, Special Agent Smith was contacted by a defense attorney, Ivan Bates, who stated that he represented defendant. Hr'g Tr. (Rough) at 33:19-24. Mr. Bates informed Special Agent Smith "that he had spoken to [defendant], and [defendant] wished to turn himself in on the next day (Friday, December 21, 2018) at [Bates's] office in Baltimore, Maryland." Cell-Site FD-302 ¶ 3; *see also* Hr'g Tr. (Rough) at 34:2-5. The next day, December 21, 2018, Mr. Bates again contacted Special Agent Smith and told him that defendant "wished to spend the Christmas holiday with his family and asked if [Smith] would be willing to allow [defendant] to turn himself in on December 26, 2018." Cell-Site FD-302 ¶ 4. Smith responded "that it would be more beneficial if [defendant] resolved the matter as soon as possible." *Id.*

Also on December 21, 2018, a second defense attorney, James Crawford, contacted Special Agent Smith to say that defendant had "contacted [Mr. Crawford] regarding his legal issues," but Crawford had encouraged defendant to continue working with Mr. Bates. *Id.* ¶ 5.

On the following day, December 22, 2018, Crawford again contacted Special Agent Smith via email and "stated that he was indeed representing [defendant]." *Id.* ¶ 6; *see also* Hr'g Tr. (Rough) at 34:20–35:9, 58:10-15. Special Agent Smith informed Crawford that there was an outstanding arrest warrant for defendant. Cell-Site FD-302 ¶ 6. Crawford attempted to coordinate defendant's surrender, at one point proposing that law enforcement meet defendant "at the courthouse" in the District of Columbia, Hr'g Tr. (Rough) at 61:15-19; *see also id.* at 35:16-19, and also suggesting that defendant surrender at Crawford's Baltimore, Maryland office, *id.* at 35:20-23. He told Smith that he "would reach out to [defendant] to discuss his surrender to law enforcement," but reiterated defendant's "desire to wait until December 26, 2018, to resolve the matter so that [defendant] could spend Christmas with his family." Cell-Site FD-302 ¶ 6.

On December 25, 2018, Special Agent Smith sent a text message to Mr. Crawford, "inquiring as to whether [defendant] was prepared to surrender to law enforcement" on December 26. *Id.* ¶ 7. Crawford responded by text, "stating that he had spoken to [defendant] and [defendant had] informed him that he would not be surrendering on December 26, 2018." *Id.* ¶ 8. Finally, on December 26, 2018, the day of defendant's anticipated surrender, Mr. Bates contacted Special Agent Smith, "stated that [defendant] was not going to surrender to law enforcement," and provided Smith with a cell phone number with area code 202 that defendant had been using to contact him. *Id.* ¶ 9; *see also* Cell-Site Warrant Aff. ¶¶ 6, 14; Hr'g Tr. (Rough) at 36:10-14.

With that 202 number in hand, on December 26, 2018, law enforcement applied in this District for a search warrant to use a cell-site simulator "to determine with precision the . . . location" of the 202 cell phone number provided by the attorney, in the hopes of tracking

defendant's whereabouts.  Cell-Site Warrant Aff. ¶ 4; *see also* Cell-Site Warrant.  A cell-site simulator warrant for the 202 number was accordingly issued on December 26, 2018 by a Magistrate Judge of this Court, *see* Cell-Site Warrant, based on an affidavit submitted by Special Agent Smith, *see* Cell-Site Warrant Aff.[4]

One day after the cell-site simulator warrant was issued, on December 27, 2018, the government obtained GPS ping warrants on defendant's cell phones, also issued by a Magistrate Judge of this Court.  Gov't Opp'n at 40; Hr'g Tr. (Rough) at 48:19–49:8, 67:17-20.[5]  By January 3, 2019, the GPS pings received pursuant to these warrants indicated that defendant was in Baltimore, Maryland.  Gov't Opp'n at 40; Hr'g Tr. (Rough) at 72:24–73:10.  Once law enforcement knew that defendant was in the Baltimore area, on January 3, 2019, the cell-site simulator on the 202 cell phone number was activated to pinpoint a more precise location.  Gov't Opp'n at 40–41; *see* Hr'g Tr. (Rough) at 72:24–73:10.  The simulator led law enforcement to the Linden Avenue neighborhood and even to a particular block, but did not identify a single residence, townhome, or apartment where defendant was located.  Gov't Opp'n at 40–41.

Thus, to find defendant, Deputy U.S. Marshal Chris Hegarty, along with Special Agent Smith, FBI Special Agent Chris Ray, and others, surveilled the Linden Avenue area.  *See* Def. James Hutchings's Mot. Suppress Evid. ("Hutchings Mot."), Ex. 1, Rep. of Investigation (Jan. 4, 2019) ("Arrest Rep.") at 1–2, *United States v. Hutchings*, No. 19-cr-361-02 (BAH) (D.D.C. Apr.

---

[4]    At the same time, officers also sought and obtained a substantially similar warrant for the 301 cell phone number provided by Ms. Davis and known by law enforcement to be used by defendant.  Gov't Opp'n at 30; Hr'g Tr. (Rough) at 67:13-16.  This warrant was never used by law enforcement, however, because the cell phone connected to the 301 number was turned off during the relevant time period.  Hr'g Tr. (Rough) at 107:20–108:8.  Accordingly, defendant does not challenge the cell-site simulator warrant issued for his 301 cell phone number or its fruits.  *See* Def.'s Cell-Site Reply at 1 n.1 (noting that defendant's motion to suppress the fruits of the cell-site simulator "applies to the 301 number" only "[i]f law enforcement received cell-site simulator information from the 301 number . . . on January 3, 2019").
[5]    Defendant does not challenge these GPS ping warrants.  *See* Hr'g Tr. (Rough) at 48:19–49:3.

21, 2020), ECF No. 51.[6]  While waiting outside, the officers saw two individuals leave a rowhouse apartment building and get into a silver Dodge Charger.  According to Hegarty, one of the individuals resembled defendant.  *Id.* at 1.  The officers followed and pulled over the vehicle on the same block as the apartment building.  They questioned the driver and passenger about defendant's whereabouts, and the driver divulged that defendant was inside 2226 Linden Avenue, in Apartment Number 2 and that he was alone.  *Id.*

Based on this information, the officers proceeded to Apartment Number 2 and Deputy U.S. Marshals knocked on the door.  *Id.*; Tr. of Mot. Hr'g (Oct. 15, 2020) ("*Hutchings* Tr.") at 26:8-11, *Hutchings*, No. 19-cr-361-02 (BAH) (D.D.C. Nov. 16, 2020), ECF No. 102.  When no one answered, the door was forced open.  Arrest Rep. at 1.  The U.S. Marshals entered and directed defendant to show himself.  *Id.*  Defendant "came out of the rear bedroom area and into the front living room area."  *Id.*; *see also Hutchings* Tr. at 26:11-12.  Officers placed him under arrest without incident.  Arrest Rep. at 1.

### 5.    *Search of Linden Avenue Address Incident to Defendant's Arrest*

Immediately after defendant's apprehension, the U.S. Marshals performed a protective sweep of the Linden Avenue address.  Hutchings Mot., Ex. 2, Form FD-302 (Jan. 4, 2019) ("Arrest FD-302") at 1, *Hutchings*, No. 19-cr-361-02 (BAH) (D.D.C. Apr. 21, 2020), ECF No. 51; *see Hutchings* Tr. at 26:6-20.  ATF and FBI agents were then "called up to . . . take custody of [defendant]."  *Hutchings* Tr. at 26:19-20.  The officers did not find any other person inside the apartment.  *Id.* at 27:1-3.  During a subsequent search of the residence incident to defendant's

---

[6]    At the June 22, 2021 motions hearing, the parties agreed to rely on testimony and evidence describing the chain of events that culminated in defendant's arrest proffered in a related case, *United States v. Hutchings*, No. 19-cr-361-02 (BAH) (D.D.C.), to provide facts related to defendant's motion to suppress the cell phones seized incident to his arrest.  *See* Hr'g Tr. (Rough) at 9:8–10:1, 109:5-7.  This Memorandum Opinion therefore relies on the reports describing defendant's arrest submitted in *Hutchings*, as well as the testimony on defendant's arrest given at an October 15, 2020 motions hearing in that case, to recount the events leading to defendant's apprehension by law enforcement.

arrest, law enforcement seized his wallet and four cell phones. Arrest FD-302 at 1. The first phone was found on defendant's person. *Id.*; *see also Hutchings* Tr. at 27:19-20. Two additional phones were found "on and next to a pile of clothes" in the living room "that [defendant] identified as belonging to him." Arrest FD-302 at 1; *see also Hutchings* Tr. at 27:21-22, 29:14-16. Special Agent Ray testified that the pile of clothes was approximately "ten feet" from defendant at the time of his arrest. *Hutchings* Tr. at 29:13. The last phone was found "on the kitchen counter," Arrest FD-302 at 1; *see also Hutchings* Tr. at 27:22-23, which was located in a "galley kitchen" that connected the living room, where defendant was arrested, to the bedrooms, *Hutchings* Tr. at 27:25; *see also* Hr'g Tr. (Rough) at 113:15–114:2. According to Special Agent Ray, the kitchen counter was "adjacent" to defendant when ATF and FBI agents entered the apartment. *Hutchings* Tr. at 31:4.

Special Agent Ray testified that law enforcement had seized all of the cell phones incident to defendant's arrest because the investigation into defendant had shown his narcotics-trafficking activity to be "highly reliant on phone conversations," making it likely, in the officers' view, that the phones would constitute or contain evidence of defendant's instant offenses. *Id.* at 31:24-25; *see also id.* at 31:23–32:1. He further reported that in his "training and experience," *id.* at 34:18, narcotics traffickers frequently carry and use multiple cell phones "as a method of communication with . . . drug customers, suppliers, [and] co-conspirators," *id.* at 34:22-23, using "various cell phone devices" to communicate with different participants in their illegal activity, *id.* at 35:3. Based on this background knowledge and the frequent use of cell phones by defendant and his associates in connection with their alleged narcotics trafficking, revealed by law enforcement's investigation prior to defendant's arrest, the officers at the Linden

Avenue scene believed that each of the seized cell phones belonged to defendant. *See id.* at 35:11-17.

### B. Procedural History

Defendant was initially indicted on two drug and gun charges. *See* Indictment. The Superseding Indictment, issued on October 23, 2019, charges defendant with the following six counts: (1) unlawful possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i); (2) using, carrying, and possessing a firearm during a drug-trafficking offense under 18 U.S.C. § 924(c)(1); (3) unlawful possession of a firearm and ammunition by a person convicted of a felony, in violation of 18 U.S.C. § 922(g)(1); (4) unlawful possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); (5) unlawful possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (6) conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, marijuana, and fentanyl, in violation of 21 U.S.C. § 846. *Thorne I*, 2020 WL 122985, at *3; *see also* Superseding Indictment at 1–4.

A jury trial on the charges against defendant was originally scheduled for December 9, 2019, *see* Min. Entry (Sept. 18, 2019), but was continued, at his request, until April 13, 2020, *see* Min. Entry (Oct. 31, 2019). In anticipation of trial beginning on that date, the parties briefed a number of pretrial motions, including, as relevant here, the still-pending motion *in limine* to exclude the testimony of the government's cell-site expert, *see* Def.'s First Wilde Mot., and motions to suppress the evidence recovered during the Foote Street and Barbara Lane searches, *see* Mot. Suppress Search Warrant at 7605 Barbara Lane & Evid. Obtained Pursuant to Search Warrant, ECF No. 43; Mot. Suppress Search Warrant at 4215 Foote St. & Evid. Obtained Pursuant to Search Warrant, ECF No. 44. A hearing on the parties' pretrial motions was held on

December 12, 2019.  *See* Min. Entry (Dec. 12, 2019); Tr. of Mot. Hr'g (Dec. 12, 2019) ("Dec. 12 Hr'g Tr."), ECF No. 71.  Defendant's motions to suppress the fruits of the Foote Street and Barbara Lane searches were denied.  Dec. 12 Hr'g Tr. at 46:14-24, 53:14-20, 57:7-12.  Judgment on the cell-site expert motion was reserved pending completion of the expert's final report and supplemental briefing "mak[ing] . . . focused challenges to this particular expert in this particular case."  *Id.* at 145:2-4; *see also id.* at 144:24–145:4.[7]  Accordingly, on February 13, 2020, after receiving the expert's final report, defendant filed his second pending motion challenging the proffered testimony.  *See* Def.'s Second Wilde Mot.

About a month later, on March 11, 2020, defendant moved *pro se* to replace his then–current counsel, who had represented him since July 31, 2019, *see* Min. Entry (July 31, 2019), and managed most of the pretrial proceedings in this case, citing "philosophical difference[s]," Mot. Counsel to Withdraw & New Counsel to Be Appointed ¶ 2, ECF No. 86.  Following a hearing, defendant's motion was granted, *see* Min. Entry (Mar. 18, 2020), and his now-counsel of record was appointed, *see* Notice of Att'y Appearance, ECF No. 87.  Due to appointment of new counsel and the exigencies of the COVID-19 pandemic, defendant's trial was continued until October 4, 2021, with an opportunity for defendant's new counsel to submit and fully brief any additional pretrial motions by early 2021.  *See* Min. Order (Oct. 1, 2020).  Before the dates

---

[7]     At the December 12, 2019 hearing, five additional motions—one motion to suppress, a motion *in limine*, a motion to preserve rough notes, a motion to decide co-conspirator statements, and a motion to exclude expert narcotics testimony—were resolved orally.  *See* Min. Entry (Dec. 12, 2019).  Judgment was reserved on: (1) the defendant's Motion *in Limine* Regarding 404(b) and 609 Admissibility, ECF No. 37; (2) the defendant's motion to exclude the testimony of the government's money laundering expert, *see* Def.'s Opp'n Gov't's *in Lim.* Notice Admit Test. Narcotics Expert & Money Laundering Expert, ECF No. 38; (3) the defendant's Motion to Exclude DNA Evidence, ECF No. 47; and (4) the defendant's motion to exclude the expert testimony of a cell-site expert, *see* Def.'s Mot. *in Lim.* Exclude Expert Test. & Cellular Analysis Report & Charts of Special Agent Mathew Wilde, ECF No. 46.  The first two motions were resolved in *Thorne I*, *see* 2020 WL 122985, at *1–2, *25; the third motion to exclude DNA evidence was denied as moot in light of a stipulation by the parties, *see* Min. Order (Jan. 7, 2020); and the last motion, regarding the government's cell-site expert, duplicated defendant's first motion *in limine* challenging the cell-site expert, *see* Def.'s First Wilde Mot., and therefore was terminated, *see* Dec. 12 Hr'g Tr. at 131:4-7; Min. Entry (Mar. 16, 2020).

set in the scheduling order for briefing of pretrial motions arrived, in December 2020, defendant retained counsel, and his current attorney therefore withdrew from the case. *See* Notice of Att'y Appearance, ECF No. 112; Min. Order (Dec. 17, 2020).

Only weeks later, defendant's retained counsel sought leave to withdraw, *see* Mot. Withdraw, ECF No. 116, and his current counsel of record was reappointed, *see* Min. Order (Feb. 10, 2021). A new schedule for briefing any additional pretrial motions was therefore entered, *see* Min. Order (Mar. 11, 2021); Min. Order (May 20, 2021), with the last briefs submitted on May 26, 2021, *see* Def.'s Reply Gov't's Omnibus Opp'n Renewed Mots. Suppress Evid. Obtained from Foote St. & Barbara Lane ("Def.'s Foote St. & Barbara Lane Reply"), ECF No. 126; Def.'s Reply Gov't's Omnibus Opp'n Mot. Suppress Fruits Law Enforcement Use of Cell-Site Simulator ("Def.'s Cell-Site Reply"), ECF No. 127; Def.'s Reply Gov't's Omnibus Resp. Mot. Suppress Evid. Obtained "Incident to His Arrest" ("Def.'s Cell Phones Reply"), ECF No. 128. A hearing on defendant's four motions to suppress and two motions *in limine* was held on June 22, 2021. *See* Min. Entry (June 22, 2021). The motions are now ripe for resolution.

## II. DISCUSSION

Defendant seeks to suppress the evidence recovered from law enforcement's searches of his Foote Street residence and Dou Perfect, the fruits of law enforcement's use of a cell-site simulator to locate and ultimately apprehend him, and the cell phones seized incident to his arrest as well as any evidence retrieved from the phones. *See* Def.'s Foote St. Mot.; Def.'s Barbara Lane Mot.; Def.'s Cell-Site Mot.; Def.'s Cell Phones Mot. For the reasons set forth below, each of his motions to suppress are denied.

### A. Defendant's Renewed Motions to Suppress Evidence Recovered During Foote Street and Barbara Lane Searches

First, defendant moves to suppress "the evidence and any fruits of the search conducted at the residence located [at 4215] Foote St., N.[E]. Washington, D.C.," Def.'s Foote St. Mot. at 1, and at Dou Perfect, "his business located at [7605] Barbara Lane, Clinton[,] Maryland," Def.'s Barbara Lane Mot. at 1. As explained *supra* Part I.A.3, the searches of Dou Perfect and the Foote Street residence, and the seizure of evidence at those locations, were authorized by search warrants issued by Magistrate Judges in the District of Columbia, for the Foote Street address, and in the District of Maryland, for the Barbara Lane address. *See* Foote St. Warrant; Barbara Lane Warrant. Both warrants were supported by substantially similar affidavits submitted by different Special Agents, Special Agent Richard Migliara of the FBI for the Foote Street residence and Special Agent Kevin T. Smith of ATF for Dou Perfect, which affidavits outlined the facts and evidence described *supra* Part I.A. *See supra* Part I.A.1–3; Migliara Aff.; Smith Aff.

With some variation specific to each of the two challenged warrants, defendant offers four main arguments to suppress evidence seized at the Barbara Lane and Foote Street locations. First, defendant says that the two warrants lack particularity in their description of the respective places to be searched. Def.'s Foote St. Mot. at 4–7; Def.'s Barbara Lane Mot. at 3–6. Second, defendant maintains that the two warrants are overbroad because Attachment B to each warrant, which provides "a list of items to be seized," includes "paragraphs [that] provided for a general rummaging" through items that "are not in and of themselves criminal in nature." Def.'s Foote St. Mot. at 10; *see also id.* at 10–11; Def.'s Barbara Lane Mot. at 6–7. Third, defendant contends that errors in the filing of the returns for the warrants at both locations requires suppression. Def.'s Foote St. Mot. at 7–8; Def.'s Barbara Lane Mot. at 9–10. Finally, defendant argues that a

handful of scrivener's or technical errors in each of the warrant affidavits "chip away at probable cause, and render the Warrant[s] invalid." Def.'s Foote St. Mot. at 9; *see also id.* at 8–10; Def.'s Barbara Lane Mot. at 7–9. He requests an evidentiary hearing on each warrant pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), "as there are too many errors within the Warrant documents." Def.'s Foote St. Mot. at 9 (citing *Franks*, 438 U.S. 154); *see also id.* at 8–10; Def.'s Barbara Lane Mot. at 8–9.[8]

Notably, defendant does not directly dispute the probable cause supporting the Foote Street and Barbara Lane warrants. Indeed, as this Court has already decided, in resolving defendant's first motions to suppress evidence recovered from these locations, probable cause existed to believe that evidence of a crime would be found at the Foote Street and Barbara Lane addresses. *See supra* Part I.B; Dec. 12 Hr'g Tr. at 46:14-24, 53:14-20, 57:7-12. Defendant's four new challenges to the Foote Street and Barbara Lane warrants are a last-gasp attempt to undermine the validity of the warrants, already confirmed by this Court, by overemphasizing a small collection of typos and clerical mistakes made in the course of a complex, multi-agency investigation into a major narcotics operation that spanned six months. This attempt to draw attention away from the overwhelming probable cause that supports each of the two warrants is ultimately fruitless.

As noted, the pending motions are defendant's second motions to suppress evidence recovered at Barbara Lane and Foote Street. His first motions to suppress evidence seized at these locations, raising many of the same arguments, were denied at the December 12, 2019

---

[8] A *Franks* hearing is an evidentiary "hearing to determine the truth of the affidavit underlying the issuance of [a] warrant . . . where 'the magistrate or judge, in issuing a warrant, was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'" *United States v. Matthews*, 753 F.3d 1321, 1326 (D.C. Cir. 2014) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)); *see also Franks*, 438 U.S. at 156, 171.

motions hearing.  *See supra* Part I.B; Dec. 12 Hr'g Tr. at 46:14-24, 53:14-20, 57:7-12.  Thus, as

the government observes, the instant motions seek "in part . . . to relitigate these findings,"

Gov't's Opp'n at 4–5, and must be treated as motions for reconsideration.  The availability of

reconsideration is therefore considered before the merits of defendant's renewed motions to

suppress.

### 1.     *Reconsideration of Foote Street and Barbara Lane Warrants*

"Although the Federal Rules [of Criminal Procedure] do not specifically provide for

motions for reconsideration in criminal cases, the Supreme Court has recognized, in *dicta*, the

utility of such motions."  *United States v. Ferguson*, 574 F. Supp. 2d 111, 113 (D.D.C. 2008);

*see also United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam) (noting "the wisdom of giving

district courts the opportunity promptly to correct their own alleged errors" in criminal cases);

*United States v. Healy*, 376 U.S. 75, 80 (1964) ("Of course speedy disposition of criminal cases

is desirable, but to deprive the Government of the opportunity to petition a lower court for the

correction of errors might, in some circumstances, actually prolong the process of

litigation . . . .").  Building on this foundation, "[c]ourts in this District have, therefore,

entertained motions for reconsideration in criminal cases by importing the standards of review

applicable in motions for reconsideration in civil cases."  *United States v. Hassanshahi*, 145 F.

Supp. 3d 75, 80 (D.D.C. 2015) (collecting cases).

Resolution of a motion to suppress is an interlocutory decision.  *See id.*  Pursuant to

Federal Rule of Civil Procedure 54(b), motions for reconsideration of interlocutory orders may

be granted at any time before the entry of a final judgment "'as justice requires.'"  *Cobell v.

Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764

F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)); *see also Capitol Sprinkler Insp., Inc. v. Guest Servs.,

Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (noting that Rule 54(b) "recognizes [a court's] inherent

power to reconsider an interlocutory order 'as justice requires'" (quoting *Greene*, 764 F.2d at 22)). That "'abstract phrase'" is typically interpreted "'narrowly'" to permit reconsideration "'only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.'" *King & Spalding LLP v. U.S. Dep't of Health & Hum. Servs.*, 395 F. Supp. 3d 116, 119–20 (D.D.C. 2019) (quoting *Bernier v. Trump*, 299 F. Supp. 3d 150, 156 (D.D.C. 2018)); *see also Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 22 (D.D.C. 2018); *Hispanic Affs. Proj. v. Perez*, 319 F.R.D. 3, 5–6 (D.D.C. 2016); *Murphy v. Exec. Off. for U.S. Att'ys*, 11 F. Supp. 3d 7, 8 (D.D.C. 2014).

Although this list may not exhaust the potential justifications for reconsideration, exercise of the discretion granted under Rule 54(b) to revisit earlier rulings in the same case is "'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (quoting *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)); *see also Nat. Res. Def. Council, Inc. v. EPA*, 490 F. Supp. 3d 190, 194–95 (D.D.C. 2020) (same); *Jordan v. U.S. Dep't of Justice*, Civ. A. No. 17-2702 (RC), 2019 WL 2028399, at *2 (D.D.C. May 8, 2019) (same). "'The burden is on the moving party to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied.'" *Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 9 (D.D.C. 2017) (quoting *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012)).

The government correctly contends that defendant has not made a threshold showing that any of the factors favoring reconsideration apply to his renewed motions to suppress the evidence seized at the Foote Street and Barbara Lane locations. *See* Gov't's Opp'n at 5. Yet the

determination that reconsideration is warranted is in the trial court's "'sound discretion,'"
*Hassanshahi*, 145 F. Supp. 3d at 80 (quoting *United States v. Trabelsi*, Crim. A. No. 06-89
(RWR), 2015 WL 5175882, at *2 (D.D.C. Sept. 3, 2015)), and thus reconsideration may be
allowed when the district court deems it necessary to prevent manifest injustice.  Defendant
argues that "justice requires consideration" of his new motions to suppress under the Court's
discretionary authority because first, "[m]ost of the issues" presented in the motions "were not
previously raised" and "[f]ailing to raise them[] could be considered ineffective"; second, "[t]he
determination of the motions has a great effect on the evidence at trial" and "[t]herefore . . . are
vital to the posture of the case"; and third, some "latitude to raise . . . additional arguments" is
appropriate because defendant has changed counsel since resolution of his first motions to
suppress, in December 2019.  Def.'s Foote St. & Barbara Lane Reply at 2.

As explained *supra* Part I.B, defendant's current counsel was initially appointed in March
2020, after resolution of defendant's previous motions to suppress, which had been filed by
counsel in whom defendant evidently lacked confidence, and was reappointed in February 2021.
Given her late entry into the case, the pending motions are her first opportunity to advance the
arguments presented therein, not an attempt to raise new arguments that she should have
advanced at an earlier date.  *See* Def.'s Foote St. & Barbara Lane Reply at 2 (arguing that
"[m]ost of the issues were not previously raised" and "[f]ailing to raise them[] could be
considered ineffective").  Under these unique circumstances, defendant will be allowed an
opportunity to revisit the Foote Street and Barbara Lane searches, even though the substantially
similar arguments raised in his first motions to suppress have already been denied.  The merits of
defendant's pending motions to suppress the fruits of these searches are considered next.

## 2.    *Applicable Legal Standards*

The Fourth Amendment prohibits law enforcement from conducting "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  Defendant's challenges to the Foote Street and Barbara Lane search warrants, outlined above, raise issues related to both the probable cause for the warrants and their particularity.  The legal standard for each type of challenge is reviewed in turn.

### a.    Probable Cause

"[T]he task of evaluating probable cause [is] 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found . . . .'"  *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (first omission in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Florida v. Harris*, 568 U.S. 237, 240 (2013) (noting that, in evaluating probable cause, courts use a "'flexible, common-sense standard'" (quoting *Gates*, 462 U.S. at 239)).  This "objective standard," informed by "'a totality-of-the-circumstances analysis,'" *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010)) (citing *Gates*, 462 U.S. at 230–32), reflects the reality that "[p]robable cause 'turn[s] on the assessment of probabilities in particular factual contexts' and cannot be 'reduced to a neat set of legal rules,'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (second alteration in original) (quoting *Gates*, 462 U.S. at 232).

A showing of probable cause "'is not a high bar,'" *id.* at 586 (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)), and, in the context of a search warrant, requires only a "fair probability that . . . evidence of a crime will be found in a particular place," *Gates*, 462 U.S.

23

at 238. To evaluate whether this standard is met, courts focus on whether the warrant application provides "a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing'" by "demonstrat[ing] cause to believe that 'evidence is likely to be found at the place to be searched'" and that "'a nexus [exists] . . . between the item to be seized and criminal behavior.'" *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (omission in original) (first quoting *Gates*, 462 U.S. at 236; then quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004); and then quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)). The task of a district court reviewing a magistrate judge's determination that a warrant is supported by probable cause "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (alteration and omission in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). While courts must conscientiously review the sufficiency of the affidavits upon which warrants were issued, *see id.* at 239, the affidavits are entitled to "a presumption of validity," *Franks*, 438 U.S. at 171, and the magistrate judge's "initial determination of probable cause" is entitled to "'great deference,'" *Griffith*, 867 F.3d at 1271 (quoting *Gates*, 462 U.S. at 236).

### b.  Particularity and Overbreadth

In addition to probable cause, the Fourth Amendment limits searches by law enforcement "to the specific areas and things for which there is probable cause to search," and requires that a search "be carefully tailored to its justifications" and "not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (footnote omitted). Thus, a search warrant must "particularly describ[e] the place to be searched[] and the persons or things to be seized." U.S. CONST. amend. IV; *see also Garrison*, 480 U.S. at 84; *Griffith*, 867 F.3d at 1275; *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016). This requirement "ensures that the search will be carefully tailored to its

justifications," that is, to the probable cause shown. *Garrison*, 480 U.S. at 84. "Consequently, a warrant with an 'indiscriminate sweep' is 'constitutionally intolerable,'" *Griffith*, 867 F.3d at 1275 (quoting *Stanford v. Texas*, 379 U.S. 476, 486 (1965)), and courts "will hold a warrant invalid when 'overly broad,'" *id.* (quoting *United States v. Maxwell*, 920 F.2d 1028, 1033–34 (D.C. Cir. 1990)). As the proper scope of a warrant is confined to the breadth of the probable cause that supports it, "the requirement of particularity is closely tied to the requirement of probable cause." *Id.* (internal quotation marks and citation omitted). "[A] broader sweep," however, may be permissible "when a reasonable investigation cannot produce a more particular description" prior to obtaining and executing the warrant. *Id.* at 1276 (citing *Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976)).

Set against these legal standards, defendant's challenges to the Foote Street and Barbara Lane warrants are addressed next, starting with the Foote Street warrant.

### 3. *Analysis of Foote Street Warrant*

Defendant first moves to suppress "the evidence and any fruits of the search conducted at the residence located [at 4215] Foote St., N.[E]. Washington, D.C." Def.'s Foote St. Mot. at 1. He raises four discrete challenges to the validity of this warrant which are discussed *seriatim*.

### a. **Particularity**

Defendant first challenges that "[t]he [Foote Street] warrant documents were facially deficient" because they left "ambiguity . . . as to the location to be searched." Def.'s Foote St. & Barbara Lane Reply at 2. Though he concedes that "the heading of the warrant notes the Foote Street address," defendant contends that the warrant "incorporate[s] and reference[s]" only "Attachment A," Def.'s Foote St. & Barbara Lane Reply at 2–3; *see also* Def.'s Foote St. Mot. at 4–5, which was filed as part of the Barbara Lane warrant application and lists the Barbara Lane address of defendant's Dou Perfect garage as the location to be searched, *see* Barbara Lane

Warrant, Attach. A at 4, instead of "Attachment A-1," which was the actual attachment filed as part of the Foote Street warrant package and lists the Foote Street address as the location to be searched, *see* Foote St. Warrant, Attach. A-1, at 4.

Despite the fact that only Attachment A-1, providing the Foote Street address, was filed with the Foote Street warrant application, defendant claims the warrant does not sufficiently identify the Foote Street address as the target location. *See* Def.'s Foote St. Mot. at 4–5. As support for this argument, defendant relies on *Groh v. Ramirez*, 540 U.S. 551 (2004). *Groh*, however, expressly provides that "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." 540 U.S. at 557–58. The Foote Street warrant application used perfectly adequate words of incorporation, consistent with *Groh*, stating "See Attachment A incorporated herein" where the form required a description of the location to be searched. Foote St. Warrant at 2; *see United States v. Suggs*, No. 19-1487, 2021 WL 2214216, at *6 (10th Cir. June 2, 2021) (finding that the phrase "See Attachment 'B' which is hereby incorporated in reference" on a warrant application form "as a matter of common sense as well as logic[] shows that the warrant's drafter knew how to use appropriate words of incorporation" (citing *United States v. Sanders*, 796 F.3d 1241, 1250 (10th Cir. 2015))); *United States v. Riesselman*, 646 F.3d 1072, 1077 (8th Cir. 2011) (concluding that "Attachment 1" was sufficient for incorporation); *United States v. Hurwitz*, 459 F.3d 463, 469–72 (4th Cir. 2006) (concluding that "See Attachment" was sufficient for incorporation).

Defendant nonetheless complains that the government's attempted incorporation of Attachment A-1 was defective for two reasons. First, he maintains that "[w]hich warrant documents were provided to the Magistrate as part of the warrant package has not yet been

established." Def.'s Foote St. & Barbara Lane Reply at 3. The government, however, submitted the full Foote Street warrant package as Exhibit B to its Opposition. *See* Foote St. Warrant. Attachment A-1 appears at page four of that document, and clearly was included as part of the warrant package. *Id.* at 4.

Second, defendant contends that the warrant's reference to "Attachment A" was to the wrong attachment and thus did not operate to incorporate the correct Attachment A-1. Def.'s Foote St. Mot. at 4–5; Def.'s Foote St. & Barbara Lane Reply at 3. This error was, as the government asserts, Gov't's Opp'n at 8, "a mere technical mistake or typographical error" that does not undermine the warrant's validity, *Groh*, 540 U.S. at 558. Courts have found warrants with similarly conflicting or inaccurate descriptions of the target property to be sufficiently particular so long as the warrant's description is "sufficient to enable the executing officer to locate and identify" the object to be searched. *United States v. Bonner*, 808 F.2d 864, 866 (1st Cir. 1986). For example, the First Circuit in *United States v. Moss*, 936 F.3d 52 (1st Cir. 2019), upheld a warrant that correctly identified a target package by tracking number in its caption but incorrectly described the package in the incorporated attachment, explaining that, because law enforcement could readily identify the target package with the tracking number, "the warrant authorizing the . . . search suffered from a mere technical error," *id.* at 60 (citing *Bonner*, 808 F.2d at 866). Likewise, the Fourth Circuit has classified the mistake of including an incorrect attachment in a search warrant as "technical" in nature. *United States v. Qazah*, 810 F.3d 879, 886 (4th Cir. 2015). The error in the Foote Street warrant is even more minor than the mistakes allowed in these cases. Both the warrant caption and the text of Attachment A-1 identify the Foote Street address as the target location. *See* Foote St. Warrant at 1, 4. The inclusion only of Attachment A-1, not Attachment A, in the warrant package, makes clear that Attachment A-1

was meant to be incorporated.  This is sufficient under *Groh*.  *See, e.g.*, *Hawkins v. United States*, No. 16-15323-A, 2016 U.S. App. LEXIS 24110, at *12 (11th Cir. Dec. 9, 2016) (upholding a warrant that "incorrectly referr[ed] to Attachment A" instead of the correct Attachment B "because Attachment B was attached to the warrant and accompanied it at the time of its execution").

Defendant persists in questioning how, in the absence of Special Agent Migliara, who was the affiant for the Foote Street warrant but was not present for the Foote Street search, *see* Hr'g Tr. (Rough) at 78:6-18; Migliara Aff., the "persons present" during the initial identification of the Foote Street residence "were able to identify which location to go to" in light of the alleged ambiguity created by the warrant's reference to "Attachment A."  Def.'s Foote St. Mot. at 5.  The answer to this question is simple and apparent.  The correct address, plainly identified as the target location in the warrant caption; the text of Attachment A-1; and the Migliara Affidavit all provided a more than sufficiently specific description of the Foote Street address law enforcement intended to search.  No ambiguity as to the identity of the target location was created by a single typo on the warrant form.

### b.     Overbreadth

Defendant next claims that Attachment B of the Foote Street warrant, describing the items to be seized, is overbroad.  Attachment B lists, in twelve paragraphs, various items connected to narcotics trafficking that law enforcement was authorized to seize, including some items that, while seemingly lawful, were potentially related to defendant's alleged narcotics trafficking.  Foote St. Warrant, Attach. B at 5–6.  Defendant argues that two of Attachment B's twelve paragraphs are not only themselves overbroad, but also have the effect of making the *entire* warrant overbroad and therefore invalid.  Def.'s Foote St. Mot. at 10–11.

The two challenged paragraphs are paragraph seven, authorizing the seizure of books, records, receipts, and other financial records "which constitute records and proceeds" of the "target [narcotics-trafficking] offenses," Foote St. Warrant, Attach. B ¶ 7 (capitalization omitted), and paragraph eight, authorizing the seizure of "currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds" of the "target offenses," *id.* ¶ 8. Defendant contends that, because the items listed in these paragraphs "are not in and of themselves criminal in nature," the paragraphs are overbroad because they lack "any parameters" such as time or connection to the offense in question and therefore "permit[] the seizure of legitimately obtained items obtained many years prior to the period of investigation." Def.'s Foote St. Mot. at 10–11. This argument lacks merit.

Though defendant says the challenged paragraphs do not require any link between items seized and the charged offenses, *see id.*, both paragraphs clearly state that seizure is restricted to those items that constitute "records" or "proceeds" of the "target offenses," *see* Foote St. Warrant, Attach. B ¶¶ 7–8 (capitalization omitted), a term clearly defined in Attachment B to refer to "violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846 . . . as described in the search warrant affidavit," *id.* at 5. This restriction provides substantial specificity regarding the items to be seized at the outset. *See, e.g.*, *United States v. Burgess*, 576 F.3d 1078, 1090–91 (10th Cir. 2009) (finding a warrant authorizing seizure of "items of personal property which would tend to show a conspiracy to sell drugs" sufficiently specific because it limited the search and seizure "to evidence of drugs and drug trafficking").

Defendant protests that "[r]eferencing a statute does not sufficiently limit the scope of a warrant." Def.'s Foote St. Mot. at 11 (citing *Roche v. United States*, 614 F.2d 6, 7 (1st Cir. 1980)). The D.C. Circuit has indeed reached this conclusion where the disputed reference is to a broad statute, such as the federal wire fraud statute, and is made without specifying the nature or character of the violations under investigation. *See Maxwell*, 920 F.2d at 1033. Attachment B, however, offers a more specific subject-matter limitation than the generic reference to "federal wire fraud violations of unspecified character" at issue in *Maxwell*. *Id.* at 1033. The "target offenses" referenced in paragraphs seven and eight are explicitly restricted to the violations of 21 U.S.C. §§ 841(a)(1) and 846 "described in the search warrant affidavit." Foote St. Warrant, Attach. B at 5. The two paragraphs therefore seek evidence directly related to defendant's conduct as set forth in the Migliara Affidavit, not to generic violations of 21 U.S.C. §§ 841(a)(1) and 846. This fact alone makes these paragraphs sufficiently specific.

Defendant's second argument, that the paragraphs do not restrict seizure to items created or obtained during the time period surrounding his offenses, *see* Def.'s Foote St. & Barbara Lane Reply at 7–8, fares no better. First, because the "target offenses" referenced in paragraphs seven and eight are tied to the conduct described in the Migliara Affidavit, the reference to those offenses imposed an indirect time limit on the warrant. *See* Foote St. Warrant, Attach. B ¶¶ 7–8; Migliara Aff. The conduct described in the Migliara Affidavit took place over a span of several months in mid-to-late 2018. *See supra* Part I.A. This time period, then, is necessarily the focus of paragraphs seven and eight.

In any event, courts have held that warrants without a time limitation are sufficiently narrow when they include a "subject-matter limitation" to fruits and evidence of the target offense, which "fulfills the same function as a time limitation would have done, by limiting the

warrant to evidence of the crimes described in the [warrant] affidavit." *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999). As explained above, the reference to "target offenses" in paragraphs seven and eight imposes an apparent subject-matter limitation of exactly this type. Further, "[w]arrants need not contain specific time limits, when 'dates of specific documents' relevant to the offenses at issue 'could not have been known to the Government,' or when 'evidence that date[s] from outside of the time period' described in a warrant affidavit 'may be relevant to the activity within the time period.'" *United States v. Manafort*, 313 F. Supp. 3d 213, 235 (D.D.C. 2018) (first quoting *United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (per curiam); and then quoting *United States v. Abboud*, 438 F.3d 554, 576 n.7 (6th Cir. 2006)). Both of these conditions are present here. The warrant was for evidence related to narcotics trafficking, detailed in the Migliara Affidavit to have occurred over a period of several months in mid-to-late 2018. *See supra* Part I.A; Foote St. Warrant; Migliara Aff. Evidence of defendant's financial records and assets before that time may well be relevant to determining the extent of the alleged illegal activity, quantifying defendant's profits, and identifying other participants in his narcotics-trafficking ring. Moreover, for many of the financial instruments listed in paragraph eight, the concept of a timestamp makes no sense. Cash and other valuable items cannot be connected to a certain date, and the government therefore could not have narrowed the time frame for these items.

The D.C. Circuit's discussion of searches for contraband items in *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017), reflects these practical concerns. In evaluating the seizure of a cell phone later determined to be unrelated to the offense at issue, the Circuit found that "with searches of lawful objects," "a broader sweep" may be allowed "when a reasonable investigation cannot produce a more particular description" of the items to be seized. *Id.* at

1276.  Here, law enforcement could not have further narrowed their description of the typically

lawful financial records and instruments they sought in Attachment B by time frame without

inspecting the items at issue, and the warrant's restriction of authority to seize evidence of the

target offenses provided sufficient specificity through the alternative means of subject matter.

In sum, given the nature of the target narcotics-trafficking offenses under investigation

and the subject-matter limitation in the text of paragraphs seven and eight of Attachment B, the

warrant was not so unreasonably broad as to violate the Fourth Amendment.

### c.      Errors in Filing of Warrant Return

Third, defendant contends that the incorrect warrant was executed based on errors in the

filing of the warrant return.[9]  Some procedural history concerning the Foote Street warrant is

necessary to reject this argument.  The government first sought, and received, a warrant to search

the Foote Street address on December 14, 2018.  Gov't Opp'n, Ex. C, Foote St. Warrant (Dec.

14, 2018) ("Dec. 14 Foote St. Warrant"), ECF No. 124-3.  The parties agree that the affidavit

submitted with the December 14 warrant application included incorrect pen register data and

"left open and uncertain who owned and was connected to Dou Perfect Auto Repair

& Detailing."  Def.'s Foote St. Mot. at 7; *see also* Gov't Opp'n at 12.  Three days later, on

December 17, 2018, the government submitted a new warrant application correcting these errors

in the Migliara Affidavit and obtained a new warrant.  This warrant is the operative Foote Street

Warrant.  *See* Foote St. Warrant; Hr'g Tr. (Rough) at 77:15–78:1.  Defendant argues, *see* Def.'s

Foote St. Mot. at 7, and the government admits, that after executing the Foote Street warrant, "an

agent unintentionally filed the return of the December 14, 2018 warrant, as opposed to the

---

[9]      A warrant return, as defined by Special Agent Smith during his testimony at the June 22, 2021 motions
hearing, is "a document that is submitted to the Court at the conclusion of a search warrant" that records "the
evidence and items seized from a particular location or a person during the execution of that search warrant."  Hr'g
Tr. (Rough) at 25:2-5.

December 17, 2018 warrant, on the Court's docket," Gov't's Opp'n at 11. The government

counters, and defendant concedes, however, that this error was remedied, and the correct warrant

return has since been filed. Gov't's Opp'n at 11; Def.'s Foote St. Mot. at 7 n.5.

Federal Rule of Criminal Procedure 41(f)(1)(D) requires that "[t]he officer executing [a]

warrant must promptly return it . . . to the magistrate judge designated on the warrant." FED. R.

CRIM. P. 41(f)(1)(D). As defendant acknowledges, "filing a return tardy is a mere ministerial

error, and only if a defendant can show prejudice can he request recourse." Def.'s Foote St. Mot.

at 7 n.5; *see also United States v. Crumpton*, 824 F.3d 593, 617 (6th Cir. 2016) (finding that Rule

41(f)(1)'s requirements are "ministerial and '[a]bsent a showing of prejudice, irregularities in

these procedures do not void an otherwise valid search'" (alteration in original) (quoting *Frisby*

*v. United States*, 79 F.3d 29, 32 (6th Cir. 1996))). Defendant has made no such showing of any

prejudice here, and therefore cannot seek relief based on the late filing of the correct return.

Moreover, law enforcement has corrected its error, if belatedly, eliminating any possibility of

prejudice to defendant.

Defendant further contends that the inadvertent return of the December 14 warrant, in

combination with "an FD-302 memorializing the inventory recovered from the Foote Street

search" which "notes that the search warrant was issued by the court on December 14, 2018,"

indicates that law enforcement in fact relied on the wrong warrant to search the Foote Street

address. Def.'s Foote St. Mot. at 7; *see* Foote St. FD-302. The evidence plainly disproves this

suggestion. The government submitted a photograph of the warrant law enforcement left at the

Foote Street residence on December 19, 2018, after completing their search. Gov't's Opp'n, Ex.

F, Warrant Photograph, ECF No. 124-6. Though the photograph is a bit blurry and the date

cannot easily be read, the handwritten time stamp next to the date in the signature block matches

the handwritten time stamp next to the signature block on the December 17, 2018 warrant. The December 14, 2018 warrant, in contrast, has no such annotation. *Compare* Warrant Photograph, *with* Foote St. Warrant at 1, *and* Dec. 14 Foote St. Warrant at 1; *see also* Hr'g Tr. (Rough) at 82:17–83:16. This clear proof of the correct warrant having been served at the Foote Street address indicates that the December 17, 2018 warrant was the warrant executed by law enforcement.

As to the FD-302 defendant references, that report summarized the property seized from the Foote Street address and makes mention of a warrant issued on December 14, 2018. Foote St. FD-302 at 1. A second FD-302 describing the search of the Foote Street location, however, accurately references the warrant as being issued on December 17, 2018. Gov't's Opp'n, Ex. E, Form FD-302 for Foote St. Warrant (Dec. 26, 2018) at 1, ECF No. 124-5. The typographical error in the FD-302 cited by defendant is a hypertechnical distinction that has no bearing on which warrant was executed or the validity of the warrant, although catching this error certainly demonstrates the thoroughness with which defense counsel has scoured the record in this case. Defendant's third challenge to the Foote Street warrant is groundless.

> **d.** **Alleged Factual Errors in Migliara Affidavit and Probable Cause**

Finally, defendant contends that the minor typographical and clerical errors already discussed, in combination with a handful of discrete and immaterial factual errors in the Migliara Affidavit, "when considered as a whole . . . chip away at probable cause and render the warrant invalid." Def.'s Foote St. Mot. at 8–9. He requests a *Franks* hearing on these issues. *Id.* at 9. The four trivial factual inaccuracies highlighted by defendant are as follows: (1) the Migliara Affidavit, in describing defendant's travel to Mexico with Kelli Davis, the woman with whom he resided at the Foote Street address, mistakenly states that defendant had tickets to fly out of

Dulles International Airport, when defendant actually had tickets to fly out of Reagan National Airport; (2) the Affidavit further asserts that this travel took place on October 16, 2018, but defendant's departure from the Washington, D.C. area actually occurred on October 12, 2018, with his return on October 16, 2018; (3) the Affidavit incorrectly avers that a conversation between the UC and Suspect-1 took place on November 29, 2018, while the conversation in fact occurred on October 18, 2018; and (4) the Affidavit claims that law enforcement observed defendant "making erratic maneuvers" while driving after leaving the Foote Street address on December 11, 2018, while the FD-302 memorializing this surveillance does not use the word "erratic" in detailing noteworthy peculiarities in defendant's driving. *Id.* at 8. The government concedes that these mistakes, to the extent that they are mistakes, "are regrettable" and "fine fodder for cross-examination at trial," but counters that they "have no meaningful bearing upon probable cause," so that suppression is not warranted. Gov't Opp'n at 13; *see* Hr'g Tr. (Rough) at 16:18-19, 17:3-9, 18:21-25. As explained below, the government is plainly correct.

### i. Probable Cause for the Foote Street Warrant

While defendant seeks suppression on the basis that the collective errors described above "chip away at probable cause," Def.'s Foote St. Mot. at 9, the Migliara Affidavit upon which the Foote Street warrant was based established ample probable cause to believe that evidence of a crime would be found at defendant's 4215 Foote Street residence. As the facts recounted *supra* Part I.A demonstrate, the chain of events observed by law enforcement provided substantial reason to believe that defendant was Suspect-1's heroin supplier. A few hours prior to the UC's last controlled purchase from Suspect-1 on November 29, 2018, Suspect-1 "indicated [to the undercover agent] that he first had to pick up the heroin from his supplier" and that "he would first have to get picked up by his driver, who would then drive him to meet his supplier."

Migliara Aff. ¶ 14.  In keeping with what Suspect-1 told the UC, Suspect-1 was shortly thereafter driven to a location where he met with defendant.  *Id.* ¶¶ 14, 16–17.  Suspect-1 brought with him a black bag.  *Id.* ¶¶ 14, 16.  Suspect-1 entered defendant's vehicle and drove with defendant to a separate nearby location, followed by the vehicle in which Suspect-1 had arrived.  *Id.* ¶¶ 17–18.  Suspect-1 and defendant's meeting lasted only a few minutes.  *Id.* ¶ 18.  Suspect-1 went back and forth between defendant's vehicle and the vehicle in which Suspect-1 had arrived, and then Suspect-1 and defendant went their separate ways in their respective vehicles.  *Id.* ¶¶ 18–19.  Suspect-1 was driven directly from his meeting with defendant to his meeting with the UC, at which point Suspect-1 retrieved a black duffle bag from his vehicle, got into the front passenger seat of the UC's vehicle, and sold heroin and firearms to the UC.  *Id.* ¶ 20; *see supra* Part I.A.2.  These events gave rise to the clear inference that defendant was the drug supplier from whom Suspect-1 told the UC he was going to pick up heroin prior to meeting with the UC.

Beyond this chain of events, the Migliara Affidavit provided further corroboration that defendant was a drug supplier.  First, as early as September 2018, Suspect-1 independently "told the UC . . . that his supplier was a millionaire who owned an auto body shop and mechanic shop."  Migliara Aff. ¶ 22.  This description was in keeping with law enforcement's observations of defendant, who appeared to be operating out of the Dou Perfect auto-repair shop at Barbara Lane in Clinton, Maryland.  *See supra* Part I.A.  Second, Suspect-1 told the undercover agent that Suspect-1's heroin supplier had recently traveled with his wife.  Migliara Aff. ¶ 24.  This statement was consistent with defendant's recent behavior, as records showed he had recently purchased tickets to travel with Kelli Davis, the woman who public records indicated was a co-resident with defendant at the Foote Street address.  *Id.*  Probable cause therefore existed to believe that defendant was involved in drug trafficking.

Additional evidence bolstered probable cause to believe that the Foote Street address was a location where defendant stored heroin, evidence related to the distribution of heroin, or both. As this Court has previously found in this case, *see* Dec. 12 Hr'g Tr. at 53:25–54:6, and the D.C. Circuit has recognized, "probable cause to suspect a person of involvement in drug trafficking . . . support[s] probable cause to believe drugs will be found in his residence," "because drug traffickers 'rarely keep on their person or immediately about them their entire supply of drugs'" and "'[f]or the vast majority of drug dealers, the most convenient location to secure items is in the home.'" *Griffith*, 867 F.3d at 1273–74 (alteration in original) (first quoting *United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014); and then quoting *Cardoza*, 713 F.3d at 661). As explained *supra* Part I.A, defendant was surveilled at the Foote Street address on two separate occasions, at different times of day. *See* Migliara Aff. ¶¶ 25–26. Further, public records listed defendant as a resident at the address. *Id.* ¶ 24. In addition, defendant brought to Foote Street the Jeep Grand Cherokee he had used when meeting with Suspect-1 on November 29, 2018, further linking the Foote Street location to defendant's suspected drug-trafficking activities. *See id.* ¶ 25; *supra* Part I.A.2.

Defendant nonetheless "asks the Court to reconsider the finding that law enforcement conducted an accurate public records database search sufficient to tie him to the Foote Street address" because (1) law enforcement "did not . . . memorialize the results of their data search"; (2) the results of a later search given to defendant "showed several addresses" under defendant's name, Def.'s Foote St. Mot. at 9; and (3) law enforcement "omitted" the fact that the public records database search showed multiple addresses connected to defendant from the Migliara Affidavit, Def.'s Foote St. & Barbara Lane Reply at 6; *see also* Def.'s Foote St. Mot. at 9–10. Reconsideration of this question, which has already been litigated and resolved in connection

with defendant's previous motions, *see* Dec. 12 Hr'g Tr. at 56:11–57:6, is not warranted.  In any event, both the original and the recreated public records searches apparently linked defendant to the Foote Street address.  *See* Gov't's Opp'n at 18.  That they also associated him with other addresses does not undermine the conclusion that defendant resided at 4215 Foote Street.  Defendant traveled abroad with Ms. Davis, the owner of the Foote Street residence, during law enforcement's investigation and was romantically involved with her.  This context alone gave law enforcement reason to believe that defendant was living at the Foote Street location.  This belief was corroborated by surveillance of the defendant at that address on different dates and at different times of day.  *See supra* Part I.A.2, 3.  The fact that multiple addresses were linked to defendant in a public records database search therefore would not have "defeated probable cause," Def.'s Foote St. & Barbara Lane Reply at 6, as defendant suggests, since the public records database search results were only one corroborating factor tying defendant to the Foote Street residence.

For all of these reasons, as previously found at the December 12, 2019 motions hearing, *see* Dec. 12 Hr'g Tr. at 57:7-12, probable cause existed to issue the warrant to search 4215 Foote Street in Northeast Washington, D.C.  As set forth below, the tiny inaccuracies in the Migliara Affidavit emphasized by defendant have no material impact on this determination.  Each of the proffered mistakes will be addressed in turn before defendant's request for a *Franks* hearing and repeated accusations of systemic negligence in this case.

### ii.    Factual Inaccuracies Immaterial to Probable Cause

Defendant points first to the insignificant distinction between Dulles International Airport and Reagan National Airport as the starting point for his travel and the small discrepancy in his travel dates in the Migliara Affidavit.  Def.'s Foote St. Mot. at 8.  The government concedes

these errors. Gov't's Opp'n at 16. This argument has already been resolved in the context of defendant's first motion to suppress evidence seized pursuant to the Barbara Lane warrant, with the conclusion that, because defendant did not then—as he does not now—"contest the key fact that evidence showed that defendant traveled with the woman he seemed to cohabitate with around the same time that Suspect-1 indicated that Suspect-1's heroin supplier had recently traveled with his wife," Dec. 12 Hr'g Tr. at 49:13-17, these mistakes did not alter the probable cause analysis, *see id.* at 53:14-20. Defendant's requested remedy, that the paragraph containing these errors be "excised" in its entirety, Def.'s Foote St. Mot. at 9, is therefore inappropriate and unwarranted.

In any case, excision of the challenged paragraph would not have the effect defendant envisions, of "dissipat[ing]" probable cause by disproving the "whole connection between [defendant] to Ms. Davis" and "plac[ing] on even shakier . . . grounds his tie to the Foote Street address." *Id.* The public records database searched by law enforcement listed Ms. Davis as a resident and owner of the Foote Street address, and law enforcement observed defendant at that location on several occasions. *See supra* Part I.A.2. Removing the reference to defendant's October 2018 travel with Ms. Davis does not undermine the reasonable inference from these facts alone that defendant was linked to Ms. Davis and the Foote Street address.

Defendant also highlights the Migliara Affidavit's inaccurate dating of a conversation between Suspect-1 and the UC, during which Suspect-1 stated that his supplier—defendant—had recently traveled with his significant other, which conversation in fact took place approximately one month before the date given in the affidavit. Def.'s Foote St. Mot. at 8. The government concedes that, although the Affidavit incorrectly stated that this exchange occurred on November 29, 2018, it actually occurred on October 18, 2018. Gov't's Opp'n at 14. As the government

correctly points out, however, the October 18, 2018 date in fact bolsters probable cause because it situates the conversation closer in time to defendant's travel, which took place from October 12–16, 2018. *See id.* at 14–15. The mistake, then, is minimal and, as defendant does not challenge the substance of the conversation, that he had recently traveled outside the Washington, D.C. area with his significant other, does not affect probable cause.

Third, defendant challenges the Migliara Affidavit's characterization of his driving while under surveillance as "making erratic maneuvers." Def.'s Foote St. Mot. at 8. The use of the term "erratic" is not a factual description, but rather an inferential leap by Special Agent Migliara based on his experience and training, in the first instance, and, after its acceptance by the Magistrate Judge, a legal conclusion. *See* Hr'g Tr. (Rough) at 19:12-17. Significantly, defendant does not question the facts provided in the Affidavit to support this assessment of his driving, namely, that, while being followed, defendant parked in a random parking lot for thirty seconds before leaving the lot again, without exiting the vehicle. Migliara Aff. ¶ 26. Nor does defendant contest Special Agent Migliara's conclusion that his "behavior was consistent with counter surveillance activities." *Id.* Defendant therefore does not claim that the Migliara Affidavit contains a false statement; he simply disagrees with Migliara's determination, evaluated by the Magistrate Judge, that defendant's conduct was erratic. This dispute is an issue for cross-examination, not suppression.

### e. *Franks* **Hearing Not Warranted**

Finally, defendant "urges the Court [to] hold a *Franks* hearing" as to the Foote Street warrant "as there are too many errors within the Warrant documents." Def.'s Foote St. Mot. at 9 (citing *Franks*, 438 U.S. 154). "A movant seeking to obtain a *Franks* hearing 'must show that (1) the affidavit contains false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with

reckless disregard for the truth.'" *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (quoting *United States v. Richardson*, 861 F.2d 291, 293 (D.C. Cir. 1988) (per curiam)). "'To mandate an evidentiary hearing,' the movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'" *Id.* (quoting *Franks*, 438 U.S. at 171); *see also United States v. Matthews*, 753 F.3d 1321, 1326 (D.C. Cir. 2014). The government admits that the affidavit contains some trivial inaccuracies but argues that even if those errors satisfied the first prong in some minimal respect, defendant has failed to carry his burden under prongs two and three of this standard. Gov't's Opp'n at 16. As explained *supra* Part II.A.3.d.ii, none of the small mistakes noted by defendant were material to the issue of probable cause. Nor does defendant make any showing that the mistakes were made "knowingly and intentionally, or with reckless disregard for the truth," *Franks*, 438 U.S. at 155, beyond a conclusory assertion that "the totality of the errors rise to a level of recklessness that undermines the integrity of the Affidavit," Def.'s Foote St. Mot. at 9. His request for a *Franks* hearing is therefore denied.

Defendant argues that while the errors he cherry-picks from the challenged warrants "may seem trivial on their own, . . . when considered as a whole," Def.'s Foote St. Mot. at 8, they "rise to a level of recklessness that undermines the integrity of the Affidavit," *id.* at 9, and raises similar arguments in connection with his motions to suppress the evidence retrieved from Barbara Lane and the fruits of law enforcement's use of a cell-site simulator to locate him on the day of his arrest, *see* Def.'s Barbara Lane Mot. at 8–9; Def.'s Cell-Site Mot. at 3–4; Hr'g Tr. (Rough) at 15:9-17 ("We are seeing across the board every single step of the way law enforcement made mistakes and . . . we believe that the errors undermine the warrant[s'] integrity."). Elsewhere in his briefing, defendant contends that that law enforcement has engaged in "'recurring or systemic negligence'" in the investigation of this case, Def.'s Foote St.

& Barbara Lane Reply at 5 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)), and that "[t]here comes a time when deterrence is required and suppression is the warranted remedy," Def.'s Cell-Site Mot. at 5. This thematic argument must be contextualized and dismissed at the outset.

The myopic focus of defendant's cherrypicked clerical, technical, or extremely minor errors in the challenged warrants loses sight of the context in which each of the minute inaccuracies he highlights took place. The searches of defendant's Foote Street residence and the Dou Perfect garage, followed by the collection of cell-site simulator data as part of the fugitive apprehension investigation that led to defendant's arrest, were the culmination of a six-month, multi-agency investigation into defendant's activities that involved millions of dollars of narcotics, including heroin laced with fentanyl; a vast array of firearms and ammunition; and additional drug paraphernalia. *See supra* Part I.A. The government describes this collective effort as "a very rapid fire investigation" with "three lead agents" from the FBI and ATF who were "working with one another" and "in concert" while also "working with multiple other agents" to obtain and execute the challenged search warrants. Hr'g Tr. (Rough) at 17:10-20. The various agents from the FBI, ATF, and MPD were simultaneously carrying out different parts of the investigation, exchanging information, managing simultaneous efforts to obtain the requisite warrants, "coordinat[ing] with the [UC]," *id.* at 17:23, and developing "the ops plans to execute the warrants in different locations" in tandem, *id.* at 18:5-6. In the course of this constantly evolving and, due to the presence of multiple guns and use of an undercover agent, risky and dangerous effort to investigate a serious threat to the community at large, unsurprisingly, some honest mistakes occurred in the documentation, despite what appear to have been law enforcement's good-faith efforts.

These human errors do not evince, as defendant attempts to convince the Court, nefarious, purposeful, or reckless disregard for the truth. Nowhere in his briefing does defendant identify any specific instance of alleged officer misconduct or negligence. This glaring omission emphasizes the reality of the mistakes on which defendant premises his requests for relief: they are a handful of oversights in the midst of a high-stakes, multi-faceted investigation, and do not affect the integrity of the government's case against defendant. Good faith, probable cause, and, at bottom, reasonableness—not perfection—are what the Fourth Amendment requires. Though, as the government acknowledges repeatedly and the agents themselves stated in their testimony at the June 22, 2021 motions hearing, *see* Hr'g Tr. (Rough) at 16:25–17:2, 18:21, 74:13-22, these errors are regrettable and the law enforcement agents whose errors defendant contests may be subject to cross-examination, the investigation as a whole far surpasses those constitutional thresholds. The tiny mistakes defendant emphasizes are unrelated to the substantial probable cause that exists in this case, nor do they undermine the integrity of the overwhelming evidence against defendant. The impact of the errors on the government's case—if any—is ultimately a question for the jury. In the absence of any specific instance of knowing, intentional, or reckless disregard in defendant's briefing, defendant's repeated protests of systemic negligence fall far short of warranting suppression of the ample evidence against him.

In sum, defendant's four challenges to the Foote Street warrant nitpick at a handful of trivial errors with no bearing on the ultimate issue of probable cause in an effort to distract from the overwhelming evidence tying him and his alleged criminal activities to this location. None of these hypertechnical arguments diminish the probable cause supporting the warrant or even remotely indicate a lack of good faith on the part of law enforcement.

For all of the foregoing reasons, defendant's Renewed Motion to Suppress Evidence Recovered During the Search of the Foote Street Address, ECF No. 120, is denied.

### 4. *Analysis of Barbara Lane Warrant*

Second, defendant moves to suppress "the evidence and any fruits of the search conducted at his business [Dou Perfect] located at Barbara Lane, Clinton[,] Maryland." Def.'s Barbara Lane Mot. at 1. Defendant's four arguments in favor of suppressing evidence seized during the December 19, 2018 search of Dou Perfect are substantially similar to his arguments already rejected in denying his first motion to suppress the Barbara Lane search, *see* Dec. 12 Hr'g Tr. at 46:25–53:20, and his current arguments in favor of suppressing the Foote Street warrant, *see supra* Part II.A.3. They are no more successful in this context. Each will be addressed in turn.

### a. Particularity

First, defendant maintains that the Barbara Lane warrant lacked particularity because it "incorrectly described the property as a residence," rather than a business, "and provided no further clarifying description." Def.'s Barbara Lane Mot. at 3. This exact issue was already decided in resolving defendant's fist motion to suppress evidence recovered during the Barbara Lane search. Specifically, the warrant's descriptions of the Barbara Lane property as a "residence" rather than a business in the warrant caption and body and the search and seizure application were found to be "apparent scrivener's errors." Dec. 12 Hr'g Tr. at 53:8; *see also id.* at 53:8-13. These errors in reference were "more than compensated for by Attachment A to the warrant, which described the physical characteristics of the building located at Barbara Lane in significant detail and correctly described the structure as a large, red brick building which houses several businesses." *Id.*; *see* Barbara Lane Warrant, Attach. A at 4.

Defendant now complains that Attachment A was not incorporated into the Barbara Lane warrant. Def.'s Barbara Lane Mot. at 3. This argument is without merit. The warrant application clearly states, where the form required a description of the location to be searched, "See Attachment A." Barbara Lane Warrant at 1. As already explained in rejecting defendant's similar objection to the Foote Street warrant, these words are sufficient to incorporate the Attachment, and its identification of Dou Perfect as a business, into the Barbara Lane warrant. Defendant claims that the absence of the words "Attachment A" on the warrant itself defeats incorporation. Def.'s Barbara Lane Mot. at 5; *see* Barbara Lane Warrant at 2. This hypertechnical interpretation of the incorporation requirement, however, overlooks the many cross-references to Dou Perfect featured in the warrant package as a whole, including the warrant's reference to the Smith Affidavit, which plainly identified the business at 7605 Barbara Lane as the Target Location. *See* Smith Aff. ¶ 5.

Defendant, citing to *United States v. Dahlman*, 13 F.3d 1391 (10th Cir. 1993), contends that the missing words of reference on the face of the warrant alone prevent incorporation. Def.'s Barbara Lane Mot. at 5. The warrant evaluated by the Tenth Circuit in *Dahlman*, unlike the Barbara Lane warrant package, neither used words of incorporation nor physically attached the affidavit meant to provide specificity. *See Dahlman*, 13 F.3d at 1395. Here, the Smith Affidavit and Attachment A were both included in the warrant package and referred to in the warrant application. *Dahlman*'s teaching that an affidavit that was neither incorporated by reference nor attached to the warrant cannot supply particularity is therefore inapposite. Defendant's reliance on *Griffith*, *see* Def.'s Barbara Lane Mot. at 5, is similarly misplaced. The government in that case attempted to narrow the scope of an overbroad warrant after the fact by pointing to the supporting affidavit. *Griffith*, 867 F.3d at 1277. The warrant, however,

referenced the affidavit only in relation to probable cause, not for the description of the person or property to be either searched or seized.  *Id.*  In contrast, the Barbara Lane warrant application explicitly referenced Attachment A as its description of the place to be searched.  Moreover, the warrant itself provided the correct address for Dou Perfect as the place to be searched.  This alone was a sufficiently specific description of the target location, independent of Attachment A.

Defendant further claims that "noting 'Suite B' on the warrant," without referring to Dou Perfect by name, was not sufficient to identify which of the several businesses at 7605 Barbara Lane law enforcement was to search.  Def.'s Barbara Lane Mot. at 4; *see* Barbara Lane Warrant at 2.  This claim is incorrect.  The "Suite B" distinction itself differentiated the target location, Dou Perfect, from other businesses at the Barbara Lane address.  In addition, Attachment A explicitly notes that Suite B is home to "Dou' Perfect Auto Repair and Detailing," Barbara Lane Warrant, Attach. A at 5, while the Smith Affidavit describes the target location as "an auto-detail facility," Smith Aff. ¶ 24.  No real question exists that law enforcement was readily able, from all of these sources, to correctly identify the target of their search.  Defendant's hypertechnical challenge to the precise wording of the warrant therefore does nothing to defeat particularity.  *See Gates*, 462 U.S. at 236 ("'[C]ourts should not invalidate . . . warrants by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.'" (omission and second alteration in original) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965))).

Defendant next protests that some statements in the Smith Affidavit drawn from Special Agent Smith's training and experience refer only to "residences," not to "business locations," when listing possible venues in which drug traffickers store, and from which they distribute, narcotics.  Def.'s Barbara Lane Mot. at 4.  Agent Smith's relevant statements, however, include other descriptors that apply to Dou Perfect, such as "garages," Smith Aff. ¶ 3(a), and "business

location[s] with which the trafficker is associated," *id.* ¶ 3(d); *see also id.* ¶ 3(e) (similar).  One

of the challenged paragraphs specifically notes that "[i]t is also common for narcotics traffickers

to distribute from specific locations other than their own residences, to include stash houses . . .

and other locations where trusted associates of the trafficker are allowed access."  *Id.* ¶ 3(b).  As

previously found in rejecting defendant's first motion to suppress the Barbara Lane search, "this

argument does nothing to undermine the concrete pen register and surveillance evidence that tied

this particular business location to defendant's suspected drug-trafficking activities."  Dec. 12

Hr'g Tr. at 52:18-21.  More relevant to the present motion, this argument also disregards the

clear nexus between defendant and Dou Perfect detailed in the remainder of the Smith Affidavit.

The Smith Affidavit draws connections between defendant and the Dou Perfect garage from his

telephone number, connections from a business records search, information from a confidential

source, and surveillance of the business.  *See supra* Part I.A.  To determine that the warrant

application as a whole did not make perfectly obvious which location was to be searched because

it mistakenly used the word "residence" instead of "business" in a few places would be, plainly,

ridiculous.

Defendant makes one last attempt to invalidate the Barbara Lane warrant on particularity

grounds, claiming that "[t]here is no time frame checked off directing when law enforcement can

execute the warrant" and that the warrant "permits execution outside of the 14 days" allowed

under Federal Rule of Criminal Procedure 41 to execute a warrant because it provides a deadline

of January 2, 2019, rather than the correct date of January 1, 2019.  Def.'s Barbara Lane Mot. at

5–6; *see* FED. R. CRIM. P. 41(e)(2)(A).  The government concedes both of these scrivener's

errors, *see* Gov't's Opp'n at 25, but correctly contends that neither has any weight.  The failure

of the Magistrate Judge or clerk to check off a time frame box on the warrant is a mere clerical

error.  This mistake is also wholly unrelated to any police misconduct and therefore falls within the good-faith exception to the exclusionary rule.  *See United States v. Leon*, 468 U.S. 897, 914–17 (1984); *infra* Part II.B.1.c.  Moreover, law enforcement executed the warrant on December 19, 2018, one day after it was issued, *see supra* Part I.A.3, and therefore never relied on the Magistrate Judge's mistaken calculation of time.  Even defendant concedes that these mistakes are "technical errors."  Def.'s Barbara Lane Mot. at 5.  Put simply, these minor mistakes do not support suppression.

### b.    Overbreadth

Defendant next raises the same overbreadth challenge to the list of items to seize included in Attachment B to the Barbara Lane warrant that has already been rejected in resolving defendant's Foote Street motion, Def.'s Barbara Lane Mot. at 6–7; *supra* Part II.A.3.b, by again challenging the scope of paragraphs seven and eight of the Attachment, which are identical to paragraphs seven and eight of the Foote Street warrant's Attachment B, *compare* Barbara Lane Warrant, Attach. B ¶¶ 7–8, *with* Foote St. Warrant, Attach. B ¶¶ 7–8.  For the same reasons already explained, these paragraphs are not unduly broad given their reference to defendant's target offenses and the nature of the offenses under investigation.  *See supra* Part II.A.3.b.

Defendant brings one new argument specific to the Barbara Lane warrant's Attachment B.  He criticizes paragraph fourteen of the Attachment, which describes law enforcement's obligation to end searches of electronic devices and information if standard procedures "do not reveal evidence of theft of government property or other criminal activity," Barbara Lane Warrant, Attach. B ¶ 14, claiming that the reference to "theft of government property" shows that "this request is not properly tailored to the crime of drug trafficking," Def.'s Barbara Lane Mot. at 7.  The additional phrase "other criminal activity," however, clearly encompasses the crime of drug trafficking.

In any event, this small error does not defeat the particularity of the Attachment as a whole. Defendant insists that because "the invalid parts [of the warrant] comprise a greater part of the warrant, the whole warrant must fall." Def.'s Foote St. & Barbara Lane Reply at 9. He challenges, however, only three paragraphs in Attachment B, hardly the greater part of a fourteen-paragraph attachment, let alone the warrant package as a whole. Two of those three paragraphs, paragraphs seven and eight, are sufficiently particular, leaving only paragraph fourteen to taint the entire Barbara Lane warrant package. The contention that a single potentially invalid paragraph in a warrant defeats the warrant as a whole is preposterous. Defendant relies on *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009), a civil case finding that a single invalid provision of a warrant allowing seizure of evidence under "any statute of this state" authorized a general search and subsumed the warrant as a whole, *id.* at 639–40; *see* Def.'s Foote St. & Barbara Lane Reply at 9–10, but that reliance is misplaced. The single cherrypicked phrase in paragraph fourteen defendant challenges does not authorize more expansive searches, as did the warrant in *Cassady*. Read in context, the language in fact sets a limit on how far law enforcement may probe electronic devices: a search must end if basic investigative techniques do not produce any "evidence of theft of government property or other criminal activity." Barbara Lane Warrant, Attach. B ¶ 14. Moreover, the challenged words in fact appear to be irrelevant to the warrant as a whole, since no government property potentially covered by the erroneous phrase was actually seized from the Barbara Lane address. *See* Barbara Lane FD-302; Barbara Lane Receipt. Even if the reference to government property were excised, the remaining provisions of the warrant are more than enough to support the seizure of the evidence defendant seeks to suppress.

In sum, Attachment B to the Barbara Lane warrant, like Attachment B to the Foote Street warrant, is sufficiently tailored to pass constitutional muster.

### c.      Errors in Filing of Warrant Return

Third, defendant maintains that "[a]t no time was a copy of the [warrant] Return left at Barbara Lane or given to the owner of the Barbara Lane properties," Def.'s Barbara Lane Mot. at 9, and that the "inventory filed with the Barbara Lane Return was for the property seized at the Foote Street address," *id.* at 10.  He seeks suppression of the Barbara Lane warrant and its fruits based on these claimed errors in filing the warrant return alone.  *See id.*

Federal Rule of Criminal Procedure 41(f)(1)(C) specifies that the officer executing a warrant "must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property."  FED. R. CRIM. P. 41(f)(1)(C).  Rule 41(f)(1)(D) further requires that "[t]he officer executing the warrant must promptly return it— together with a copy of the inventory [of any property seized]—to the magistrate judge designated on the warrant."  FED. R. CRIM. P. 41(f)(1)(D).  Defendant acknowledges, *see* Def.'s Barbara Lane Mot. at 10, that "'[a]lthough the procedural steps enumerated in [Rule 41(f)(1)] are important and should not be disregarded, they are ministerial and [a]bsent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search.'"  *Crumpton*, 824 F.3d at 617 (third alteration in original) (quoting *Frisby*, 79 F.3d at 32); *see also United States v. Sigillito*, 759 F.3d 913, 925 (8th Cir. 2014) ("[E]xclusion of evidence" for violations of Rule 41(f)(1) "is required only when the error prejudices the defendant, or the police act in reckless disregard to the proper procedure.").  In this context, "[p]rejudice means being 'subjected to a search that might not have occurred or would not have been so abrasive' had the

rules been followed." *United States v. Burgos-Montes*, 786 F.3d 92, 109 (1st Cir. 2015) (quoting *Bonner*, 808 F.2d at 869).

As to defendant's first claim, that no copy of the return was left at the Barbara Lane location, Special Agent Migliara, who was present at the Barbara Lane search, prepared the requisite paperwork while at the scene and documented the receipt for property on the same day the warrant was executed. *See* Barbara Lane Receipt. The property receipt and a copy of the warrant was given to the building owner's designate at the Dou Perfect scene and was provided to defendant in discovery. *Id.* at 1; Barbara Lane FD-302 at 2; Gov't's Opp'n at 27; Hr'g Tr. (Rough) at 27:12-18, 28:20-25, 80:11-20. The Barbara Lane search was also documented in a formal FD-302, *see* Barbara Lane FD-302, and the warrant return was filed with the District of Maryland. All of these steps complied with the procedural requirements set forth in Rule 41(f)(1). The government concedes that, as defendant claims, Special Agent Smith filled out the return for the Barbara Lane warrant and gave it to Ms. Davis, the Foote Street homeowner, during an interview at the FBI's Washington Field Office. Gov't's Opp'n at 27; Hr'g Tr. (Rough) at 39:9-12, 40:15–41:10. As noted, however, Special Agent Migliara did provide a copy of the Barbara Lane warrant with the correct property receipt attached to an authorized designate at the Dou Perfect scene, consistent with Rule 41(f)(1)(C)'s requirements. Hr'g Tr. (Rough) at 27:12-18, 28:20-25, 80:11-20. That these documents were also given to an individual associated with the Foote Street residence has no bearing on the government's compliance with its Rule 41 obligations.

Defendant further asserts that, when Special Agent Smith filed the Barbara Lane return in the District of Maryland, the "inventory filed with the Barbara Lane Return was for the property seized at the Foote Street address." Def.'s Barbara Lane Mot. at 10. The government again

admits this error, but notes that the correct property receipt exists and was furnished both to an individual on the scene at Barbara Lane and to defendant in discovery, consistent with the spirit, if not the form, of Rule 41(f)(1).  Gov't's Opp'n at 28; *see* Hr'g Tr. (Rough) at 26:18–27:18.[10]

Though Rule 41 may technically have been violated through this ministerial mistake, as already explained, suppression is not warranted unless defendant was prejudiced by the error. Defendant makes no argument that he suffered prejudice, *see* Def.'s Barbara Lane Mot. at 9–10, nor could he.  The errors he identifies, both of which took place after the Barbara Lane warrant was executed, did not facilitate a search that would not have otherwise occurred or alter the scope the Barbara Lane search in any way.  *See Burgos-Montes*, 786 F.3d at 109.  Moreover, defendant is fully aware of exactly which items were seized from that location, as he received the correct property receipt in discovery.  *See* Gov't's Opp'n at 27.  Instead of carrying his burden to establish prejudice, defendant contends that "[t]o turn a blind eye, will only encourage continued mishandling of warrants by law enforcement" and that "these ministerial errors chip away at the integrity of the federal courts."  Def.'s Barbara Lane Mot. at 10.  As explained *supra* Part II.A.3.d.iii, the nitpicked, clerical mistakes highlighted by defendant reflect simple human error in the course of a rapidly evolving, complicated, and potentially dangerous investigation into a major narcotics-trafficking operation.  Defendant goes too far in asserting that such tiny details of this six-month investigation into his alleged criminal activities undermine "the integrity of the federal courts," Def.'s Barbara Lane Mot. at 10, particularly since he does not substantiate this hyperbolic claim with even a shred of evidence of government misconduct.

---

[10]  This error has not yet been corrected on the docket in the District of Maryland, but law enforcement represents that it can be rectified.  Hr'g Tr. (Rough) at 29:1-5.

### d. Alleged Factual Errors in Smith Affidavit and Probable Cause

Finally, defendant repeats the argument, already rejected in resolving his Foote Street motion, *see supra* Part II.A.3.d, that the minor typographical and clerical errors already discussed, in combination with a handful of discrete and immaterial factual errors in the Smith Affidavit, "when considered as a whole . . . chip away at probable cause[] and render the Warrant invalid." Def.'s Barbara Lane Mot. at 8–9. He again requests a *Franks* hearing on these issues. *Id.* at 9.

#### i. Probable Cause for the Barbara Lane Warrant

The Barbara Lane warrant's showing of probable cause that defendant was involved in drug trafficking rested on essentially the same evidence as the Foote Street warrant, described *supra* Part I.A and Part II.A.3.d.i. Beyond that evidence, the Smith Affidavit also states that a confidential source identified defendant as someone "known to supply large amounts of heroin." Smith Aff. ¶ 14(b). Based on the collective weight of these facts, just as in the Foote Street warrant, probable cause existed in the Barbara Lane warrant to believe that defendant was involved in drug trafficking.

As previously found in resolving defendant's first motion to suppress evidence recovered during the Barbara Lane search, the Barbara Lane warrant also established probable cause to believe that Dou Perfect was a location where defendant stored heroin, evidence related to the distribution of heroin, or both. *See* Dec. 12 Hr'g Tr. at 49:18–52:6. This conclusion was based on Special Agent Smith's attestations, drawing on his training and experience as a narcotics investigator, that narcotics traffickers keep related items in stash locations such as garages, Smith Aff. ¶ 3(a), often distribute from locations other than their own residences to which they have access, *id.* ¶ 3(b), and use business locations with which they are associated to keep records and store large amounts of currency, *id.* ¶¶ 3(c)-(e). These statements were "all . . . pertinent to

explaining why Dou' Perfect . . . [was] likely to hold evidence of narcotics trafficking activity." Dec. 12 Hr'g Tr. at 50:15-18.  In addition, "pen register evidence" showing that Suspect-1 was in contact with a 301 area code phone number listed as the business contact number for Dou Perfect during undercover buys "tied heroin distribution to Dou' Perfect." *Id.* at 50:19-20.  Further, "a business [records] search . . . listed the defendant as a business contact/key executive of Dou' Perfect," *id.* at 51:6-9, and "the . . . confidential source reported to law enforcement that the defendant stored large amounts of heroin at Dou' Perfect, including as recently as November 2018," *id.* at 51:11-14.  Law enforcement also "observed the defendant at Dou' Perfect," *id.* at 51:23-24, on November 29, 2018 and December 4, 2018, *id.* at 51:23-52:2.  Finally, and most importantly, the events culminating in the November 29, 2018 undercover purchase "showed that the defendant traveled directly from Dou' Perfect to meet with Suspect 1 before Suspect 1 met with the [UC] to sell him heroin." *Id.* at 51:15-22.  Altogether, this evidence "established a sufficient nexus between the defendant's suspected drug trafficking and the Dou' Perfect auto repair business." *Id.* at 52:3-5.

For these reasons, probable cause existed to issue the warrant to search Dou Perfect, located at 7605 Barbara Lane in Clinton, Maryland.  *See id.* at 53:15-19.  Just as the trivial inaccuracies in the Migliara Affidavit do not undermine probable cause for the Foote Street affidavit, *see supra* Part II.A.3.d.ii, the minute errors in the Smith Affidavit highlighted by defendant have no material impact on this determination.  Each of the proffered mistakes will be addressed in turn before defendant's request for a *Franks* hearing.

### ii.      Factual Inaccuracies Immaterial to Probable Cause

Defendant attempts to undermine the mountain of evidence supporting probable cause for the Barbara Lane warrant by citing to tiny factual inaccuracies in the Smith Affidavit, most of

which have already been discussed in the context of the Migliara Affidavit, *see supra* Part II.A.3.d.ii. He again emphasizes the Smith Affidavit's statement that defendant traveled outside of the Washington, D.C. area from Dulles International Airport rather than Reagan National Airport; the discrepancy in the dates of his travel; and the date of the UC's conversation with Suspect-1, in which Suspect-1 said that his "heroin supplier had recently traveled with his wife." Def.'s Barbara Lane Mot. at 8 (internal quotation marks omitted); *see* Smith Aff. ¶ 27. As explained in rejecting defendant's identical arguments in support of his motion to suppress the Foote Street search, *see supra* Part II.A.3.d.ii, none of these trivial factual errors undermine probable cause in this case.

Defendant adds a new grievance particular to the Barbara Lane warrant to this list, that Special Agent Smith's description in three subparagraphs of his Affidavit of the places in which narcotics traffickers may store items related to their illegal activities did not specifically include "business locations." Def.'s Barbara Lane Mot. at 8 (citing Smith Aff. ¶¶ 3(a)-(c)). In defendant's view, this omission means that these provisions of the affidavit "do[] not provide probable cause to search for those items at [defendant's] business," Dou Perfect. *Id.* This argument ignores the numerous references to business locations in the relevant sections of the Smith Affidavit. Special Agent Smith makes abundantly clear that, in his training and experience, narcotics traffickers store contraband and other items associated with their illegal activities at "business location[s] with which [they] are associated." Smith Aff. ¶ 3(d); *see also id.* ¶ 3(e). Moreover, a "business location" may easily serve as a "stash house," a type of location Special Agent Smith explicitly references in the challenged paragraphs. *See id.* ¶¶ 3(a)-(c).

Further, though Special Agent Smith's statements based on his training and experience bolstered the finding of a sufficient nexus between defendant's heroin sales and the Barbara Lane location, the other evidence this Court found to support probable cause is more than adequate even without the challenged assertions.  In particular, the pen register data and surveillance tying defendant to Dou Perfect at the time of undercover buys of heroin gives rise to a clear inference that defendant was carrying out at least some of his allegedly criminal activity from that location. Defendant's challenge to probable cause based on this omission and the factual inaccuracies previously discussed is therefore without merit.

### e.     *Franks* Hearing Not Warranted

Finally, defendant again requests a *Franks* hearing on two grounds, neither of which is persuasive.  Defendant first argues, repeating the argument advanced for a *Franks* hearing in his Foote Street motion, that "there are too many errors within the Warrant documents."  Def.'s Barbara Lane Mot. at 9 (citing *Franks*, 438 U.S. 154).  Once again, he has failed to make the requisite threshold showing for a *Franks* hearing because, just as was the case in relation to the Foote Street warrant, none of the discrete mistakes noted by defendant are material to the issue of probable cause and defendant makes no showing that the mistakes were made "knowingly and intentionally, or with reckless disregard for the truth," *Franks*, 438 U.S. at 155, beyond a conclusory assertion that "the totality of the errors rise to a level of recklessness that undermines the integrity of the Affidavit," Def.'s Barbara Lane Mot. at 9; *see supra* Part II.A.3.e.

Defendant next, without any substantiation, accuses law enforcement of including a false statement in the Smith Affidavit and requests a *Franks* hearing on this issue.  Def.'s Barbara Lane Mot. at 10–11.  The allegedly false statement at issue is the averment that a confidential source informed law enforcement that defendant "stored large amounts of heroin [at Dou Perfect] as recently as late November 2018."  Smith Aff. ¶ 14(b).  Defendant claims that "the

owner of the complex closed Dou' Perfect during that time period" and that the statement is therefore false. Def.'s Barbara Lane Mot. at 11.

Defendant concedes, as he must, that he has failed to make the threshold showing to require a *Franks* hearing on the allegedly false statement. Def.'s Suppl. Notice ¶ 1, ECF No. 130; Hr'g Tr. (Rough) at 13:12-15; *see supra* Part II.A.3.e (outlining the *Franks* hearing standard). First, he provides no evidence, let alone the necessary "substantial preliminary showing," *Franks*, 438 U.S. at 155, that the statement was in fact false or that law enforcement knew it was false. Defendant represents that he is attempting to produce an affidavit or other evidence in support of this claim, Def.'s Foote St. & Barbara Lane Reply at 10–11; Def.'s Suppl. Notice ¶¶ 1, 5; Hr'g Tr. (Rough) at 13:16-20, but nearly three years into this case and only months before trial, he has failed to do so. Second, even if defendant could establish that the statement is false, it is not material to probable cause. Defendant contends that, without the statement, the Smith Affidavit would contain "no averments that drugs were seen at the [Barbara Lane] location." Def.'s Suppl. Notice ¶ 2. As previously described, however, *see supra* Part I.A, Part II.A.4.d.i, overwhelming evidence connected defendant and his heroin sales to Dou Perfect. Even if the information relayed by the confidential source is shown to be false, pen register data and surveillance plainly link defendant's suspected drug trafficking to Dou Perfect. *See supra* Part I.A, Part II.A.4.d.i. The confidential source's statement enhances this showing of probable cause, but is not essential to it. Defendant's request for a *Franks* hearing on paragraph 14(b) of the Smith Affidavit is therefore denied.

In short, for all of the foregoing reasons, none of defendant's challenges to the Barbara Lane warrant hold water. His Renewed Motion to Suppress Evidence Recovered During the Search of the Barbara Lane Location, ECF No. 121, is denied.

**B.** **Defendant's Motion to Suppress Fruits of Law Enforcement Use of Cell-Site Simulator**

Defendant next moves to suppress four cell phones and "other matter" recovered incident to his arrest as "[t]he fruits of [law enforcement's] use of [a] cell site simulator" on his 202 cell phone number, pursuant to a warrant issued by a Magistrate Judge of this Court. Def.'s Cell-Site Mot. at 5; *see supra* Part I.A.4. This challenged cell-site simulator warrant was obtained as part of the fugitive apprehension investigation to locate defendant and successfully led to his arrest at 2226 Linden Avenue in Baltimore, Maryland. *See supra* Part I.A.4. In his two-pronged challenge to this warrant, first, defendant claims that venue in the District of Columbia for the cell-site simulator warrant under Federal Rule of Criminal Procedure 41(b)(2) was not proper and that the warrant was therefore invalid because the Magistrate Judge in this District lacked authority to issue it. Def.'s Cell-Site Mot. at 2–3. Second, defendant argues that a single alleged factual inaccuracy in the affidavit submitted in support of the warrant "affect[s] . . . the probable cause analysis" underlying the warrant. *Id.* at 4; *see also id.* at 3–4. Resolution of defendant's venue challenge to the cell-site simulator warrant requires some understanding of the investigative techniques used by law enforcement to track down and arrest defendant. Evaluation of the merits of defendant's arguments thus follows review of the relevant technology.

**1.** *Description of Investigative Techniques Related to Cell Phone Location*

As set forth in detail *supra* Part I.A.4, during the fugitive apprehension investigation to find and arrest defendant after his December 20, 2018 indictment and the issuance of a warrant for his arrest, law enforcement obtained cell-site simulator warrants and GPS ping warrants in this District for defendant's two cell phone numbers with area codes 202 and 301. The GPS ping data officers received on the device with the 202 cell phone number indicated that he was in

Baltimore, Maryland, but did not produce an exact location.  To pinpoint a more precise location, on January 3, 2019, law enforcement activated a cell-site simulator targeting the 202 cell phone. The cell-site location data collected by the simulator brought officers to the Linden Avenue neighborhood where defendant was ultimately apprehended.  The two location-tracking techniques used by law enforcement to find defendant in the course of the fugitive apprehension investigation are described in turn.

### a.      Cell-Site Simulators

Cell phones make calls, send text messages and emails, and access the internet "by connecting to a set of radio antennas called 'cell sites.'"  *Carpenter v. United States*, 138 S. Ct. 2206, 2211 (2018).  Cell sites are most often mounted on a cell tower, but can also be attached to common structures such as "light posts, flagpoles, church steeples, or the sides of buildings."  *Id.* "The typical cell site covers a more-or-less circular geographic area" and "has three (or sometimes six) separate antennas pointing in different directions."  *Id.* at 2225 (Kennedy, J., dissenting).  Each antenna "provides cell service for a different 120-degree (or 60-degree) sector of the cell site's circular coverage area."  *Id.*  As a result, the particular antenna on a cell site to which a cell phone connects is determined by the cell phone's location relative to the cell site. For example, "a cell phone activated on the north side of a cell site will connect to a different antenna than a cell phone on the south side."  *Id.*

In order to perform their various functions, "[c]ell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site," and "tap into" the vast cell-site network "several times a minute whenever their signal is on, even if the owner is not using one of the phone's features."  *Id.* at 2211 (majority opinion).  Every time a phone connects to a cell site, it creates "a time-stamped record known as cell-site location information" or "CSLI."  *Id.*  This record shows "the cell site and particular sector that were

used" by a cell phone to connect to the network at a particular moment in time. *Id.* at 2212. That information is sufficient to "reveal the general location of the cell phone user" without generating precise location information "because an individual cell-site sector usually covers a large geographic area" that can span up to two miles in urban areas. *Id.* at 2225 (Kennedy, J., dissenting).

A cell-site simulator or "stingray" is a device that "pretends to be a cell tower," or more specifically, a cell site on a cell tower, "and harvests identifying information, including location data, about every phone that responds to its signals." *United States v. Sanchez-Jara*, 889 F.3d 418, 419 (7th Cir. 2018). Cell phones cannot authenticate cell sites and therefore "have no way to differentiate between" a cell tower "owned or operated by the [device's] wireless carrier" and a law enforcement–operated simulator "impersonating a carrier's base station." Stephanie K. Pell & Christopher Soghoian, *Your Secret StingRay's No Secret Anymore: The Vanishing Government Monopoly over Cell Phone Surveillance and Its Impact on National Security and Consumer Privacy*, 28 HARV. J.L. & TECH. 1, 12 (2014). As a result, a cell phone will connect to the source of the strongest signal it can find, regardless of the source's identity. A cell-site simulator "emit[s] an especially strong signal" relative to the typical cell tower and thus "induces nearby cell phones to connect and reveal their direction relative to the device." *United States v. Patrick*, 842 F.3d 540, 542 (7th Cir. 2016). Essentially, the signals emitted by the simulator are so powerful that cell phones in its proximity will "identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower." U.S. DEP'T OF JUSTICE, DEPARTMENT OF JUSTICE POLICY GUIDANCE: USE OF CELL-SITE SIMULATOR TECHNOLOGY 2 (2015), https://www. justice.gov/opa/file/767321/ [hereinafter DOJ CELL-SITE SIMULATOR POLICY].

A cell-site simulator warrant allows law enforcement to use a stingray device "to help locate cellular devices whose unique identifiers are already known to law enforcement, or to determine the unique identifiers of an unknown device by collecting limited signaling information from devices in the simulator user's vicinity." *Id.* at 1. When a stingray is deployed "to locate a known cellular device," it "initially receives the unique identifying number from multiple devices in [its] vicinity." *Id.* at 2. "Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone." *Id.*

The identifying information generated by a cell-site simulator, like the CSLI produced by a networked tower, is "limited" and indicates "only the relative signal strength and general direction" of a cell phone at the moment when it connects with the device. *Id.* The information obtained through use of a cell-site simulator, then, is "the same sort of information that a phone company could provide using its own facilities," with the concomitant benefit of being available to law enforcement agents "in real time," without the delays caused by communication between agents and a wireless carrier. *Patrick*, 842 F.3d at 543. This feature of cell-site simulators enables simultaneous tracking of a cell phone's movements and, by proxy, the movements of the individual carrying the cell phone. In addition, in contrast to carrier-generated CSLI, by collecting data on the target cell phone's location through signaling information "over a period of time," a stingray may use changes in the "relative strength" of the connection between the simulator and the phone "to generate a precise location" for the target device. Carrie Leonetti, *A Hailstorm of Uncertainty: The Constitutional Quandary of Cell-Site Simulators*, 85 U. CIN. L. REV. 665, 668 (2017); *see also United States v. Lambis*, 197 F. Supp. 3d 606, 609 (S.D.N.Y. 2016) (noting that a stingray "forc[es] cell phones to transmit 'pings' to the simulator"

continuously and "then calculates the strength of the 'pings' until the target phone is pinpointed").  Through this continuous production and analysis of location data, a cell-site simulator can locate cellular devices "with extraordinary precision," generating location estimates that are within feet of a phone's actual location.  Pell & Sogohian, *supra*, at 11 & n.44.  This ability to pinpoint an individual's exact whereabouts in real time, without the involvement of third-party carriers, means that cell-site simulators "fulfill critical operational needs" in law enforcement's efforts to mitigate various public-safety threats, for example, "fugitive apprehension effort[s]," "complex narcotics investigation[s]," and missing-persons investigations.  DOJ CELL-SITE SIMULATOR POLICY, *supra*, at 1.

        **b.**      **GPS "Pinging"**

In contrast to the cell-site simulator technique, which allows law enforcement to independently track a cell phone's whereabouts, a second investigative technique, known as GPS "pinging," relies on carrier-generated data about a cell phone's location.  While carrier-produced CSLI and cell-site simulators use a cell phone's connection with a cell tower to approximate the device's position, "pings" look instead to the phone's "GPS location, which is generated by triangulating the cell phone's position by reference to three or more network satellites" that connect to the phone.  *United States v. Caraballo*, 831 F.3d 95, 99 (2d Cir. 2016).  "A cell phone's GPS location can be identified so long as the phone has GPS functionality installed (as smartphones almost universally do), the phone is turned on, and the GPS functionality is not disabled."  *United States v. Riley*, 858 F.3d 1012, 1014 n.1 (6th Cir. 2017).  The GPS data produced by the three satellites "reveal the latitude and longitude coordinates of the cell phone," *id.*, producing an estimate of a device's location that, by Special Agent Smith's estimation, is accurate within a range of approximately 500 to 1,000 meters, *see* Hr'g Tr. (Rough) at 30:18-20.  If, however, only one or two satellites are connected to a cell phone at the moment when GPS

data is sought, "the ping produces only the phone's less precise, cell-tower location." *Caraballo*, 831 F.3d at 99.

GPS-based location information can be generated "only at the specific command of" the network carrier, "an action called 'pinging.'" *Id.* "Pinging" refers to "a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own." *Riley*, 858 F.3d at 1014 n.1; *see also United States v. Barajas*, 710 F.3d 1102, 1104 n.1 (10th Cir. 2013) (defining a "ping" as "a GPS query on . . . the target telephone" carried out by the wireless carrier (internal quotation marks and citation omitted) (omission in original)); *United States v. Caraballo*, 963 F. Supp. 2d 341, 346 (D. Vt. 2013) ("This investigative technique, commonly referred to as cell phone 'pinging,' consists of the cell phone carrier surreptitiously accessing by satellite the cell phone's GPS location, or if unavailable, its location in terms of its proximity to the nearest cell phone tower."). A GPS ping warrant therefore "orders a cellular telephone company to affirmatively create evidence about the whereabouts of a particular cellular telephone at the direction of law enforcement" by sending a ping to the device and transmitting the GPS coordinates that result to officers. *In re Search of Cellular Tel.*, 430 F. Supp. 3d 1264, 1273 (D. Utah 2019).

GPS pings, like cell-site simulators, are frequently used to find and apprehend fugitives, *see, e.g.*, *Riley*, 858 F.3d at 1013; *Patrick*, 842 F.3d at 542; *United States v. Hill*, Case No. 1:20-cr-12, 2021 WL 1305381, at *1, *3 (S.D. Ohio Apr. 7, 2021), but the two technologies play different roles in an investigation. GPS data "can locate a device more precisely" than the cell-site data collected by a cell tower and is therefore preferable to CSLI. Leonetti, *supra*, at 669. The 500 to 1,000 meter location range produced by GPS pinging, *see* Hr'g Tr. (Rough) at 30:18-20, however, is far less exact than a cell-site simulator's location estimate, which is accurate

within mere feet of a device's actual location, *see* Pell & Soghoian, *supra*, at 11 n.44.  In addition, cell-site simulator tracking offers the practical benefit of being "done in real time without the involvement of the wireless service provider" and therefore "speeds up the delivery of location information from the phone to the police," Leonetti, *supra*, at 669, a critical advantage in situations where time may be of the essence.  Thus, when sophisticated location tracking is needed, law enforcement frequently obtains both cell-site simulator and GPS ping warrants "simultaneously or close in time to one another," Hr'g Tr. (Rough) at 31:6-7; *see id.* at 31:3-8, turns first to GPS pinging to place the target device in a particular neighborhood or general area, and then uses the cell-site simulator within the vicinity identified by the GPS pings to "specify . . . a more exact or accurate location," *id.* at 31:10-11; *see also id.* at 31:9-12.  As described *supra* Part I.A.4, officers followed exactly this sequence in their use of GPS pinging and a cell-site simulator to locate and apprehend defendant.

Defendant's claim that venue was lacking in this District for the cell-site simulator warrant on his 202 cell phone number is next assessed against the backdrop of this technological overview.

### 2. *Venue Under Rule 41*

#### a. Applicable Legal Standard

Federal Rule of Criminal Procedure 41(b) governs "venue for a warrant application," FED. R. CRIM. P. 41(b), and authorizes magistrate judges to "issue a warrant to search for and seize a person or property located within the district," FED. R. CRIM. P. 41(b)(1).  The rule also provides five exceptions to this territorial restriction, including, as relevant here, an exception set forth in Rule 41(b)(2), allowing a magistrate judge to issue a warrant "for a person or property outside the district if the person or property is located within the district when the warrant is

issued but might move or be moved outside the district before the warrant is executed."  FED. R. CRIM. P. 41(b)(2).

The question of the standard under which a magistrate judge determines whether venue is proper under Rule 41(b)(2) because the "person or property is located within the district when the warrant is issued" is an issue of first impression.  Defendant argues that the text of this exception to Rule 41(b)(1)'s territorial requirement "require[es] actual knowledge that the person or property is located within the District when the warrant is issued" for venue to lie.  Hr'g Tr. (Rough) at 90:23-25, 90:22–91:6.  The government, on the other hand, suggests that "law enforcement [may] need only possess 'reason to believe' that the person or property to be searched is located within the same district as the magistrate issuing the warrant," Gov't's Opp'n at 30, and that, "[a]t most, the rule should require no more than probable cause that the person or property is located within the same district as the magistrate issuing the warrant, the same standard governing the issuance of warrants generally," *id.* at 31 (citing *Gates*, 462 U.S. at 230); *see also* Hr'g Tr. (Rough) at 99:2-7, 102:6-10.  For the reasons explained below, as a matter of first impression, Rule 41(b)(2) is best read to require law enforcement to demonstrate reason to believe that the person or property as to which they seek a warrant is located within the district when the warrant is issued.

### i.       Principles Guiding Interpretation of Rule 41

At the outset, some discussion of how to interpret the text of the Federal Rules of Criminal Procedure is warranted.  The standard "principles of statutory interpretation apply also to federal rules, including the Federal Rules of Criminal Procedure."  *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020); *see also, e.g.*, *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989) (applying principles of statutory interpretation to the Federal Rules of Civil

Procedure); *United States v. Owen*, 500 F.3d 83, 89–91 (2d Cir. 2007) (same for Federal Rules of Criminal Procedure).  Thus, in interpreting any of the Rules, courts must "'begin with the text.'" *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)).  In conducting its textual analysis, a reviewing court is "aided by" the established canons of statutory construction.  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014); *see also, e.g.*, *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 982–83 (D.C. Cir. 2021).  In addition, the court may, if necessary, look beyond the text to other "'traditional tools of statutory interpretation,'" including a Rule's "'structure, purpose, and legislative history.'"  *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (quoting *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003)).

The D.C. Circuit's approach to interpreting Rule 6(e) in *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir.), *reh'g en banc denied* (D.C. Cir. July 22, 2019), *cert. denied*, 140 S. Ct. 597 (2020) (mem.), offers further guidance to district courts seeking to apply these general principles of statutory interpretation to the specific context of the Federal Rules of Criminal Procedure.  The *McKeever* Court determined that Rule 6(e), which "sets out the general rule of grand jury secrecy and provides a list of 'persons' who 'must not disclose a matter occurring before the grand jury' '[u]nless these rules provide otherwise,'" 920 F.3d at 844 (alteration in original) (quoting FED. R. CRIM. P. 6(e)(2)(B)), "'must be narrowly construed'" and therefore deprives a district court of inherent authority to disclose grand jury materials unless one of the exceptions specifically enumerated in the Rule applies, *id.* at 847 (quoting *In re Sealed Case*, 250 F.3d 764, 769 (D.C. Cir. 2001)).[11]  The panel ultimately found that it was bound by the four corners of Rule 6(e)'s

---

[11]     As Justice Breyer observed in his statement respecting the Supreme Court's denial of certiorari in *McKeever*, *see* 140 S. Ct. at 597–98 (Breyer, J., respecting the denial of certiorari), and the *McKeever* Court itself acknowledged, *see* 920 F.3d at 850, this conclusion stands in tension with the interpretation of Rule 6(e) adopted by several other circuit courts, "which have indicated that district courts retain inherent authority to release grand jury

text, rejecting the appellant's argument that the Rule "did not eliminate the district court's preexisting authority at common law to disclose grand jury matters" as "difficult to square with the text of the Rule." *Id.* at 848.

In reaching the conclusion that Rule 6(e)'s text must be taken at face value, however, the *McKeever* Court looked beyond the plain text of the Rule to a range of additional interpretive tools, including the background constitutional interests served by grand jury secrecy, the legislative history of Rule 6(e), and the Rule's structure. *See id.* at 844–49. First, the paramount constitutional principles, stemming from the Fifth Amendment right to grand jury indictment, *see* U.S. CONST. amend. V, of "(1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated," all of which are "safeguard[ed]" by the long tradition of grand jury secrecy, required rigorous defense of the protections for grand jury secrecy codified in the Rule. *McKeever*, 920 F.3d at 844 (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979)). Since the effect of any potential disclosure of grand jury materials "must be evaluated *ex ante*," and could "grow as district courts continue over time to create additional exceptions to grand jury secrecy," *id.* at 849, these considerations of constitutional policy weighed heavily in favor of reading Rule 6(e) narrowly and literally.

Turning next to legislative history, the Circuit noted that Congress had "in 1977 directly enacted Rule 6(e) in substantially its present form" and had not revisited it since, suggesting that the exceptions in the Rule reflect "a carefully considered policy judgment by the Supreme Court

material in other appropriate cases," 140 S. Ct. at 598 (Breyer, J., respecting the denial of certiorari) (citing *Carlson v. United States*, 837 F.3d 753, 766–67 (7th Cir. 2016); *In re Craig*, 131 F.3d 99, 105 (2d Cir. 1997); *In re Hastings*, 735 F.2d 1261, 1271–72 (11th Cir. 1984)).

in its rulemaking capacity, and by the Congress" as to the limited circumstances in which disclosure of grand jury materials aligns with constitutional interests. *Id.* at 845. The structure of Rule 6(e), which features "a detailed list of 'exceptions' to grand jury secrecy" but no residual or catch-all phrase that might be understood to allow district courts to imply additional exceptions, bolstered this inference. *Id.* at 844–45. So too did the decades of Supreme Court and D.C. Circuit precedent interpreting Rule 6(e) against the background principle that "'[i]n the absence of a clear indication in a statute or Rule, [courts] must always be reluctant to conclude that a breach of [grand jury] secrecy has been authorized.'" *Id.* at 844 (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983)); *see also id.* at 844–45, 846–47 (discussing cases); *cf. Doe v. Bell*, 969 F.3d 883, 892 (8th Cir. 2020) ("In fact, 'the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings' so much so that the [Supreme] Court has referred to its confidentiality as 'vital.'" (quoting *Rehberg v. Paulk*, 566 U.S. 356, 374 (2012))). The totality of these sources informed the Circuit's decision that the text of Rule 6(e) must be interpreted narrowly and precisely, in accord with its plain meaning. Application of this interpretive framework resulted in the conclusion that district courts lack inherent authority to disclose grand jury materials. *See McKeever*, 920 F.3d at 844–47, 850.

The lesson of *McKeever*, then, is not that the Federal Rules of Criminal Procedure must be construed only by their plain text, in isolation from any relevant context or extratextual interpretive tools that might alter the meaning apparent from the face of a Rule. *McKeever* teaches instead that the background constitutional principles animating a particular Rule and any previous judicial or legislative applications of those principles to the Rule in question should inform a court's approach to construing its text.[12] In the case of Rule 6(e), these sources

---

[12] The *McKeever* Court also emphasized that the addition of a judicially created "inherent authority" exception to Rule 6(e) "would render the detailed list of exceptions [in the Rule] merely precatory and

counseled in favor of a strict and literal interpretation of the Rule's exceptions as an exclusive list that precludes the recognition by implication of additional circumstances in which disclosure of grand jury materials is appropriate. The context surrounding other Rules may point a reviewing court towards an alternative interpretive approach that better fits the constitutional context of the Rule at issue. When applying the approach determined to be most appropriate to a particular Rule, however, the court must remain mindful of *McKeever*'s caution against an interpretation that would "'circumvent' or 'disregard' a Federal Rule of Criminal Procedure." *Id.* at 845 (quoting *Carlisle v. United States*, 517 U.S. 416, 426 (1996)) (citing *Dietz v. Bouldin*, 136 S. Ct. 1885, 1888 (2016)).

### ii. Plain-Text Reading of Rule 41(b)(2) Produces Absurd Results

Application of the interpretive principles discussed above to Rule 41(b)(2)'s exception to the general territorial restriction on warrant venue clearly disfavors a plain-text reading of the Rule. Rule 41(b)(2)'s text, the necessary starting point for analysis, allows a magistrate judge "to issue a warrant for a person or property outside the district" only "if the person or property is located within the district when the warrant is issued." FED. R. CRIM. P. 41(b)(2). As defendant rightly contends, *see* Hr'g Tr. (Rough) at 90:22–91:6, on its face, this phrasing appears to refer to the definite location of the target person or property, not to the location where law enforcement believes the person or property to be. A reasonable plain-text reading of Rule 41(b)(2), then, suggests that actual knowledge of the person or property's location when the warrant is issued is necessary to establish venue.

---

impermissibly enable the court to 'circumvent' or 'disregard' a Federal Rule of Criminal Procedure," 920 F.3d at 845 (quoting *Carlisle v. United States*, 517 U.S. 416, 426 (1996)) (citing *Dietz v. Bouldin*, 136 S. Ct. 1885, 1888 (2016)), suggesting that the Circuit may distinguish between the situation presented in *McKeever*, in which a district court sought to expand the scope of a Rule without any textual hook, and the more typical situation in a which a court seeks to identify the meaning of a Rule's text as written.

The facts of this case clearly show, however, that an "actual-knowledge" standard would be unworkable in practice. If law enforcement had actual knowledge of defendant's precise location when the warrant for his arrest was issued, they would have had no need to seek judicial authorization to use a cell-site simulator to locate him. In fact, officers sought the challenged warrant for the very reason that they did not know where defendant was and were therefore unable to execute the warrant for his arrest. Reading Rule 41(b)(2) to require actual knowledge would have prevented law enforcement from obtaining a cell-site simulator warrant in *any* jurisdiction for this defendant and might have delayed or prevented the apprehension of defendant, a fugitive known to have ready access to kilogram quantities of narcotics and significant numbers of firearms.

Defendant suggests that, in order to remedy this problem created by the imposition of an actual-knowledge standard for a cell-site simulator warrant, law enforcement could instead obtain a GPS ping warrant, collect location data pursuant to that warrant, use the data to determine the jurisdiction in which the target device is located, and then apply for a cell-site simulator warrant in that district. *See* Hr'g Tr. (Rough) at 92:21–93:8, 94:15-21.[13] Thus, in defendant's view, when the officers searching for him obtained location data pursuant to the GPS ping warrants on defendant's cell phones indicating that the phones were in Baltimore, Maryland, law enforcement should have applied for a cell-site simulator warrant in the District of Maryland based on their actual knowledge that defendant's cell phone with the 202 number

---

[13] GPS ping warrants are typically obtained pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2712, and are therefore subject to that statute's venue provision, which allows a warrant to an electronic communications service or remote computing service (including a wireless carrier) to issue from "any district court of the United States" that, as relevant here, has jurisdiction over the target offense or is located in a district in which the electronic communications service or remote computing storage is located, *id.* § 2711(3)(A). Although GPS ping warrants are frequently sought and issued under both 18 U.S.C. § 2703 and Rule 41, because Rule 41 expressly provides that it "does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances," FED. R. CRIM. P. 41(a)(1), the SCA's more expansive venue provision controls. *See In re Search of Cellular Tel.*, 430 F. Supp. 3d at 1269–70; Gov't's Opp'n at 39 n.6.

was in Maryland.  *See* Def.'s Cell-Site Reply at 3.  Even this belt-and-suspenders approach to application of the actual-knowledge standard, however, leaves substantial gaps in law enforcement's ability to obtain a cell-site simulator warrant while searching for a fugitive.  As Special Agent Smith testified, GPS location data pinpoints a device's location within 500 to 1,000 meters.  Hr'g Tr. (Rough) at 30:19-20.  In a metropolitan area that spans multiple jurisdictions, like the Washington, D.C. area, this relatively narrow location estimate still could straddle, for example, the D.C.–Maryland border, leaving law enforcement without actual knowledge of the jurisdiction in which the target device is located, as defendant concedes, Hr'g Tr. (Rough) at 94:15-21.  In such circumstances, the plain-text interpretation of Rule 41(b)(2) endorsed by defendant would still prevent law enforcement from obtaining a cell-site simulator warrant in any jurisdiction.  Defendant's proposed solution to this problem, that law enforcement obtain warrants in both jurisdictions, *see id.* at 94:19-21, itself suggests that actual knowledge cannot be the correct standard, since the ambiguity created by a location estimate that encompasses two jurisdictions would necessarily preclude a finding of actual knowledge in either district.

Moreover, actual knowledge is such a high standard that defendant's suggested approach might not allow law enforcement to establish venue for a cell-site simulator warrant even when the approximation produced by GPS pinging does not cross state lines.  GPS location data would certainly supply actual knowledge of a target device's whereabouts at the moment in time when the device is pinged by the carrier.  Assuming, however, some delay between the ping by the carrier, communication of the resulting GPS location data to law enforcement, and the filing of a warrant application in the appropriate jurisdiction, by the time the warrant application is submitted, the GPS pings may no longer reflect the device's actual location.  The inevitable

passing of still more time between the filing of an warrant application and the issuance of a warrant by a judicial officer reduces even further the likelihood that data obtained pursuant to a GPS ping warrant could establish actual knowledge of the target person or property's location "when the warrant is issued." FED. R. CRIM. P. 41(b)(2).

As consideration of how defendant's theory would work in practice demonstrates, a literal reading of Rule 41(b)(2) to require an actual-knowledge standard would essentially bar the use of cell-site simulators and similar investigative techniques in any fugitive apprehension investigation, imposing an extraordinarily high bar for a crucial law-enforcement tool. The overly stringent interpretation of Rule 41(b)(2) proffered by defendant, though consistent with the plain text of the Rule, would therefore produce unreasonable outcomes and stymie law enforcement's ability to use all the available technological means to track down potentially dangerous individuals.

Thus, the plain-text reading of Rule 41 as imposing an actual-knowledge standard and therefore allowing venue in *no* district to obtain the cell-site simulator warrant challenged by defendant cannot be correct. The standard principles and canons of statutory interpretation applicable to the Federal Rules of Criminal Procedure, *see Melvin*, 948 F.3d at 852; *supra* Part II.B.2.a.i, include "the absurd results doctrine, which embodies 'the long-standing rule that a statute [or rule] should not be construed to produce an absurd result,'" *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 411 (D.C. Cir. 2013) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)); *see also Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid . . . unreasonable results whenever possible."). Application of the absurd results doctrine here weighs heavily against adopting the plain-text reading of Rule 41(b)(2), the only exception to Rule 41(b)(1) that might establish venue in cases

such as this, to allow issuance of warrants only when law enforcement is certain that the person or property that is the object of the warrant sought is located within a particular district.

Yet the text of Rule 41 supplies no other standard to guide the judicial determination of whether venue lies. This omission reveals a troubling gap in the law and this Rule that has not been filled by Congress, the Rules Committee, or any Judge. The plain text of the exception in Rule 41(b)(2) appears to prohibit law enforcement from establishing venue in *any* jurisdiction to seek a warrant to use investigative techniques to locate a missing person or missing property in the absence of actual knowledge of their whereabouts. At the same time, none of the other exceptions to Rule 41(b)(1)'s territorial requirement, codified in Rule 41(b)(3)–(6), cover the situation this case presents. *See* FED. R. CRIM. P. 41(b)(3)-(6). Even Rule 41(b)(6), which was designed to expand law enforcement's ability to obtain warrants to search remotely electronic devices whose location is technologically concealed, *see* FED. R. CRIM. P. 41(b) advisory committee's notes to 2016 amendment; *e.g.*, *United States v. Henderson*, 906 F.3d 1109, 1114 (9th Cir. 2018) (recognizing that the addition of the exception at Rule 41(b)(6) was meant "to authorize magistrate judges to issue warrants to search computers located outside their district"), does not supply venue for the type of warrant at issue here, to find an electronic device whose location is not anonymized or otherwise hidden from law enforcement, but simply unknown to officers. As a result of this misfit between the Rule as it currently stands and the evolving technologies available to law enforcement, the text of Rule 41(b)(2) simply does not anticipate the challenge of establishing venue for a warrant to use a cell-site simulator or similar investigative technique to track down a fugitive. Consideration of interpretive tools beyond the plain text of the Rule is therefore necessary to construe Rule 41(b)(2).

### iii. Constitutional Policies and Precedent Favor a Flexible Reading of Rule 41

Beyond the text of Rule 41(b)(2), the background constitutional policies that motivate the Rule, the legislative history of amendments to the Federal Rules of Criminal Procedure, and case law interpreting various provisions of Rule 41 all suggest that a flexible approach to interpreting this Rule is appropriate, particularly in the constantly evolving context of technologically sophisticated investigative techniques.

Rule 41, codifying procedures for searches and seizures, is closely linked to the Fourth Amendment, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  The various clauses of the Fourth Amendment are among "citizens' chief constitutional protections against police excess," but the Amendment is "not rigid."  *Mora v. City of Gaithersburg*, 519 F.3d 216, 222 (4th Cir. 2008).  Rather, it "strikes a balance between the individual citizen's interest in conducting certain affairs in private and the general public's interest in subjecting possible criminal activity to intensive investigation."  *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1042 (D.C. Cir. 1978).  As this balancing approach to Fourth Amendment analysis suggests and the Supreme Court has repeatedly emphasized, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'"  *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978); *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (identifying as "the central inquiry under the Fourth Amendment . . . the reasonableness in all the circumstances of the particular

governmental invasion"). Thus, courts "approach the Fourth Amendment . . . with at least some measure of pragmatism," *Mora*, 519 F.3d at 222, affording "fair leeway for enforcing the law in the community's protection," *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975). Put simply, "[i]f there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way." *Mora*, 519 F.3d at 222; *see also Tennessee v. Garner*, 471 U.S. 1, 19 (1985) ("We would hesitate to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement.").

Its inherent pragmatism notwithstanding, the Fourth Amendment also enshrines the "'cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants whenever reasonably practicable.'" *Chimel v. California*, 395 U.S. 752, 758 (1969) (quoting *Trupiano v. United States*, 334 U.S. 699, 705 (1948)); *see also, e.g., Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) ("Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures."); *King*, 563 U.S. at 459 ("'[S]earches and seizures inside a home without a warrant are presumptively unreasonable.'" (quoting *Brigham City*, 547 U.S. at 403)); *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971). To implement the obligations imposed on law enforcement by the Warrant Clause while recognizing the Fourth Amendment's competing emphasis on preserving the necessary flexibility for law enforcement to do their jobs, the drafters of the Federal Rules of Criminal Procedure have sought to eliminate procedural hurdles to obtaining warrants expeditiously in the first instance and, in so doing, to encourage law enforcement to seek warrants *ex ante*, instead of relying on exceptions to the warrant requirement *ex post*. *See* FED. R. CRIM. P. 41 advisory committee's note to 1977 amendment ("Use of search warrants can best be encouraged by

making it administratively feasible to obtain a warrant when one is needed."); *United States v. McEachin*, 670 F.2d 1139, 1146–47 (D.C. Cir. 1981).

Fittingly, then, the Advisory Committee's Note to the 1990 Amendments to Rule 41, which introduced the exception now codified at (b)(2), sought to "encourage[] reliance on warrants" when law enforcement needs to locate or seize people or property traveling between jurisdictions. FED. R. CRIM. P. 41 advisory committee's note to 1990 amendment. The Advisory Committee "recognize[d] that there are inevitable delays between the application for a warrant and its authorization, on the one hand, and the execution of the warrant, on the other hand," *id.*, that made reliance on warrants issued under Rule 41(b)(1), which supplies venue only for warrants targeting "a person or property located within the district" when the warrant is both issued and executed, FED. R. CRIM. P. 41(b)(1), impractical. The addition of the (b)(2) exception was thus meant to "provide[] a practical tool for federal law enforcement officers" to obtain warrants for people or property that may leave the district before execution of the warrant "that avoids the necessity of [officers] . . . seeking several warrants in different districts for the same property" and to "afford[] a useful warrant procedure to cover familiar fact patterns," FED. R. CRIM. P. 41 advisory committee's note to 1990 amendment, including the situations presented in well-known cases in which a beeper of interest to law enforcement crossed state lines after issuance of a warrant but before its execution, *id.* (citing *United States v. Karo*, 468 U.S. 705 (1984); *United States v. Knotts*, 460 U.S. 276 (1983)).

Consistent with the Advisory Committee's express intent to eliminate procedural obstacles to law enforcement obtaining and using warrants through the territorial exceptions to Rule 41(b)(1) and the balancing of constitutional protections against effective law enforcement evident across Fourth Amendment jurisprudence, the Supreme Court, and at least six courts of

appeals, have found that "Rule 41 . . . is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding a probable cause," including intrusions facilitated by previously unanticipated technological means. *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 169 (1977) (citing *Katz v. United States*, 389 U.S. 347, 354–56, 355 n.16 (1967)).[14] Just as, in the Rule 6(e) context, the constitutional principle, reflected in decisions of the Supreme Court and the D.C. Circuit, that exceptions to grand jury secrecy should not be lightly inferred favors a strict textual reading of that Rule and its exceptions, *see supra* Part II.B.2.a.i, this judicial consensus in favor of flexibility and reasonableness in the Fourth Amendment and Rule 41 contexts counsels against unduly rigid interpretations of the Rule that would prevent law enforcement from seeking warrants to use available tools to promote public safety, within constitutional bounds, simply because the Rules have failed to keep pace with and account for the full array of modern investigative techniques.

In short, the background Fourth Amendment guidepost of reasonableness; Rule 41's goal of encouraging the use of warrants, in accord with the Fourth Amendment's warrant requirement, by developing practical procedures for officers to obtain them; and the body of precedent taking a flexible approach to interpretation of Rule 41 all favor a pragmatic construction of Rule 41(b)(2). As explained below, this practical interpretive framework supports a reading of Rule 41(b)(2) as requiring law enforcement to show a "reason to believe" that the target property or person is in the district when the warrant is issued to establish venue.

---

[14]    *See also, e.g.*, *United States v. Werdene*, 883 F.3d 204, 212 (3d Cir. 2018) ("Rule 41 should be read flexibly 'to include within its scope electronic intrusions authorized upon a finding of probable cause' so that it can keep up with technological innovations." (quoting *N.Y. Tel. Co.*, 434 U.S. at 169)); *United States v. Horton*, 863 F.3d 1041, 1048 (8th Cir. 2017) ("[C]ourt[s] interpret[] Rule 41 flexibly in light of advances in technology." (citing *N.Y. Tel. Co.*, 434 U.S. at 169; *United States v. Falls*, 34 F.3d 674, 678–79 (8th Cir. 1994))); *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992) (similar); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1436 (10th Cir. 1990) (applying this general principle to interpretation of Rule 41(b)); *United States v. Villegas*, 899 F.2d 1324, 1334–35 (2d Cir. 1990) (same); *United States v. Torres*, 751 F.2d 875, 878 (7th Cir. 1984) (noting that the Supreme Court has read Rule 41 "very broadly in view of its language").

### iv. Rule 41(b)(2) Is Best Read to Impose a "Reason to Believe Standard"

As explained *supra* Part II.B.2.a.ii, rejection of the actual-knowledge standard suggested by the plain text of Rule 41(b)(2) leaves unresolved the question of the appropriate standard to be applied in assessing whether the person or property targeted by the warrant is located within the district of the magistrate judge with authority to issue a warrant. Though preferring a "reason to believe" standard, the government suggests that the Rule 41(b)(2) standard "[a]t most . . . should require no more than probable cause that the person or property is located within the same district as the magistrate issuing the warrant, the same standard governing the issuance of warrants generally." Gov't Opp'n at 31 (citing *Gates*, 462 U.S. at 230); *see also* U.S. CONST. amend. IV; Hr'g Tr. (Rough) at 99:2-7, 102:6-16. The probable cause standard requires that a "fair probability that contraband or evidence of a crime will be found in a particular place" exist before a warrant is issued, *Gates*, 462 U.S. at 238, and thus "fair probability" is the measure of a warrant application's compliance with that substantive and constitutional requirement. As applied to the challenged cell-site simulator warrant, law enforcement was required to establish probable cause that the use of a cell-site simulator to track the location of defendant's cell phone with a 202 area code phone number was likely to produce evidence that would lead officers to defendant, a fugitive with an outstanding arrest warrant. *See* Hr'g Tr. (Rough) at 101:3-19. Establishing probable cause as to the location of the cell phone for Rule 41(b) venue purposes, however, presents a different question than the probable cause inquiry under the Fourth Amendment's Warrant Clause.

In contrast to the Warrant Clause, Rule 41(b) is a venue provision that imposes a procedural rather than a substantive, and a rule-based rather than a constitutional, requirement for obtaining a warrant. The Fourth Amendment is silent as to the proper venue for seeking a

search warrant, and its constitutional threshold for the substantive warrant requirement of probable cause is therefore not automatically applicable to a determination of venue under Rule 41(b)(2). To the contrary, "[a] close reading of the case law shows that the Supreme Court uses the 'probable cause' standard almost exclusively to assess the basis and strength of an officer or magistrate's belief that a particular person has committed a particular crime or that an article subject to seizure can be found at a particular location—in short, whether criminal activity is afoot." *United States v. Vasquez-Algarin*, 821 F.3d 467, 476 (3d Cir. 2016) (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). As a result, "probable cause . . . is not a standard typically applied by police to settle a question of . . . where an individual lives," *id.* (footnote omitted), or, by extension, where a person or property is located at a moment in time.

In addition, the same interpretive principles and practical considerations that counsel against imposing an actual-knowledge requirement in the Rule 41(b)(2) context disfavor reading a probable cause requirement for establishing venue into the exception. Specifically, application of the probable cause standard to Rule 41(b)(2)'s location requirement, like an actual-knowledge standard, would also produce the absurd result of eliminating *all* proper venues for some warrants. When the purpose of a warrant is to allow law enforcement to locate a missing person or missing property, the officers are unlikely to be able to show probable cause as to the whereabouts of the person or property they seek without using the investigative techniques described in the warrant application, as this case again amply demonstrates.

Law enforcement sought the challenged cell-site simulator warrant on December 26, 2018. At that time, some evidence suggested that defendant, and his 202 cell phone, were reasonably likely to be in this District. As set forth *supra* Part I.A, defendant was known to reside at 4215 Foote Street, in Northeast Washington, D.C. A search of that residence only days

earlier, on December 19, 2018, located millions of dollars of illegal drugs and multiple firearms. Kelli Davis, the owner of the residence and defendant's significant other, confirmed that defendant had lived at the address for the past year or two and stated that the contraband recovered by law enforcement belonged to defendant. In addition, one of the two defense attorneys claiming to represent defendant informed law enforcement that defendant communicated with his attorney using the phone number with a 202 area code, while the other attorney suggested that defendant surrender himself at a courthouse in the District of Columbia, giving rise to the inference that he may have been somewhere in the District. *See supra* Part I.A.4.

Other factors, however, indicated that defendant and his 202 cell phone could have been in Maryland on December 26, 2018. Defendant was known to lease an auto-repair shop, Dou Perfect, located on Barbara Lane in Clinton, Maryland. Law enforcement had also executed a search warrant at that location on December 19, 2018 and seized forty-six rounds of nine-millimeter ammunition, two laptops, vehicles, and a lease between defendant and the property owner, among other items. *See supra* Part I.A.3. One day after the searches of the Foote Street and Barbara Lane locations, on December 20, 2018, a Maryland-based attorney claiming to represent defendant reached out to law enforcement and indicated that defendant wished to surrender at the attorney's Baltimore office, suggesting that defendant was somewhere in the Baltimore area. Indeed, by December 26, 2018, both of the attorneys who contacted law enforcement claiming to represent defendant had tried to coordinate his surrender at their respective offices in Baltimore. *See supra* Part I.A.4.

Ultimately, in the tri-state area composed of the District of Columbia, Maryland, and Virginia, where residents have easy access to at least three adjoining jurisdictions, neither the

evidence connecting defendant to the District of Columbia nor the evidence connecting defendant to Maryland creates a "fair probability" that defendant was in one district rather than the other.  Law enforcement therefore could not establish probable cause that defendant or his 202 cell phone was in either this District or the District of Maryland when the cell-site simulator warrant was issued on December 26, 2018 and, under a probable cause standard, would lack venue in any jurisdiction for the instant warrant.  Interpreting Rule 41(b) to import a probable cause standard for assessment of the location of the target person or property, then, like an actual-knowledge standard, would generate the absurd result of law enforcement being unable to establish venue in *any* jurisdiction for a warrant seeking to locate a potentially dangerous and fugitive person or property through investigative techniques, even if all the evidence points to the fugitive being in one of two judicial districts.  This result contravenes not only the absurd results doctrine, but also the accepted view that the Fourth Amendment should not be read to prevent law enforcement from acting to protect the public and the constitutional policy, shared by the Federal Rules of Criminal Procedure, of encouraging law enforcement to seek and use warrants.  Thus, under the interpretive principles described above, this outcome indicates that Rule 41(b)(2) should not be read to require probable cause as to the whereabouts of the target person or property.

To avoid the obstacles to obtaining warrants created by either an actual-knowledge or probable cause requirement and to encourage law enforcement to seek cell-site simulator warrants instead of relying on a potentially applicable warrant exception, as an issue of first impression, Rule 41(b)(2) is best read to impose neither of these two standards, but instead to adopt a lesser standard of "reason to believe" that the person or property as to which they seek a

warrant is located within the district when the warrant is issued.[15]  As previously explained, the

venue requirement is an extra-constitutional requirement for warrants, and therefore falls outside

the strictures of the Warrant Clause, as indicated by the Fourth Amendment's silence on the topic

of venue.  Construing Rule 41(b)(2) to integrate a "reason to believe" standard aligns with the

Supreme Court's consistent conclusion that, in contexts not directly governed by the warrant

requirement, "the ultimate touchstone of the Fourth Amendment is reasonableness."  *Riley*, 573

U.S. at 381 (internal quotation marks and citation omitted).  The "reason to believe" formulation

also avoids the absurd result of eliminating *all* possible venues for a warrant to locate people or

property on the move in the course of an investigation or hunt for a fugitive.  This standard thus

enables law enforcement to apply for such a warrant while still requiring agents to demonstrate

an objective basis for believing that the target person or property is located in the district when a

warrant is issued, consistent with the text of Rule 41(b)(2) and Fourth Amendment principles.

The "reason to believe" or "reasonable belief" standard "is satisfied by something less

than would be required for a finding of 'probable cause.'"  *United States v. Thomas*, 429 F.3d

282, 289 (D.C. Cir. 2005) (collecting cases).  It is an objective standard that requires "more than

a hunch . . . , but less than a probability."  *United States v. Bohannon*, 824 F.3d 242, 255 (2d Cir.

2016).  "[R]eason to believe is not a particularly high standard, but it does require specific and

articulable facts that, taken together with rational inferences drawn therefrom, provide a

particularized and objective basis for thinking" that the person or property at issue is located

within the district when the warrant is issued.  *Id.*  Whether law enforcement satisfied this

standard to demonstrate a reasonable belief that defendant and his 202 cell phone were in the

---

[15]     As the government notes, *see* Gov't's Opp'n at 30–31, a Magistrate Judge of this Court recently suggested, without analysis, that "reason to believe" is the appropriate standard under Rule 41(b)(2).  *See In re Use of Cell-Site Simulator to Locate Cellular Device Associated with One Cellular Tel. Pursuant to Rule 41*, Case No. 20-sc-3276 (ZMF), 2021 WL 1133838, at *2 (D.D.C. Mar. 25, 2021).

District of Columbia when they sought the challenged cell-site simulator warrant, and therefore established venue under Rule 41(b)(2), is considered next.

> **b.** **Law Enforcement Had "Reason to Believe" Defendant and His 202 Cell Phone Were in the District of Columbia**

Under the standard articulated above, law enforcement had a reasonable belief that defendant and his 202 cell phone were within the District of Columbia on December 26, 2018, when they applied for the instant cell-site simulator warrant. Defendant's residence in the District of Columbia, the recent search of his District of Columbia home about a week prior, on December 19, 2018, and his use of a cell phone with a 202 area code all constitute specific and articulable facts leading to the reasonable inference that defendant was reasonably likely to be found somewhere within his home district. The reason to believe standard requires nothing more. Venue for the cell-site simulator warrant in this District was therefore proper under Rule 41(b)(2).

Defendant challenges this common-sense conclusion, that defendant's D.C. residence and use of a phone with area code 202 gave a reason to believe that he was somewhere in this District, on three grounds, none of which are persuasive. First, defendant argues that "there was every indication that [he] was not in the District of Columbia" on December 26, 2018 because both of defendant's putative attorneys who "contacted law enforcement had offices in Maryland" and indicated that defendant wished to surrender at his counsel's Baltimore, Maryland offices. Def.'s Cell-Site Mot. at 2–3; *see supra* Part I.A.4. Neither the location of defendant's counsel outside of the District nor his initial request to surrender at one of his attorneys' Baltimore offices provides any concrete information about the whereabouts of defendant or his cell phones when law enforcement applied for the cell-site simulator warrant. Defendants residing in the District of Columbia commonly retain lawyers with offices in adjoining jurisdictions to represent

them in this District, and the short distance between the District of Columbia and Baltimore makes it possible that defendant could have been in either Maryland or the District of Columbia when he contacted his attorneys. Likewise, defendant's desire to surrender at a location in Baltimore, which was last communicated to law enforcement on December 20, 2018, *see supra* Part I.A.4, sheds no light on his location nearly a week later, on December 26, 2018. The weight of this fact is further diminished by the fact that one of defendant's attorneys also attempted to coordinate his surrender at a courthouse in the District of Columbia. *See supra* Part I.A.4. Though defendant's connections to Maryland raise the possibility that he may have been in that jurisdiction when law enforcement applied for the cell-site simulator warrant, they do not foreclose officers' reasonable belief that defendant and his cell phone would be located somewhere in the District of Columbia, where he resided, particularly in light of his use of a cell phone with a 202 area code number in the days before the warrant was obtained and his attorneys' efforts to arrange for surrender in either the District of Columbia or Maryland.

Second, defendant maintains that law enforcement had no basis to believe defendant was in Washington, D.C. when they obtained the cell-site simulator warrant for three reasons, none of which holds water. First, defendant argues that, as of December 26, 2018, law enforcement had "nothing to show that [he] actually resided at [the Foote Street] residence" in Northeast Washington, D.C. Def.'s Cell-Site Reply at 2. As noted *supra* Part I.A.3, Kelli Davis, the owner of the Foote Street residence and defendant's girlfriend, told law enforcement that defendant lived at the home with her and her two children, and law enforcement located millions of dollars of contraband Davis said belonged to defendant at that location, where he had been surveilled and where public records listed defendant as a resident. *See supra* Part I.A.2, 3; Migliara Aff.

¶¶ 15, 24.  These facts provided a substantial basis for law enforcement to believe that defendant actually resided at 4215 Foote Street and therefore within the District.

Defendant next contends that the assumption defendant would be at his residence was unfounded because defendant would be unlikely to return "to the exact location in which law enforcement" located evidence of his alleged criminal activity and Ms. Davis "was on notice to let law enforcement know if [defendant] returned to the residence."  Def.'s Cell-Site Reply at 2. Rule 41(b)(2), however, does not require law enforcement to connect the person or property they seek to a specific location within a district, only to have a reasonable belief that "the person or property is located" somewhere "within the district" at large.  FED. R. CRIM. P. 41(b)(2). Moreover, defendant's logic applies equally to the District of Maryland, the venue he believes was proper for the cell-site simulator warrant, because defendant had an auto-repair business in that district that was also searched by law enforcement on December 19, 2018 and turned up evidence of his alleged criminal activity.  *See supra* Part I.A.3.  Given that defendant resided within the District of Columbia and was using a cell phone with a 202 area code to contact his counsel, law enforcement's belief that defendant was likely somewhere in this District, even if not at his Foote Street home, was reasonable.

Third, defendant notes that "there was no surveillance of [him] at [the Foote Street] address or any other location in the District after the Foote Street address was searched" on December 19, 2018.  Def.'s Cell-Site Reply at 2.  This observation is beside the point.  Law enforcement had no information on defendant's location on December 26, 2018, which is why they initiated a fugitive apprehension investigation and sought the cell-site simulator warrant in the first place.  *See supra* Part I.A.4.

Finally, defendant contends that "once law enforcement started to receive GPS ping data from the ping warrant which they sought on December 27, 2018, they should have immediately sought a cell-site simulator warrant in Maryland, as that data would have shown [defendant] to be residing and moving around Maryland." Def.'s Cell-Site Reply at 3. This argument misconstrues the nature and purpose of Rule 41(b)(2). Rule 41(b)(2), by its very terms, requires only that the person or property that is the subject of a warrant be "located within the district when the warrant is issued." FED. R. CRIM. P. 41(b)(2). A warrant properly issued under this provision remains in full force and effect if the person or property is "moved outside the district before the warrant is executed." *Id.* Thus, law enforcement was required to show only a reasonable belief that defendant's 202 cell phone was likely located within the District of Columbia on December 26, 2018, when officers applied for and received the cell-site simulator warrant. As already explained, this showing was made. Law enforcement had no obligation, as defendant suggests, to demonstrate a continuing reasonable belief that the cell phone remained in the District of Columbia at all times until the cell-site simulator was activated on January 3, 2019. Data from the GPS warrant issued on December 27, 2018 may have shown that defendant's 202 cell phone was moved outside the district *after* December 26, 2018, but that evidence has no bearing on the phone's location when the warrant was issued and therefore is irrelevant to the venue inquiry under Rule 41(b)(2). Further, Rule 41(b)(2) was expressly designed to address circumstances such as these, in which a warrant targets moveable property, and to eliminate the requirement in such situations that officers "seek[] several warrants in different districts for the same property." FED. R. CRIM. P. 41 advisory committee's note to 1990 amendment; *see supra* Part II.B.2.a.iii. Adopting defendant's position, which implies that law enforcement should have sought cell-site simulator warrants first in this District and then, after

receiving GPS ping data placing defendant in Baltimore, in the District of Maryland, would require the precise result that the drafters of the Rule 41(b)(2) exception intended to avoid.

In short, venue in this District for the cell-site simulator warrant was proper, and the warrant's issuance did not violate Rule 41.

### c.        Good-Faith Exception

Even if Rule 41(b)(2) requires more than a reasonable belief that the person or property is located within the issuing judicial district when a warrant is issued for venue to lie, the good-faith exception to the exclusionary rule applies and suppression of the fruits of the cell-site simulator warrant is not required.

### i.        Applicable Legal Standard

"When police obtain evidence by way of an unlawful search, the exclusionary rule may require exclusion of that evidence in some circumstances." *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012). Suppression of evidence is, however, a "last resort" meant to deter future Fourth Amendment violations by law enforcement. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Recognizing that suppression "generates 'substantial social costs,' which sometimes include setting the guilty free and the dangerous at large," *id.* (quoting *Leon*, 468 U.S. at 907), the Supreme Court has cautioned that the exclusionary rule should be limited to cases in which "the deterrent value of exclusion is strong and tends to outweigh the resulting costs," *Davis v. United States*, 564 U.S. 229, 238 (2011) (citing *Herring*, 555 U.S. at 144). Thus, suppression remains appropriate if law enforcement demonstrates "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights." *Id.* (quoting *Herring*, 555 U.S. at 144). In contrast, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," *id.* (quoting *Leon*, 468 U.S. at 909), "the 'deterrence rationale loses much of its force,'" *id.* (quoting *Leon*, 468 U.S. at 919), "and exclusion cannot 'pay its way,'" *id.* (quoting

*Leon*, 468 U.S. at 908 n.6).  In such cases, a good-faith exception, first set forth in *United States v. Leon*, 468 U.S. 897 (1984), applies and exclusion is not warranted.

Under the logic of the good-faith exception, when a seemingly valid search warrant that is ultimately found to be unlawful purports to authorize a search, the "exclusionary rule has limited force."  *Glover*, 681 F.3d at 418.  Thus, "'evidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause" or otherwise invalid.  *Griffith*, 867 F.3d at 1278 (quoting *Leon*, 468 U.S. at 905).  This application of the good-faith exception to the exclusionary rule reflects the policies behind the suppression remedy, which "'was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.'"  *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (quoting *Gates*, 462 U.S. at 263 (White, J., concurring in judgment)).

### ii.     Law Enforcement Reasonably Relied on the Cell-Site Simulator Warrant in Good Faith

Officers used a cell-site simulator to locate defendant's 202 cell phone pursuant to a warrant issued by a Magistrate Judge of this Court.  If venue did not lie in the District of Columbia, then issuance of the cell-site simulator warrant by the Magistrate Judge violated Rule 41(b).  As explained *supra* Part II.A.4.c, violations of many of Rule 41's procedural provisions are ministerial in nature and therefore do not warrant suppression.  Some Rule 41 violations, however, are "constitutional" rather than ministerial in nature, and may be remedied by suppression in appropriate circumstances.  *United States v. Werdene*, 883 F.3d 204, 213 (3d Cir. 2018).  Whether violations of Rule 41(b)'s venue requirement are constitutional or ministerial has been the subject of recent debate in the circuit courts, and, as the Second Circuit observed, "the issue is not clear cut" because "the Fourth Amendment itself says nothing about where [magistrate judges' authority to issue warrants] may be exercised, nor whether a venue

requirement exists as a matter of Fourth Amendment law." *United States v. Eldred*, 933 F.3d 110, 116 (2d Cir. 2019). Nonetheless, some circuit courts have held that a Rule 41(b) violation renders a warrant void *ab initio* because it indicates that the authorizing magistrate judge lacked jurisdiction to issue the warrant in the first place, in violation of the Fourth Amendment precept that "a warrant may travel only so far as the power of its issuing official." *United States v. Krueger*, 809 F.3d 1109, 1124 (10th Cir. 2015) (Gorsuch, J., concurring).[16]

The constitutional status of a Rule 41 violation need not be resolved here, however, because even if a failure by law enforcement to establish venue under Rule 41(b)(2) is a constitutional violation, the good-faith exception set forth in *Leon* applies and suppression is not warranted. "The deterrence rationale for the exclusionary rule aims at the conduct of the police, not the conduct of the magistrate judge" and as a result, "whether the magistrate judge lacked authority [to issue a warrant] has no impact" on application of the good-faith rule. *United States v. Kienast*, 907 F.3d 522, 528 (7th Cir. 2018) (Barrett, J.) (citing *Davis*, 564 U.S. at 238). As the Supreme Court explained in *Leon*, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." 468

---

[16] The conclusion that a Rule 41(b) violation is constitutional in nature rests on the relationship between the Federal Rules of Criminal Procedure and the Federal Magistrates Act, 28 U.S.C. § 636. The Federal Magistrates Act authorizes magistrate judges to exercise "all powers and duties conferred or imposed . . . by the Rules of Criminal Procedure" only "within the district" that appoints them, "at other places where [the appointing] court may function," and "elsewhere as authorized by law." 28 U.S.C. § 636(a). Therefore, if a warrant is executed outside of the magistrate judge's appointing district, unless one of Rule 41's exceptions to the territorial restriction applies, issuance of the warrant "violate[s] § 636(a)'s jurisdictional limitations" on magistrate judges' authority. *Werdene*, 883 F.3d at 214. A finding that venue under Rule 41(b) is improper indicates that the warrant was neither executed within the magistrate judge's appointing district pursuant to Rule 41(b)(1) nor within the scope of a territorial exception and thus necessarily suggests that the warrant exceeded the magistrate judge's jurisdiction. Four courts of appeals—the Third, Eighth, Ninth, and Eleventh—have determined on this ground that a violation of Rule 41(b) is constitutional in nature. *See United States v. Taylor*, 935 F.3d 1279, 1287–88 (11th Cir. 2019); *Henderson*, 906 F.3d at 1116–17; *Werdene*, 883 F.3d at 212–14; *Horton*, 863 F.3d at 1046–49. An additional seven circuit courts have either assumed without deciding that a Rule 41(b) violation is a constitutional error or reserved the question. *See United States v. Moorehead*, 912 F.3d 963, 966–67 (6th Cir. 2019); *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir. 2019); *Eldred*, 933 F.3d at 116–18; *United States v. McLamb*, 880 F.3d 685, 689–90 (4th Cir. 2018); *United States v. Kienast*, 907 F.3d 522, 527 (7th Cir. 2018); *United States v. Levin*, 874 F.3d 316, 321–23 (1st Cir. 2017); *United States v. Workman*, 863 F.3d 1313, 1317 (10th Cir. 2017); *Krueger*, 809 F.3d at 1114–15. The D.C. Circuit has not addressed this issue.

U.S. at 921.  Accordingly, all eleven circuits to have considered the question—that is, every circuit except the D.C. Circuit and the Federal Circuit—have determined that the good-faith exception can extend to a warrant that was void *ab initio*, including for violations of Rule 41, provided that the officer or officers executing the warrant acted under an objectively reasonable belief that the warrant was valid.[17]

In this case, even if the Magistrate Judge erroneously concluded that venue was proper in this District, the officers' belief that the cell-site simulator warrant issued was valid was objectively reasonable.  By issuing the warrant, the Magistrate Judge indicated that she had determined that the government had carried its burden to establish venue, that venue under Rule 41(b)(2) was proper, and that she had the authority under the Rule and the Federal Magistrates Act, 28 U.S.C. § 636, to grant the government's warrant application.  Law enforcement had no reason to question the Magistrate Judge's legal conclusion that all requirements under Rule 41(b)(2) for issuance of the warrant were met.  Thus, "[t]o the extent that a mistake was made in issuing the warrant, it was made by the magistrate judge, not by the executing officers," and the good-faith exception applies.  *United States v. Levin*, 874 F.3d 316, 323 (1st Cir. 2017) (applying the good-faith exception to a warrant that was not validly issued under Rule 41); *see also Sheppard*, 468 U.S. at 989–90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested.").  Suppression of the cell-site simulator warrant and its fruits is therefore unwarranted.

---

[17]    *See Moorehead,* 912 F.3d at 967–69; *Ganzer*, 922 F.3d at 584–87; *Eldred*, 933 F.3d at 118–21; *Taylor*, 935 F.3d at 1288–91; *Henderson*, 906 F.3d at 1118–19; *Werdene*, 883 F.3d at 216–18; *McLamb*, 880 F.3d at 690–91; *Kienast*, 907 F.3d at 527–29; *Levin*, 874 F.3d at 321–24; *Horton*, 863 F.3d at 1050–51; *Workman*, 863 F.3d at 1317–19.

Defendant groundlessly asserts that law enforcement engaged in "'[i]ntentional attempts to avoid adhering to jurisdictional limitations'" by seeking the cell-site simulator warrant in the District of Columbia, such that the good-faith exception should not apply. Def.'s Cell-Site Mot. at 4 (quoting *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010)). He places the fault for a venue error, if such an error exists, squarely on law enforcement, arguing that "law enforcement did not exercise objective good faith when they presented the Magistrate in the District of Columbia the warrant documents to be signed" because "the Affiant . . . chose to present the warrant to the District of Columbia Magistrate" with "full knowledge of the investigation underway to locate [defendant]," which had produced evidence of his connections to Maryland as well as the District of Columbia, and with full awareness of "Rule 41(b) and its requirements." *Id.* This argument, which places the burden of untangling thorny legal knots on individual law enforcement officers, is totally unpersuasive. As explained *supra* Part II.B.2.a, the government's burden under Rule 41(b)(2) to establish that a person or property is located in the district when a warrant is issued is a legal question of first impression that has not been clearly resolved by Congress, the Judicial Conference's Standing Committee of Practice and Procedure, or any Judge. Defendant's suggestion that an individual law enforcement agent seeking a warrant should be expected to succeed where all of these bodies have thus far left the issue unresolved is unreasonable on its face.

Defendant nonetheless persists in challenging this conclusion, pointing to *United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013), for the proposition that a "jurisdictional flaw in [a] warrant cannot be excused as a 'technical defect.'" Def.'s Cell-Site Mot. at 3 (quoting *Glover*, 736 F.3d at 515). In that case, the D.C. Circuit suppressed evidence resulting from the placement of a listening bug on a truck for which the warrant was issued in violation of Rule

41(b)(2) and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C

§ 2510 *et seq.*, a complex statutory regime governing the use of wiretaps and other surveillance

technologies. 736 F.3d at 512–16. *Glover* is inapposite for at least two reasons. First, the

*Glover* Court did not, as defendant suggests, refuse to apply the Fourth Amendment's good-faith

exception to a jurisdictionally flawed warrant. The warrant at issue in that case was issued under

Title III, not the Fourth Amendment. Accordingly, the Circuit's discussion of suppression and

any potential application of the good-faith exception addressed the availability of statutory, not

constitutional, remedies. *See Glover*, 736 F.3d at 515–16. The panel declined to "import a good

faith exception to Title III's remedy of suppression" where "[t]he statute require[d] suppression

of evidence gathered pursuant to a facially insufficient warrant." *Id. Glover* therefore has no

bearing on the availability of the Fourth Amendment's good-faith exception to excuse execution

of a warrant that the judicial officer lacked jurisdiction to issue.

Second, though the *Glover* Court questioned whether "the government's actions in

seeking a warrant so clearly in violation of Rule 41" were "motivated by 'good faith,'" the

warrant application in that case made clear on its face that venue in the District of Columbia was

improper under Rule 41. *Id.* at 516. The application plainly stated that the targeted truck was

parked at Baltimore/Washington International Thurgood Marshall Airport, located in Baltimore,

Maryland, leaving no possibility that that the target property was in the District of Columbia. *Id.*

at 510. The *Glover* Court's conclusion that venue was obviously lacking in light of this fact, and

that the good-faith exception, even if available, would not have excused law enforcement's

failure to seek a Maryland warrant, is distinguishable from the situation presented in this case, in

which the standard to which law enforcement had to establish the target device's location in

order to obtain the cell-site simulator warrant presented an undecided legal question, the true

location of the cell phone was unknown, and law enforcement had a reasonable belief that the phone, and defendant himself, was in the District of Columbia.[18]

In sum, if venue for the cell-site simulator warrant was in fact improper under Rule 41(b), the good-faith exception nonetheless applies to bar suppression of evidence obtained against defendant pursuant to the warrant. The government's final argument against suppression, that the cell phones seized at the time of defendant's arrest are not fruits of the poisonous tree, *see* Gov't's Opp'n at 40–45, therefore need not be addressed.

### 3. Franks *Hearing Not Warranted*

In a last-ditch effort to suppress all evidence seized at 2226 Linden Avenue incident to his arrest, defendant points to a single "factual inaccuracy" in the cell-site simulator warrant affidavit. Def.'s Cell-Site Mot. at 3; *see also id.* at 3–4. Paragraph four of the affidavit states that "[a]fter speaking to a different resident of the [Foote Street] house, law enforcement confirmed that [defendant] continued to use the Target Cellular Device as his own cell phone." Cell-Site Warrant Aff. ¶ 4. Defendant picks at this statement, noting that that phone number with area code 301 targeted by law enforcement in a separate cell-site simulator warrant, not the 202 area code phone number targeted by the challenged warrant, is his personal cell phone, Def.'s Cell-Site Mot. at 3–4, as the affidavit confirms in a separate paragraph, *see* Cell-Site Warrant Aff. ¶ 11. He contends first, that the affidavit's characterization of the 202 number as

---

[18] The government originally contended that *Glover*'s determination that suppression is necessary for a jurisdictional defect in a warrant "was abrogated by *Dahda v. United States*, 138 S. Ct. 1491 (2018)," Gov't's Opp'n at 33, but at the June 22, 2021 motions hearing, suggested that the impact of *Dahda* on *Glover*'s holding with respect to suppression, and thus the availability of the good-faith exception for a jurisdictional flaw in a warrant, might present an issue of first impression, *see* Hr'g Tr. (Rough) at 98:6-23. As another Judge on this Court has observed, after *Dahda*, there remains "disagreement amongst the courts as to whether suppression is warranted for lack of territorial jurisdiction with respect to Title III wiretap orders." *United States v. Fajardo Campos*, No. 1:16-cr-00154 (KBJ), 2018 WL 6448633, at *6 n.6 (D.D.C. Dec. 10, 2018) (comparing cases). In any event, since both *Dahda* and *Glover* addressed suppression of jurisdictionally defective orders only in the context of Title III, without reaching the broader issue of suppression under the Fourth Amendment, resolution of this debate is not necessary to determine, in accord with every circuit court to have decided the issue, that the constitutional good-faith exception applies to violations of Rule 41(b).

his personal cell phone is "blatantly incorrect," Def.'s Cell-Site Mot. at 4, and second, that, as a result of this inaccuracy, law enforcement has only one statement confirming defendant's use of the 202 number—his lawyer's representation that defendant used the 202 number to make contact during the week of December 20, 2018—and probable cause to collect cell-site data related to the 202 number is therefore lacking, *id.* at 3–4. For the third time in his briefing of the pending motions, defendant requests a *Franks* hearing. *Id.* at 4. The government concedes that the reference to the 202 number as defendant's personal device was an error, but notes that "[t]his error was made in the attempt of trying to coordinate the defendant's safe capture, after he declined to turn himself in, while law enforcement applied for a cell-site simulator warrant for the defendant's [301] telephone number" simultaneously. Gov't's Opp'n at 33.

Once again, defendant has not made the threshold "substantial preliminary showing" necessary to require a *Franks* hearing on this issue, that the challenged statement in paragraph four of the cell-site simulator warrant affidavit was included in the affidavit "knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155; *see supra* Part II.A.3.e (outlining the standard to mandate a *Franks* hearing). Though the government admits that the statement is inaccurate, defendant offers nothing to suggest that the mistake was anything more than a clerical error made in the course of a months-long, complex investigation of a drug-trafficking ring and an attempt to apprehend a potentially dangerous fugitive and thus fails to carry his burden. Moreover, as defendant notes, *see* Def.'s Cell-Site Mot. at 3–4, the affidavit acknowledges that defendant also had a 301 phone number, undermining the premise implicit in defendant's argument, that law enforcement intended to bamboozle the Magistrate Judge by leading her to believe that defendant had only one phone number with a 202 area code.

Nor has defendant shown that the allegedly false statement in paragraph four of the warrant affidavit is "material to the issue of probable cause," as is further required to mandate a *Franks* hearing. *Becton*, 601 F.3d at 594. The Affidavit clearly states that defendant's counsel made contact with Special Agent Smith on December 20, 2018 and provided the 202 phone number for which the cell-site simulator warrant was sought. Cell-Site Warrant Aff. ¶¶ 6, 14. That defendant's own counsel provided this number to law enforcement itself established probable cause for officers to believe that the phone number belonged to defendant, or at a minimum, was being used by him in the days leading up to the warrant application, and that there was therefore a "fair probability" that the cell-site data related to the phone number would lead to information about defendant's whereabouts and evidence of his alleged criminal activities. *Gates*, 462 U.S. at 238. No additional evidence or corroborating statement was needed to bolster this showing. The inaccuracy pointed out by defendant therefore has no impact on the probable cause analysis.

For the foregoing reasons, venue to issue the challenged cell-site simulator warrant was proper in the District of Columbia and, even if venue did not lie, the good-faith exception applies and suppression is not warranted. Nor has defendant met the requirements to mandate either a *Franks* hearing or suppression with respect to the small inaccuracy in paragraph four of the cell-site simulator warrant affidavit. His Motion to Suppress Fruits of Law Enforcement Use of Cell-Site Simulator, ECF No. 122, is therefore denied.

### C.     Defendant's Motion to Suppress Cell Phones Seized at Arrest Location

Third, defendant moves to suppress three cell phones recovered at the time of his arrest, which were in the living room and kitchen of an apartment located at 2226 Linden Avenue, Baltimore, Maryland—the residence at which defendant was apprehended on January 3, 2019— but were not on his person. Def.'s Cell Phones Mot. at 1. At the June 22, 2021 motions hearing,

the parties agreed to rely on the evidence and testimony outlining the details of defendant's arrested proffered in connection with a motion to suppress one of the seized cell phones in a related case, *United States v. Hutchings*, No. 19-cr-361-02 (BAH) (D.D.C.), and thus no evidentiary hearing was held on defendant's motion to suppress the phones. *See* Hr'g Tr. (Rough) at 9:8–10:1, 109:5-7; *supra* note 6. As explained in detail *supra* Part I.A.5, testimony and documents submitted in *Hutchings* reveal that law enforcement seized four cell phones during a search of the Linden Avenue apartment incident to defendant's arrest, after a protective sweep of the residence. One of the four phones was found on defendant's person, two were located on and next to a pile of clothes in the living room that defendant identified as belonging to him, and the fourth phone was on the kitchen counter, adjacent to the living room in which defendant was arrested. *See supra* Part I.A.5. All three phones not on defendant's person were within approximately ten feet of him at the time of the arrest. *Id.* In other words, the three phones were within officers' plain view when they entered and searched the Linden Avenue apartment.

Defendant concedes that "any cell phone found on [his] person" was properly seized, Def.'s Cell Phones Reply at 2, but claims that seizure of the three phones located in the living room and kitchen violated the Fourth Amendment for two reasons. First, defendant argues that the phones were "not within arm[']s reach" of him when he was arrested and therefore were not lawfully seized incident to his arrest. Def.'s Cell Phones Mot. at 2. Second, defendant maintains that "[l]aw enforcement did not have a basis to seize all four cellular telephones without a search warrant" at the time of his arrest because they "only had evidence that [defendant] was using and in possession of two telephones." Def.'s Cell Phones Reply at 1.

These alleged Fourth Amendment violations were already decided in resolving a substantially similar motion to suppress one of the seized cell phones in *Hutchings*, where it was determined that seizure of the phones incident to defendant's arrest was constitutional. *See Hutchings* Tr. at 169:22–175:24. The analysis in that case rested on the warrant exception available to officers conducting a search incident to arrest, who may search the area within an arrestee's immediate control, defined as "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence," and seize any evidence of the offense of arrest that the arrestee might conceal or destroy. *Arizona v. Gant*, 556 U.S. 332, 339 (2009); *see also United States v. Robinson*, 414 U.S. 218, 224 (1973). Since all three phones not on defendant's person "were within ten feet of him," they were well within arms' reach of him at the time of his arrest. *Hutchings* Tr. at 173:12. Moreover, "given the proximity of the phone[s]" to defendant, the fact that defendant "was the only person in the apartment at the time of the arrest," and law enforcement's knowledge that "phones are essential tools for a massive drug trade like [defendant] was [allegedly] running," law enforcement had probable cause to believe the phones belonged to defendant and would lead to evidence of his offenses. *Id.* at 173:13-24. Therefore, the officers "had a right to seize all four phones." *Id.* at 173:24-25.

The parties' briefing of defendant's instant motion to suppress again disputes the constitutionality of the phones' seizure under the warrant exception for a search incident to arrest. *See* Def.'s Cell Phones Mot.; Def.'s Cell Phones Reply; Gov't's Opp'n at 45. None of the arguments presented in connection with that doctrine alter the conclusion that law enforcement was entitled to seize the cell phones. As was observed in *Hutchings*, however, the seized cell phones "were all in plain view of the officers who were arresting [defendant]." *Hutchings* Tr. at 173:23-24. Their recovery by law enforcement therefore was also justified

under the plain view doctrine. Application of that warrant exception to the phones retrieved from the Linden Avenue address follows an overview of the plain view doctrine.

### 1. *Applicable Legal Standard*

Though the Fourth Amendment normally requires a warrant for the seizure of property, "there are well-defined exceptions to this rule." *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2533 (2019). The plain view doctrine is one such "exception that is addressed to the concerns that are implicated by seizures," *Horton v. California*, 496 U.S. 128, 134 (1990), and provides that, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant," *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if 'its incriminating character [is not] immediately apparent,'—the plain-view doctrine cannot justify its seizure." *Id.* at 375 (alteration in original) (quoting *Horton*, 496 U.S. at 136) (citing *Arizona v. Hicks*, 480 U.S. 321 (1987)).

The plain view doctrine balances the Fourth Amendment's purposes of "eliminat[ing] . . . searches not based on probable cause" and preventing exploratory searches against the goal of promoting effective law enforcement. *Coolidge*, 403 U.S. at 467. When law enforcement is lawfully present in a particular location, including pursuant to a valid warrant, and discovers incriminating evidence in plain view, the lawful scope of the warrant is not exceeded, and warrantless seizure of the object presents "only a minor peril to Fourth Amendment protections, [but] . . . a major gain in effective law enforcement." *Id.* at 467. To require law enforcement to obtain a warrant to seize items in plain view would thus "often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves." *Id.* at 468.

## 2.    Seizure of Cell Phones Was Constitutional

As the description of defendant's arrest and the search carried out immediately after his arrest makes apparent, *see supra* Part I.A.5, the seizure of the three cell phones not on defendant's person incident to his arrest was constitutional under the plain view doctrine. The officers were lawfully present at the 2226 Linden Avenue residence pursuant to the warrant for defendant's arrest. *See* Arrest Warrant. Defendant was the only person in the apartment when the officers entered and arrested him in the living room. *See supra* Part I.A.5; *Hutchings* Tr. at 27:1-3. Two of the three seized phones were on or next to a pile of clothes in the living room, while the last was on the kitchen counter adjacent to the living room and defendant. *Hutchings* Tr. at 27:21-23, 29:17-18, 31:3-4. All three phones were within ten feet of defendant, and thus within officers' plain sight, at the time of the arrest. *Id.* at 29:13; *see supra* Part I.A.5. The officers therefore had a lawful right of access to all three phones because they were lawfully present at the Linden Avenue address and did not have to engage in any further searches to locate the items.

In addition, law enforcement had probable cause to believe that the three phones would contain or constitute evidence of defendant's illegal activity. Special Agent Ray testified in *Hutchings* that phones are essential tools for a massive drug trade such as defendant's alleged narcotics-trafficking operation. He further confirmed that drug traffickers often use or have access to multiple phones as part of their efforts to evade law enforcement. *See Hutchings* Tr. at 34:10–35:10. Indeed, the investigation into defendant revealed that he was organizing sales of heroin via cell phone. *See supra* Part I.A; *Hutchings* Tr. at 31:24-25. Given that defendant was the only person in the apartment at the time of the arrest, the officers' knowledge that defendant used multiple cell phones to carry out his alleged criminal activities, the proximity of the three phones to defendant, and the officers' training and experience, they had reason to believe that the

99

phones were or contained evidence of the narcotics-trafficking offenses for which they were arresting defendant and therefore had the right to seize them.  *See, e.g.*, *United States v. Babilonia*, 854 F.3d 163, 180–81 (2d Cir. 2017) (upholding warrantless seizure of cell phone and iPad in plain view where investigation showed that the defendant "and his co-conspirators used cell phones to conduct drug-related activity" and law enforcement "had analyzed [the defendant's] use of numerous cell phones in connection with his purported criminal activity"); *United States v. Darden*, 353 F. Supp. 3d 697, 719 (M.D. Tenn. 2018) (finding seizure of iPhones in plain view constitutional where law enforcement "knew that [the defendant] was alleged to have participated in a drug conspiracy . . . and it was apparent to [the officer] that the cell phones were used in that trade"); *United States v. Delva*, 13 F. Supp. 3d 269, 276 (S.D.N.Y. 2014) ("Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime.").

Defendant challenges the reasonableness of law enforcement's belief that all the phones were associated with defendant and were likely to contain evidence of his crimes by pointing out that "[l]aw enforcement only had evidence that [defendant] was using and in possession of two telephones" and that "law enforcement observed two persons leave the Linden Avenue location"—the driver and passenger law enforcement stopped outside the Linden Avenue apartment complex.  Def.'s Cell Phones Reply at 1; *see supra* Part I.A.4.  He argues that "[i]t would . . . make sense," after "finding four phones in a location [from] which two persons just left," to explore the possibility "that not all four phones . . . belong[ed] to" defendant.  Def.'s Cell Phones Reply at 2.  This argument is unavailing.  Law enforcement was already aware both that drug traffickers frequently have multiple phones and that defendant himself used at least two

different cell phones to coordinate sales of heroin. *See supra* Part I.A. Officers' belief that each of the phones seized at the Linden Avenue location might contain evidence of defendant's crimes was therefore reasonable.

Defendant next contends that law enforcement erred by taking "[n]o investigative steps . . . to determine the ownership of the phones," Def.'s Cell Phones Reply at 3, citing to language in *Griffith* that suggests "some innocuous devices would need to 'be examined, at least cursorily,' to determine their relevance to the investigation," *Griffith*, 867 F.3d at 1276 (quoting *Andresen*, 427 U.S. at 482 n.11). The *Griffith* Court, however, made this statement in the context of assessing the particularity of a warrant that allowed police to search for and seize "all electronic devices" as part of the investigation of a murder that had occurred almost a year before the execution of the search warrant. *Id.* at 1276. The panel found the warrant to be invalid in part because its authorization to seize *all* electronic devices, including cell phones, was not supported by probable cause due to two omissions in the government's warrant application. First, the warrant's "supporting affidavit . . . offered almost no reason to suspect that [defendant] in fact owned a cell phone, or that any phone or other device containing incriminating information would be found in his apartment," *id.* at 1268, a showing that was particularly necessary to establish probable cause because defendant had been incarcerated for most of the year since the murder occurred and at least one of his associates and suspected co-conspirators was known to have no cell phones. *See id.* at 1271–73. Second, the government proffered no evidence that any cell phone was used in connection with the homicide. *See id.* The challenged affidavit simply failed to articulate any connection between the electronic devices allowed to be seized and the crime that was being investigated, and the Circuit thus found only a "limited

likelihood that any cell phone discovered in the apartment would contain incriminating evidence of [the defendant's] suspected crime." *Id.* at 1275.

In the course of this analysis, the *Griffith* Court observed that the Fourth Amendment "may allow a broader sweep" for searches of lawful objects "when a reasonable investigation cannot produce a more particular description" of a seemingly lawful device that law enforcement has probable cause to seize. *Id.* at 1276. In such cases, according to the panel, "some innocuous devices would need to 'be examined, at least cursorily,' to determine their relevance to the investigation," and broader searches of electronic devices at the target location would therefore be permissible to determine which devices ought to be seized. *Id.* (quoting *Andresen*, 427 U.S. at 482 n.11). Thus, contrary to defendant's characterization, the statement was intended to preserve greater latitude for officers executing a search warrant, not to narrow their authority to search and seize electronic devices for which probable cause exists.

Moreover, *Griffith* is factually distinguishable from the instant case for at least two reasons. First, the *Griffith* affidavit "conveyed no reason to think that [the defendant] . . . owned a cell phone" or other electronic devices, *id.* at 1272, and did not square his incarceration during the investigation's pendency with law enforcement's belief that he had an electronic device connected with the year-old murder being investigated. By contrast, here, agents believed that defendant's criminal activity of narcotics trafficking was ongoing and had ample evidence that defendant, as the suspected supplier of heroin to Suspect-1, not only possessed but also used a cell phone to communicate with Suspect-1 about heroin distribution and sales. In addition, the phones seized were located at defendant's hideout. Second, the crime of homicide at issue in *Griffith* and the crime of narcotics trafficking with which defendant is charged are substantially different. No inherent connection between murder and possession or use of a cell phone exists.

In contrast, many courts have recognized the well-known link between narcotics-trafficking offenses and cell phones. *See, e.g.*, *United States v. Hammett*, 555 F. App'x 108, 110 (2d Cir. 2014) (mem.) (describing "cell phones" as "tools that drug dealers often possess"); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (describing cell phones as "essential tools of [the defendant's] drug trade").

In short, though defendant is correct that, as *Griffith* states, "[b]ecause a cell phone . . . is not inherently illegal, there must be reason to believe that a phone may contain evidence of the crime" before seizure, 867 F.3d at 1274, here, the fact that the phones were present at defendant's Baltimore hideout, in combination with the knowledge that defendant, like many narcotics traffickers, used cell phones to facilitate sales and distribution of heroin, provided exactly such a reason.

As explained above, law enforcement had a right to seize the cell phones found at the Linden Avenue apartment not only as part of a search incident to defendant's arrest, but also under the plain view doctrine. Defendant's Motion to Suppress Cell Phones at Arrest Location, ECF No. 123, is therefore denied.

## III.    CONCLUSION

For the foregoing reasons, defendant's Renewed Motion to Suppress Evidence Recovered During the Search of the Foote Street Address, ECF No. 120; Renewed Motion to Suppress Evidence Recovered During the Search of the Barbara Lane Location, ECF No. 121; Motion to Suppress Fruits of Law Enforcement Use of Cell-Site Simulator, ECF No. 122; Motion to Suppress Cell Phones at Arrest Location, ECF No. 123; and Motions *in Limine* to Exclude the Expert Testimony, Cellular Analysis Report, and Charts of Special Agent Mathew Wilde, ECF Nos. 39 and 74, are each denied.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  June 30, 2021

_____
BERYL A. HOWELL
Chief Judge